UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of ACCENT DELIGHT
INTERNATIONAL LTD. and XITRANS FINANCE LTD.
for an Order Under 28 U.S.C. § 1782 to
Conduct Discovery for Use in Foreign Proceedings.

Case No. 16 Misc. 125

### APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS

1. Based upon the concurrently filed Memorandum of Law and Declaration of Daniel J. Kornstein, Petitioners Accent Delight International Ltd. ("Accent") and Xitrans Finance Ltd. ("Xitrans") (together, "Petitioners") request this Court to endorse the Order annexed as Exhibit A to the Kornstein Declaration, which grants Petitioners leave, pursuant to 28 U.S.C. § 1782 and Rules 26 and 45 of the Federal Rules of Civil Procedure, to serve Respondents Warren Adelson, Alexander Parish, Robert Simon, and Sotheby's with the subpoenas annexed as Exhibit B to the Kornstein Declaration.

2. The requested relief is for the purpose of obtaining limited, but necessary, discovery in aid of criminal and civil proceedings currently pending in Monaco, France, and Singapore (the "Foreign Proceedings").

3. Petitioners seek evidence to support allegations that Yves Bouvier (an art intermediary), together with his corporation (MEI Invest Ltd.), one of his associates (Tania Rappo), and their agents, defrauded Petitioners of approximately $1 billion for the sale of thirty-eight art masterworks they obtained on Petitioners' behalf. The parties from whom discovery is sought are the New York sellers of one of these paintings, Leonardo da Vinci's *Christ as Salvator Mundi* (Warren Adelson, Alexander Parish, and Robert Simon), and Sotheby's, which brokered that sale and others.

1

4. This is the second application for discovery in this Court in aid of the French and Monégasque proceedings. Bouvier commenced an action here in September 2015 to obtain documents and testimony concerning, among other things, the New York sale of a painting by Amedeo Modigliani that Bouvier obtained for Petitioners. *See In re Application of Yves Bouvier and MEI Invest Ltd.*, 1:15-MC-00312-DLC (S.D.N.Y. 2015). Bouvier sought this discovery for use in the same proceedings in Monaco and France. On December 9, 2015, Judge Cote authorized Bouvier to obtain documents and deposition testimony concerning the sale of the Modigliani painting.

**The International Art Transactions**

5. The Foreign Proceedings concern whether Bouvier defrauded Petitioners of approximately $1 billion by misrepresenting to Petitioners the prices at which and the negotiations through which he had obtained works of art while acting as Petitioners' representative in a series of thirty-seven transactions from 2003 to 2014. Through these transactions, Petitioners acquired a collection of thirty-eight art masterworks (the "Works"), including paintings by Picasso, Van Gogh, Rothko, Modigliani, and da Vinci, at a cost in excess of $2 billion.[1] Unbeknownst to Petitioners, the true acquisition price of these paintings was approximately half—that is, $1 billion instead of $2 billion. Petitioners contend that Bouvier was acting as Petitioners' representative and agent in these transactions and therefore had a fiduciary obligation to report accurately to Petitioners and to obtain the best possible price for Petitioners.

6. Bouvier was first introduced to Petitioners through a mutual connection, Tania Rappo. As the godmother of one of Rybolovlev's daughters, Rappo was considered a family member, which allowed her to foster Rybolovlev's trust in Bouvier. Over the course of the next

---

[1] A complete list of the Works is annexed as Exhibit C to the Kornstein Declaration.

eleven years, Bouvier and his company, MEI Invest, worked on behalf of the Petitioners to acquire the Works. Typically, Bouvier would arrange for the purchase transaction and would collect a 2% commission based upon the purchase price of each Work. Bouvier was also secretly paying Rappo on each transaction for her efforts to maintain his fraudulent relationship with Petitioners. Over the years, these secret payments to Rappo totaled approximately $100 million: far more than the total commissions Bouvier charged Petitioners. And the payments to Rappo were dwarfed by the sums that Bouvier secretly pocketed for himself by misrepresenting to Petitioners the purchase prices of the Works.

7. Petitioners finally uncovered Bouvier's massive fraud in late 2014, and less than two weeks later initiated a criminal proceeding in Monaco against Bouvier.

8. Despite the existence of an agency relationship between the parties, Bouvier asserts in his defense that he acted as the owner and seller of the Works and owed no duty to Petitioners. In this capacity, Bouvier reasons, he was free to charge whatever price purchasers would pay for the artworks and collect commission fees as well.

9. But Bouvier was acting as Petitioners' agent when he advised Petitioners about which works to buy at what prices, and then negotiated for and obtained the Works on their behalf. Bouvier held himself out to Petitioners as an intermediary acting on a fiduciary basis—not as a seller in the marketplace—and therefore misled them and breached his duties to them by making misrepresentations and withholding material information concerning the purchase of the Works. A seller cannot serve as an agent of the buyers, providing advice to the buyers, while simultaneously negotiating against the seller—i.e., himself—on the buyers' behalf.

10. For example, Bouvier acquired Gustave Klimt's *Wasserschlangen II* (Water Serpents II) on Petitioners' behalf in 2012 for $112 million. Petitioners contend that Bouvier

falsely represented to them that after hard-fought negotiations he acquired the painting for $183.8 million. Based on these false representations, Bouvier defrauded Petitioners of almost $72 million on this transaction. For example, Bouvier falsely claimed in one email exchange: "They're holding back for 180 and are at the breaking point; I think they are ready at 190. But I should be able to twist them to reach 185 . . . ." When Petitioners' representative informed Bouvier that Petitioners would purchase the painting for up to $185 million, Bouvier falsely stated that he had succeeded in reaching a deal at $183.8 million.

11. Similarly, Bouvier acquired Mark Rothko's *No. 6 (Violet, Green, and Red)* on Petitioners' behalf in 2014 for $80 million. Bouvier falsely represented to Petitioners that he had acquired the painting on their behalf for €140 million (approximately $180 million using the exchange rate at the time). In his communications with Petitioners' representative, Bouvier again described fabricated negotiations that had never occurred: "After a long discussion and difficult negotiation, I got 140 million euros, but with a financial commitment." Bouvier told Petitioners that €140 million was a "very good deal," when in fact he had secretly acquired the painting for less than half that price, defrauding Petitioners of approximately $100 million in the process.

**The da Vinci Transaction**

12. Much of the discovery sought in this application relates to one transaction that took place in New York and involved a painting by Leonardo da Vinci called *Christ as Salvator Mundi*.

13. Bouvier acquired *Christ as Salvator Mundi* for Petitioners in May 2013 for between $75 and $80 million from a three-person consortium (Alexander Parish, Warren Adelson, and Robert Simon), *see* Kornstein Decl. Ex. D, in a private sale brokered by Sotheby's. Bouvier falsely told Petitioners that the acquisition price was $127.5 million and thereby induced

4

Petitioners to pay him $47.5 to $52.5 million more than the actual acquisition price. In emails sent by Bouvier to Petitioners' representative, Bouvier described fabricated hard-nosed negotiations with the seller of the painting. For example, Bouvier falsely represented that Petitioners' $100 million offer was "rejected without a moment's hesitation," and that the seller is "[o]ne tough nut, but I'll fight and take as long as necessary." Bouvier also falsely claimed that the deal was "[c]linched at 127.5. Terribly difficult, but it's a very good deal with regard to this unique masterpiece by Leonardo."

14. Bouvier also charged Petitioners a commission of $1.275 million, reduced to 1% of the purchase price from the usual 2% because the painting had been first offered to Petitioners by another intermediary. Bouvier asked to take over the deal, and the commission was reduced to 1% according to Bouvier to prevent the overall price charged to Petitioners from becoming excessive.

**Sotheby's Involvement in the da Vinci Transaction**

15. Nearly a year later, in March 2014, the *New York Times* reported that *Christ as Salvator Mundi* had been sold in May 2013 by the same three-person consortium for between $75 million and $80 million—more than $45 million less than the purchase price Bouvier identified to Petitioners. The private transaction, the *Times* reported, was brokered by Sotheby's. *See* Kornstein Decl. Ex. E.

16. Bouvier never disclosed any details to Petitioners concerning the Sotheby's acquisition of *Christ as Salvator Mundi*, which apparently took place concurrently with the negotiations he described to Petitioners for the same Work. Petitioners only learned about the *New York Times* article in or around November 2014.

5

17. Rybolovlev confronted Bouvier with the *New York Times* article in or around November 2014, and Bouvier claimed it was inaccurate. In January 2015, after Rybolovlev confronted him with the article documenting the sale at Sotheby's for $75 million to $80 million, Bouvier obtained an estimate of the painting's value from Sotheby's. *See* Kornstein Decl. Ex. F. In a twenty-page document, Sotheby's provided its opinion that the estimated value of *Christ as Salvator Mundi* was €100 million—equivalent to approximately $129.7 million at May 2013 exchange rates. In its valuation, Sotheby's did not discuss Bouvier's purchase of the painting for $75 to $80 million in May 2013 in a transaction it had brokered. Nor did Sotheby's explain why its valuation matched Bouvier's confidential sale price to Petitioners, rather than the price at the private sale brokered by Sotheby's that was more than $45 million lower.

18. Petitioners later learned that Jean-Marc Peretti, a friend and associate of Bouvier, represented Bouvier in negotiations preceding the Sotheby's sale of *Christ as Salvator Mundi*. Peretti met with the sellers and a Sotheby's representative in Paris to discuss *Christ as Salvator Mundi*. Peretti worked on Bouvier's behalf to persuade the sellers to reduce their price.

**Sotheby's Involvement in Other Transactions**

19. Sotheby's also brokered other transactions in which Bouvier acquired certain Works on Petitioners' behalf. For example, on November 14, 2011, a Sotheby's representative emailed Bouvier to follow up on their recent conversation concerning "the current market for Surrealist works and the market for [René] Magritte in particular." Kornstein Decl. Ex. G. Bouvier forwarded this email to Petitioners' representative and suggested the purchase of Magritte's surrealist painting *Le domaine d'Arnheim*. *See id.* Three weeks later, on December 5, 2011, Accent acquired *Le domaine d'Arnheim* with Bouvier's assistance.

20. Documentary evidence also indicates that Bouvier purchased Klimt's

6

*Wasserschlangen II* on behalf of Petitioners through Sotheby's. *See* Kornstein Decl. Ex. H. Bouvier falsely represented to Petitioners that he had purchased this Work for $183.8 million after extensive negotiations, when in fact he had purchased it for $112 million with the assistance of Sotheby's. In October 2014, Sotheby's provided Bouvier with a valuation of *Wasserschlangen II* that estimated its value as $180 million. *See* Kornstein Decl. Ex. I.

21.     When Bouvier was arrested in connection with the proceedings in Monaco, police recovered from Bouvier a USB flash drive containing a Sotheby's logo, the scanned signatures of two Sotheby's representatives, and a photograph of the painting *Otahi* (Alone) by Paul Gaugin. *See* Kornstein Decl. Ex. J. Bouvier acquired *Otahi* for Petitioners in 2013 at the purported price of $120 million. Sotheby's later estimated the value of *Otahi* at exactly $120 million. Petitioners do not know the true acquisition price of *Otahi*, but when Pettioners resold the painting, they were only able to recoup less than $50 million, despite the purported acquisition price of $120 million and Sotheby's matching valuation.

22.     Sotheby's provided a valuation of another painting Bouvier acquired for Petitioners entitled *Nude with a Green Shawl* by Henri Matisse. *See* Kornstein Decl. Ex. K. Bouvier acquired this painting for Petitioners at the purported price of $85 million. Sotheby's later estimated the value of *Nude with a Green Shawl* at exactly $85 million. Petitioners do not know the price at which Bouvier acquired this painting.

23.     Sotheby's also has a demonstrable connection to at least two other Works involved in the dispute between Petitioners and Bouvier: Rothko's *No. 6* and *Au Lit: Le Baiser* by Henri Toulouse-Lautrec. In approximately December 2014, Petitioners instructed Bouvier to arrange a sale of certain Works at prices similar to those Petitioners had paid for the Works. Bouvier refused, likely because he knew the open market would not support the fraudulently

inflated prices he had charged Petitioners. Bouvier did, however, arrange to sell *Au Lit: Le Baiser* by public auction at Sotheby's. Bouvier then refused to transfer the proceeds of that sale to Petitioners, claiming that he was entitled to them as partial satisfaction of the fraudulently inflated purchase price for *No. 6*. Bouvier also refused to transfer title to *No. 6* to Petitioners.

24. Because Bouvier actively concealed material details concerning his acquisition of the Works, Petitioners do not know with certainty how many of the Works were acquired by Bouvier with Sotheby's involvement, or whether Bouvier paid any undisclosed commission to Sotheby's or to any employee of Sotheby's out of his hidden margins.

**The Foreign Proceedings**

25. As Bouvier's misrepresentations and deliberate omissions came to light, Petitioners started criminal proceedings against him and Rappo in Monaco; joined criminal proceedings initiated against him by a third party in France; and filed a civil action against him, MEI Invest, and Rappo in Singapore.

26. In Monaco, Petitioners initiated a criminal proceeding against Bouvier for alleged forgery and fraud in January 2015. *Dossier JI No. Cab1/15/04, PG n°2015/000039* (Principality of Monaco); *see* Kornstein Decl. Ex. L, at 8. Thereafter, the Monaco authorities sought the appointment of an investigating magistrate, who brought charges for fraud and complicity in money laundering against Bouvier and for money laundering against Rappo.

27. Petitioners and Rybolovlev's daughter, Ekaterina Rybolovleva, joined the Monaco proceedings as civil parties in February 2015. Kornstein Decl. Ex. M, at 1. Under Monégasque procedure, Petitioners may, upon request to the investigating magistrate, submit evidence in connection with the criminal proceeding in Monaco.

28. French criminal proceedings concerning the ownership of two of the Works,

8

Pablo Picasso's *Tête de femme* and *Espagnole à l'éventail*, were initiated by Mrs. Catherine Hutin-Blay, Picasso's stepdaughter. *See generally* Kornstein Decl. Ex. N. According to Mrs. Hutin-Blay, these paintings were stolen from her. Petitioner Accent Delight International Ltd., which bought the two Picasso paintings through Bouvier, joined these proceedings as a "civil party" (victim). The appointed investigating magistrate brought charges against Bouvier for repeated handling of stolen goods. The proceedings are ongoing, and the investigating magistrate is authorized to investigate theft, fraud, money laundering, and breach of trust offenses.

29.     Finally, Petitioners commenced a proceeding in Singapore against Bouvier, MEI Invest, and Rappo in March 2015, *Accent Delight Int'l and Xitrans Finance Ltd. v. Bouvier, MEI Invest Ltd. and Rappo*, HC/S 236/2015 (High Court of the Republic of Singapore). In the Singapore proceedings, Petitioners assert claims against Bouvier for, among other things, breach of fiduciary duty, fraudulent misrepresentation, breach of duty to deliver Rothko's *No. 6*, and wrongful retention of the proceeds of the sale of Tolouse-Lautrec's *Au Lit: Le Baiser*. Bouvier and MEI Invest have moved to stay the Singapore action in favor of a new proceeding in Switzerland on the basis of *forum non conveniens*, while Rappo moved to stay the Singapore proceedings in favor of the Monaco proceedings. The court in Singapore denied these motions on March 17, 2016. As a condition of denying the requested stay, the court in Singapore will require Petitioners and Ekaterina Rybolovleva to withdraw their civil claims in Monaco. The criminal proceedings initiated by Petitioners in Monaco will continue, and Petitioners will be able to provide the investigating magistrate with evidence.

30.     In the Singapore action, Petitioners sought a worldwide injunction to prevent Bouvier and MEI Invest from disposing of any of their assets up to $500 million, wherever in the world such assets were located. After the lower court granted the injunction, the Court of Appeal

of Singapore (Singapore's highest court) reversed and discharged the injunction on August 21, 2015. While it found that the totality of the circumstances on the limited record weighed against an injunction (mainly because there was insufficient evidence of the risk of dissipation of assets), the court held that "there is a good arguable case of dishonesty on Bouvier's part." Kornstein Decl. Ex. O, at 28.

**Bouvier's New York 28 U.S.C. § 1782 Application**

31. On September 25, 2015, Bouvier filed an application in this Court, under 28 U.S.C. § 1782, to obtain documents and deposition testimony from Sanford Heller and his companies (The Heller Group LLC and Sanford Heller Fine Art LLC). *See In re Application of Yves Bouvier and MEI Invest Ltd.*, 1:15-MC-00312-DLC (S.D.N.Y. 2015). Bouvier sought discovery from the Heller respondents in New York concerning, among other things, the sale of the painting *Nu couché au coussin bleu* (Nude on a blue cushion) by Amedeo Modigliani.

32. Bouvier acquired *Nu couché au coussin bleu* for Petitioners in 2012 for the purported price of $118 million. In December 2014, however, Heller told Rybolovlev that he had arranged the December sale of that painting to Petitioners through Bouvier for $95 million. This disclosure led Rybolovlev to realize that Bouvier had defrauded Petitioners of more than $20 million.

33. In October 2014, Sotheby's provided Bouvier with a valuation estimating the value of *Nu couché au coussin bleu* as $110 million. Kornstein Decl. Ex. P.

34. In his application pursuant to 28 U.S.C. § 1782, Bouvier sought documents from the Heller respondents relating to their dealings with Rybolovlev. On December 9, 2015, Judge Cote granted the application in part. Kornstein Decl. Ex. Q. Judge Cote amended her order on December 11, 2015. Kornstein Decl. Ex. R. Judge Cote authorized Bouvier to obtain documents

relating to the Heller respondents' involvement in the sale of *Nu couché au coussin bleu* and to depose Heller for one hour concerning his December 2014 conversation with Rybolovlev. *See id.* Judge Cote denied Bouvier's application to the extent it sought discovery relating to Heller's subsequent role as a consulting expert to Rybolovlev in connection with other Works, and to the extent it sought privileged material. *See id.*

**The Instant Application Under 28 U.S.C. § 1782**

35. Petitioners here meet all the statutory criteria for the issuance of an order allowing the requested discovery under 28 U.S.C. § 1782. The documents sought from Respondents concerning the sale of *Christ as Salvator Mundi*, and the additional documents sought from Sotheby's concerning the sale of other Works, are directly relevant to the core issues in the Foreign Proceedings. As victims, plaintiffs, and civil parties in the Foreign Proceedings, Petitioners are "interested persons." On information and belief, all of the targets of this discovery—the three sellers and the broker—are found within this District. Moreover, as set forth in Petitioners' Memorandum of Law filed simultaneously herewith, the discretionary factors to be considered favor granting this application. *See Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 264-65 (2004) (describing discretionary factors).

36. Petitioners must obtain these materials as soon as possible for use in the ongoing Foreign Proceedings.

37. Accordingly, Petitioners request that the Court grant this application for an Order (in the form annexed as Exhibit A to the Kornstein Declaration) granting them leave to serve Respondents with the subpoenas annexed to the Kornstein Declaration as Exhibit B.

Dated: March 25, 2016
      New York, New York

                                      EMERY CELLI BRINCKERHOFF
                                      & ABADY LLP

                                      /s/ Daniel J. Kornstein
                                      Daniel J. Kornstein
                                      O. Andrew F. Wilson
                                      600 Fifth Avenue, 10th Floor
                                      New York, New York 10020
                                      (212) 763-5000

                                      *Attorneys for Petitioners Accent Delight*
                                      *International Ltd. and Xitrans Finance Ltd.*