UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of ACCENT DELIGHT INTERNATIONAL LTD. and XITRANS FINANCE LTD. for an Order Under 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings. | Case No. 16 Misc. 125 |

**PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782
TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS**

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## TABLE OF CONTENTS

**PAGE NO.**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ......................................................................................................................... 2

      The da Vinci Transaction ................................................................................................... 4

      Sotheby's Involvement in the da Vinci Transaction ......................................................... 5

      Sotheby's Involvement in Other Transactions .................................................................. 6

      The Foreign Proceedings .................................................................................................. 8

      Bouvier's New York 28 U.S.C. § 1782 Application ....................................................... 10

ARGUMENT ............................................................................................................................. 11

I.      THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782 ARE MET ..................... 12

II.     THE DISCRETIONARY FACTORS FAVOR PRODUCTION ..................................... 13

CONCLUSION .......................................................................................................................... 16

# TABLE OF AUTHORITIES

**PAGE NO(s)**

Cases

*Brandi-Dohrn v. IKB Deutsche Industriebank AG,*
    673 F.3d 76 (2d Cir. 2012).................................................................................. 12, 13

*Euromepa S.A. v. R. Esmerian, Inc.,*
    51 F.3d 1095 (2d Cir. 1995).................................................................................. 14

*In re Application for an Order Pursuant to 28 U.S.C. § 1782,*
    773 F.3d 456 (2d Cir. 2015).................................................................................. 12

*In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf,*
    No. M 19-88, 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006)................................ 14

*In re Application of Hornbeam Corp.,*
    14-MC-424, 2014 WL 8775453 (S.D.N.Y. Dec. 24, 2014) .................................. 15

*In re Application of Microsoft Corp.,*
    428 F. Supp. 2d 188 (S.D.N.Y. 2006).................................................................... 16

*In re Application of Sumar,*
    123 F.R.D. 467 (S.D.N.Y. 1988) ........................................................................... 15

*In re Application of Yves Bouvier and MEI Invest Ltd.,*
    No. 1:15-MC-312-DLC (S.D.N.Y. 2015)................................................... 1, 10, 15

*Intel Corp. v. Advanced Micro Devices, Inc.,*
    542 U.S. 241 (2004)........................................................................... 11, 12, 13, 14

*Lancaster Factoring Co. Ltd. v. Mangone,*
    90 F.3d 38 (2d Cir. 1996)....................................................................................... 11

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP,*
    376 F.3d 79 (2d Cir. 2004)..................................................................................... 13

Statutes

28 U.S.C. § 1782.............................................................................................................*passim*

Petitioners Accent Delight International Ltd. and Xitrans Finance Ltd. submit this memorandum of law in support of their application for an Order, under 28 U.S.C. § 1782, to conduct discovery for use in criminal and civil proceedings in Monaco, France, and Singapore (the "Foreign Proceedings").

## PRELIMINARY STATEMENT

This application requests discovery in aid of Foreign Proceedings concerning one of the largest art frauds in history. Petitioners seek evidence in this district to support allegations that Yves Bouvier (an art intermediary), together with his corporation (MEI Invest Ltd.), one of his associates (Tania Rappo), and their agents, defrauded Petitioners of approximately $1 billion for the sale of thirty-eight masterworks they obtained on Petitioners' behalf. The parties from whom discovery is sought are the New York sellers of one of these paintings, Leonardo da Vinci's *Christ as Salvator Mundi* (Warren Adelson, Alexander Parish, and Robert Simon), and Sotheby's, which brokered that sale and others.

This is the second application for discovery in this Court in aid of the French and Monégasque proceedings. Bouvier commenced an action here in September 2015 to obtain documents and testimony concerning, among other things, the New York sale of a painting by Amedeo Modigliani that Bouvier obtained for Petitioners. *See In re Application of Yves Bouvier and MEI Invest Ltd.*, 1:15-MC-00312-DLC (S.D.N.Y. 2015). Bouvier sought this discovery for use in the same proceedings in Monaco and France. In December 2015, Judge Cote authorized Bouvier to obtain documents and deposition testimony relating to the sale of the Modigliani painting from New York art dealer Sanford Heller and his companies.

Just as in the previous Bouvier petition, Petitioners here satisfy the statutory requirements that allow this Court to grant an application under 28 U.S.C. § 1782, and the circumstances

presented weigh in favor of the Court exercising its discretion to do so. Accordingly, Petitioners request that the Court endorse the Proposed Order annexed to the Declaration of Daniel J. Kornstein, dated March 25, 2016 ("Kornstein Decl."), as Exhibit A, granting Petitioners leave to serve the subpoenas annexed to the Kornstein Declaration as Exhibit B on Respondents Warren Adelson, Alexander Parish, Robert Simon, and Sotheby's.[1]

## BACKGROUND

The Foreign Proceedings concern whether Bouvier defrauded Petitioners of approximately $1 billion by misrepresenting to Petitioners the prices at which and the negotiations through which he had obtained works of art while acting as Petitioners' representative in a series of thirty-seven transactions from 2003 to 2014. Through these transactions, Petitioners acquired a collection of thirty-eight art masterworks (the "Works"), including paintings by Picasso, Van Gogh, Rothko, Modigliani, and da Vinci, at a cost in excess of $2 billion.[2] Petition ¶ 5. Unbeknownst to Petitioners, the true acquisition price of these paintings was approximately half—that is, $1 billion instead of $2 billion. *Id.* Petitioners contend that Bouvier was acting as Petitioners' representative and agent in these transactions and therefore had a fiduciary obligation to report accurately to Petitioners and to obtain the best possible price for Petitioners. *Id.*

Bouvier was first introduced to Petitioners' authorized representative, Dmitry Rybolovlev, through a mutual connection, Tania Rappo. *Id.* ¶ 6. As the godmother of one of Rybolovlev's daughters, Rappo was considered a family member, which allowed her to foster Rybolovlev's trust in Bouvier. *Id.* Over the course of the next eleven years, Bouvier and his company, MEI Invest, worked on behalf of Petitioners to acquire the Works. *Id.* Typically,

---

[1]    Exhibits A-R are attached to the Kornstein Declaration.
[2]    A complete list of the Works is annexed as Exhibit C to the Kornstein Declaration.

Bouvier would arrange for the purchase transaction and would collect a 2% commission based upon the purchase price of each Work. *Id.* Bouvier was also secretly paying Rappo on each transaction for her efforts to maintain his fraudulent relationship with Petitioners. *Id.* Over the years, these secret payments to Rappo totaled approximately $100 million: far more than the total commissions Bouvier charged Petitioners. *Id.* And the payments to Rappo were dwarfed by the sums that Bouvier secretly pocketed for himself by misrepresenting to Petitioners the purchase prices of the Works. *Id.*

Petitioners finally uncovered Bouvier's massive fraud in late 2014, and less than two weeks later initiated a criminal proceeding in Monaco against Bouvier. *Id.* ¶ 7.

Despite the existence of an agency relationship between the parties, Bouvier asserts in his defense that he acted as the owner and seller of the Works and owed no duty to Petitioners. *Id.* ¶ 8. In this capacity, Bouvier contends, he was free to charge whatever price purchasers would pay for the artworks and collect commission fees as well. *Id.*

But Bouvier was acting as Petitioners' agent when he advised Petitioners about which works to buy at what prices, and then negotiated for and obtained the Works on their behalf. *Id.* ¶ 9. Bouvier held himself out to Petitioners as an intermediary acting on a fiduciary basis—not as a seller in the marketplace—and therefore misled them and breached his duties to them by making misrepresentations and withholding material information concerning the purchase of the Works. *Id.* A seller cannot serve as an agent of the buyers, providing advice to the buyers, while simultaneously negotiating against the seller—i.e., himself—on the buyers' behalf. *Id.*

For example, Bouvier acquired Gustave Klimt's *Wasserschlangen II* (Water Serpents II) on Petitioners' behalf in 2012 for $112 million. *Id.* ¶ 10. Petitioners contend that Bouvier falsely represented to them that after hard-fought negotiations he acquired the painting for $183.8

million. *Id.* Based on these false representations, Bouvier defrauded Petitioners of almost $72 million on this transaction. *Id.* For example, Bouvier falsely claimed in one email exchange: "They're holding back for 180 and are at the breaking point; I think they are ready at 190. But I should be able to twist them to reach 185 . . . ." *Id.* When Petitioners' representative informed Bouvier that Petitioners would purchase the painting for up to $185 million, Bouvier falsely stated that he had succeeded in reaching a deal at $183.8 million. *Id.*

Similarly, Bouvier acquired Mark Rothko's *No. 6 (Violet, Green, and Red)* on Petitioners' behalf in 2014 for $80 million. *Id.* ¶ 11. Bouvier falsely represented to Petitioners that he had acquired the painting on their behalf for €140 million (approximately $180 million using the exchange rate at the time). *Id.* In his communications with Petitioners' representative, Bouvier again described fabricated negotiations that had never occurred: "After a long discussion and difficult negotiation, I got 140 million euros, but with a financial commitment." *Id.* Bouvier told Petitioners this was a "very good deal," when in fact he had secretly acquired the painting for less than half that price, defrauding Petitioners of approximately $100 million in the process. *Id.*

**The da Vinci Transaction**

Much of the discovery sought in this application relates to one transaction that took place in New York and involved a painting by Leonardo da Vinci called *Christ as Salvator Mundi*. *Id.* ¶ 12.

Bouvier acquired *Christ as Salvator Mundi* for Petitioners in May 2013 for between $75 and $80 million from a three-person consortium (Alexander Parish, Warren Adelson, and Robert Simon), *see* Kornstein Decl. Ex. D, in a private sale brokered by Sotheby's. Petition ¶ 13. Bouvier falsely told Petitioners that the acquisition price was $127.5 million and thereby induced

Petitioners to pay him $47.5 to $52.5 million more than the actual acquisition price. *Id.* In emails

sent by Bouvier to Petitioners' representative, Bouvier described fabricated hard-nosed

negotiations with the seller of the painting. *Id.* For example, Bouvier falsely represented that

Petitioners' $100 million offer was "rejected without a moment's hesitation," and that the seller

is "[o]ne tough nut, but I'll fight and take as long as necessary." *Id.* Bouvier also falsely claimed

that the deal was "[c]linched at 127.5. Terribly difficult, but it's a very good deal with regard to

this unique masterpiece by Leonardo."[3] *Id.*

**Sotheby's Involvement in the da Vinci Transaction**

Nearly a year later, in March 2014, the *New York Times* reported that *Christ as Salvator

Mundi* had been sold in May 2013 by the same three-person consortium for between $75 million

and $80 million—more than $45 million less than the purchase price Bouvier identified to

Petitioners. *See* Kornstein Decl. Ex. E; Petition ¶ 15. The private transaction, the *Times* reported,

was brokered by Sotheby's. *See* Kornstein Decl. Ex. E.

Bouvier never disclosed any details to Petitioners concerning the Sotheby's acquisition of

*Christ as Salvator Mundi*, which apparently took place concurrently with the negotiations he

described to Petitioners for the same work. Petition ¶ 16. Petitioners only learned about the *New

York Times* article in or around November 2014. *Id.*

Rybolovlev confronted Bouvier with the *New York Times* article in or around November

2014, and Bouvier claimed it was inaccurate. *Id.* ¶ 17. In January 2015, after Rybolovlev

confronted him with the article documenting the sale at Sotheby's for $75 million to $80 million,

---

[3]     Bouvier also charged Petitioners a commission of $1.275 million, reduced to 1% of the
purchase price from the usual 2% because the painting had been first offered to Petitioners by
another intermediary. Bouvier asked to take over the deal, and the commission was reduced to
1% according to Bouvier to prevent the overall price charged to Petitioners from becoming
excessive. Petition ¶ 14.

Bouvier obtained an estimate of the painting's value from Sotheby's. *See* Kornstein Decl. Ex. F; Petition ¶ 17. In a twenty-page document, Sotheby's provided its opinion that the estimated value of *Christ as Salvator Mundi* was €100 million—equivalent to approximately $129.7 million at May 2013 exchange rates. *See* Kornstein Decl. Ex. F. In its valuation, Sotheby's did not discuss Bouvier's purchase of the painting for $75 to $80 million in May 2013 in a transaction it had brokered. *See id*. Nor did Sotheby's explain why its valuation matched Bouvier's confidential sale price to Petitioners, rather than the price at the private sale brokered by Sotheby's that was more than $45 million lower. *See id*.

Petitioners later learned that Jean-Marc Peretti, a friend and associate of Bouvier, represented Bouvier in negotiations preceding the Sotheby's sale of *Christ as Salvator Mundi*. Petition ¶ 18. Peretti met with the sellers and a Sotheby's representative in Paris to discuss *Christ as Salvator Mundi*. *Id.* Peretti worked on Bouvier's behalf to persuade the sellers to reduce their price. *Id.*

**Sotheby's Involvement in Other Transactions**

Sotheby's also brokered other transactions in which Bouvier acquired certain Works on Petitioners' behalf. *Id.* ¶ 19. For example, on November 14, 2011, a Sotheby's representative emailed Bouvier to follow up on their recent conversation concerning the market for surrealist works, and particularly those by René Magritte. *See* Kornstein Decl. Ex. G. Bouvier forwarded this email to Petitioners' representative and suggested the purchase of Magritte's surrealist painting *Le domaine d'Arnheim*. *See id.* Three weeks later, Petitioners acquired *Le domaine d'Arnheim* with Bouvier's assistance. Petition ¶ 19.

Documentary evidence also indicates that Bouvier purchased Klimt's *Wasserschlangen II* on behalf of Petitioners through Sotheby's. *See* Kornstein Decl. Ex. H; Petition ¶ 20. Bouvier

falsely represented to Petitioners that he had purchased this Work for $183.8 million after extensive negotiations, when in fact he had purchased it for $112 million with the assistance of Sotheby's. Petition ¶¶ 10, 20. In October 2014, Sotheby's provided Bouvier with a valuation of *Wasserschlangen II* that estimated its value as $180 million. *See* Kornstein Decl. Ex. I; Petition ¶ 20.

When Bouvier was arrested in connection with the proceedings in Monaco, police recovered from Bouvier a USB flash drive containing a Sotheby's logo, the scanned signatures of two Sotheby's representatives, and a photograph of the painting *Otahi* (Alone) by Paul Gaugin. *See* Kornstein Decl. Ex. J; Petition ¶ 21. Bouvier acquired *Otahi* for Petitioners in 2013 at the purported price of $120 million. Petition ¶ 21. Sotheby's later estimated the value of *Otahi* at exactly $120 million. *Id.* Petitioners do not know the true acquisition price of *Otahi*, but when Petitioners resold the painting, they were only able to recoup less than $50 million, despite the purported acquisition price of $120 million and Sotheby's matching valuation. *Id.*

Sotheby's provided a valuation of another painting Bouvier acquired for Petitioners entitled *Nude with a Green Shawl* by Henri Matisse. *See* Kornstein Decl. Ex. K; Petition ¶ 22. Bouvier acquired this painting for Petitioners at the purported price of $85 million. Petition ¶ 22. Sotheby's later estimated the value of *Nude with a Green Shawl* at exactly $85 million. Kornstein Decl. Ex. K. Petitioners do not know the true price at which Bouvier acquired this painting. Petition ¶ 22.

Sotheby's also has a demonstrable connection to at least two other Works involved in the dispute between Petitioners and Bouvier: Rothko's *No. 6* and *Au Lit: Le Baiser* by Henri Toulouse-Lautrec. *Id.* ¶ 23. In approximately December 2014, Petitioners instructed Bouvier to arrange a sale of certain Works at prices similar to those Petitioners had paid for the Works. *Id.*

Bouvier refused, likely because he knew the open market would not support the fraudulently inflated prices he had charged Petitioners. *Id.* Bouvier did, however, arrange to sell *Au Lit: Le Baiser* by public auction at Sotheby's. *Id.* Bouvier then refused to transfer the proceeds of that sale to Petitioners, claiming that he was entitled to them as partial satisfaction of the fraudulently inflated purchase price for *No. 6. Id.* Bouvier also refused to transfer title to *No. 6* to Petitioners. *Id.*

Because Bouvier actively concealed material details concerning his acquisition of the Works, Petitioners do not know with certainty how many of the Works were acquired by Bouvier with the involvement of Sotheby's, or whether Bouvier paid any undisclosed commission to Sotheby's or to any employee of Sotheby's out of his hidden margins. *Id.* ¶ 24.

**The Foreign Proceedings**

As Bouvier's misrepresentations and deliberate omissions came to light, Petitioners started criminal proceedings against him and Rappo in Monaco; joined criminal proceedings initiated against him by a third party in France; and filed a civil action against him, MEI Invest, and Rappo in Singapore. *Id.* ¶ 25.

In Monaco, Petitioners initiated a criminal proceeding against Bouvier for alleged forgery and fraud in January 2015, *Dossier JI No. Cab1/15/04, PG n°2015/000039* (Principality of Monaco). *See* Kornstein Decl. Ex. L, at 8; Petition ¶ 26. Thereafter, the Monaco authorities sought the appointment of an investigating magistrate, who brought charges for fraud and complicity in money laundering against Bouvier and for money laundering against Rappo. Petition ¶ 26.

Petitioners and Rybolovlev's daughter, Ekaterina Rybolovleva, joined the Monaco proceedings as civil parties in February 2015. Kornstein Decl. Ex. M; Petition ¶ 27. Under

Monégasque procedure, Petitioners may, upon request to the investigating magistrate, submit evidence in connection with the criminal proceeding in Monaco. Petition ¶ 27.

French criminal proceedings concerning the ownership of two of the Works, Pablo Picasso's *Tête de femme* and *Espagnole à l'éventail*, were initiated by Mrs. Catherine Hutin-Blay, Picasso's stepdaughter. Petition ¶ 28; *see generally* Kornstein Decl. Ex. N. According to Mrs. Hutin-Blay, these paintings were stolen from her. Petition ¶ 28. Petitioner Accent Delight International Ltd., which bought the two Picasso paintings through Bouvier, joined these proceedings as a "civil party" (victim). *Id*. The appointed investigating magistrate brought charges against Bouvier for repeated handling of stolen goods. *Id.* The proceedings are ongoing, and the investigating magistrate is authorized to investigate theft, fraud, money laundering, and breach of trust offenses. *Id.*

Finally, Petitioners commenced a civil action in Singapore against Bouvier, MEI Invest, and Rappo in March 2015, *Accent Delight Int'l and Xitrans Finance Ltd. v. Bouvier, MEI Invest Ltd. and Rappo*, HC/S 236/2015 (High Court of the Republic of Singapore). Petition ¶ 29. In the Singapore proceedings, Petitioners assert claims against Bouvier for, among other things, breach of fiduciary duty, fraudulent misrepresentation, breach of duty to deliver Rothko's *No. 6*, and wrongful retention of the proceeds of the sale of Tolouse-Lautrec's *Au Lit: Le Baiser*.[4] *Id.* Bouvier and MEI Invest moved to stay the Singapore action on the basis of *forum non conveniens* in favor of a new proceeding in Switzerland, while Rappo moved to stay the

---

[4]     In the Singapore action, Petitioners sought a worldwide injunction to prevent Bouvier and MEI Invest from disposing of any of their assets up to $500 million, wherever in the world such assets were located. Petition ¶ 30. After the lower court granted the injunction, the Court of Appeal of Singapore (Singapore's highest court) reversed and discharged the injunction on August 21, 2015. *See* Kornstein Decl. Ex. O; Petition ¶ 30. While it found that the totality of the circumstances on the limited record weighed against an injunction (mainly because there was insufficient evidence of the risk of dissipation of assets), the court held that "there is a good arguable case of dishonesty on Bouvier's part." Kornstein Decl. Ex. O, at 28.

Singapore proceedings in favor of the Monaco proceedings. *Id*. The court in Singapore denied

these motions on March 17, 2016. *Id*. As a condition of denying the requested stay, the court will

require Petitioners and Ekaterina Rybolovleva to withdraw their civil claims in Monaco. *Id*. The

criminal proceedings initiated by Petitioners in Monaco will continue, and Petitioners will be

able to provide the investigating magistrate with evidence. *Id*.

**Bouvier's New York 28 U.S.C. § 1782 Application**

On September 25, 2015, Bouvier filed an application in this Court, under 28 U.S.C. §

1782, to obtain documents and deposition testimony from Sanford Heller and his companies

(The Heller Group LLC and Sanford Heller Fine Art LLC). *See In re Application of Yves*

*Bouvier and MEI Invest Ltd.*, 1:15-MC-00312-DLC (S.D.N.Y. 2015); Petition ¶ 31. Bouvier

sought discovery from the Heller respondents in New York concerning, among other things, the

sale of the painting *Nu couché au coussin bleu* (Nude on a blue cushion) by Amedeo Modigliani.

Petition ¶ 31.

Bouvier acquired *Nu couché au coussin bleu* for Petitioners in 2012 for the purported

price of $118 million. *Id*. ¶ 32. In December 2014, however, Heller told Rybolovlev that he had

arranged the December sale of that painting to Petitioners through Bouvier for $95 million. *Id*.

This disclosure led Rybolovlev to realize that Bouvier had defrauded Petitioners of more than

$20 million. *Id*. In October 2014, Sotheby's provided Bouvier with a valuation estimating the

value of *Nu couché au coussin bleu* as $110 million. Kornstein Decl. Ex. P; Petition ¶ 33.

In his application pursuant to 28 U.S.C. § 1782, Bouvier sought documents from the

Heller respondents relating to their dealings with Rybolovlev. Petition ¶ 34. Judge Cote granted

the application in part on December 9, 2015, Kornstein Decl. Ex. Q, and amended her order on

December 11, 2015, Kornstein Decl. Ex. R; Petition ¶ 34. Judge Cote authorized Bouvier to

obtain documents relating to the Heller respondents' involvement in the sale of *Nu couché au coussin bleu* and to depose Heller for one hour concerning his December 2014 conversation with Rybolovlev. *See id*. Judge Cote denied Bouvier's application to the extent it sought discovery relating to Heller's subsequent role as a consulting expert to Rybolovlev in connection with other Works, and to the extent it sought privileged material. *See id.*

## ARGUMENT

This application for discovery should be granted because the statutory factors of 28 U.S.C. § 1782 are satisfied and the discretionary factors to be considered weigh in its favor.

Federal courts may grant discovery within the United States for use in a foreign proceeding, under 28 U.S.C. § 1782(a):

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made . . . upon the application of any interested person.

The goals of the statute "are to provide equitable and efficacious discovery procedures in United States courts for the benefit of tribunals and litigants involved in litigation with international aspects, and to encourage foreign countries by example to provide similar means of assistance to [United States] courts." *Lancaster Factoring Co. v. Mangone*, 90 F.3d 38, 41 (2d Cir. 1996) (internal quotation marks, citations and alterations omitted). "In pursuit of these twin goals, the section has, over the years, been given increasingly broad applicability." *Id.* (internal quotation marks omitted).

Where a court finds that the statutory requirements of 28 U.S.C. § 1782 are satisfied, it may, in its discretion, grant an application for discovery. *See Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 264-65 (2004).

11

I.      **THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782 ARE MET**

Courts are authorized to grant an application made under 28 U.S.C. § 1782 where "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012). Petitioners' application satisfies all three statutory requirements.

First, all four Respondents reside in this District. All of the individual sellers—Parish, Adelson, and Simon—reside in this District, and Sotheby's principal place of business is in Manhattan. Kornstein Decl. ¶ 3.

Second, the discovery sought is for use in foreign proceedings pending in Monaco, France, and Singapore. All of these proceedings satisfy the requirement for a foreign proceeding. *See* 28 U.S.C. §1782(a) (referring to discovery "for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation"); *In re Application for an Order Pursuant to 28 U.S.C. § 1782*, 773 F.3d 456, 461 (2d Cir. 2015) (the "criminal investigation in the instant case is exactly the type of proceeding that the 1996 amendments to [28 U.S.C. § 1782] were intended to reach").

Third, Petitioners are "interested persons" authorized to bring this application because they have initiated the Foreign Proceedings or joined them as civil parties. As victims, plaintiffs, and civil parties in the proceedings in Monaco, France, and Singapore, Petitioners are permitted to present evidence. And given the significant financial harm Petitioners have suffered (approximately $1 billion), they have "a reasonable interest in obtaining judicial assistance" from the foreign tribunals. *Intel Corp.*, 542 U.S. at 256 (internal quotation marks omitted). Each Petitioner is therefore an "interested person" under the statute.

Accordingly, the elements necessary to permit the Court to order discovery under 28 U.S.C. § 1782 are all present here. The objects of discovery are found in this district. And Judge Cote has already concluded that Bouvier, the defendant and indicted person in the Foreign Proceedings, satisfies the statutory requirements—as do the French and Monégasque proceedings themselves. The Court should now conclude that the same procedings and Petitioners, who are victims, plaintiffs, and civil parties in those proceedings, satisfy the same requirements in seeking reciprocal discovery from other New York art dealers and brokers.

## II.    THE DISCRETIONARY FACTORS FAVOR PRODUCTION

"Once the statutory requirements [of 28 U.S.C. § 1782] are met, a district court is free to grant discovery in its discretion." *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83-84 (2d Cir. 2004) (internal quotation marks and alterations omitted). The Supreme Court has identified a number of factors that courts are to consider in ruling on a § 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceeding underway abroad, and the receptivity of the foreign court to federal-court assistance; (3) whether the application conceals an attempt to circumvent the proof-gathering restrictions of a foreign country; and (4) whether the application is unduly intrusive or burdensome. *See Intel Corp.*, 542 U.S. at 264-65; *Brandi-Dohrn*, 673 F.3d at 80-81. Here, all of these factors weigh in favor of granting Petitioners' application.

First, where, as here, discovery is sought from a party who is not participating in the foreign proceeding, the need for court-ordered discovery is apparent. "A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence. In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's

jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel Corp.*, 542 U.S. at 264 (citations omitted). None of the Respondents is a party to any of the Foreign Proceedings and thus the tribunals in Monaco, France, and Singapore do not have jurisdiction to acquire from them the document discovery that Petitioners seek here. *See* Kornstein Decl. ¶ 4 & Ex. R. These materials directly bear on the issues at the core of the Foreign Proceedings—the veracity of Bouvier's representations to Petitioners and the amount of damages Petitioners suffered as a result of Bouvier's fraudulent misrepresentations— and this application is the most efficient means of ensuring these materials are available for use in the Foreign Proceedings.

The second factor identified by the Supreme Court—the nature of the foreign proceeding and the receptivity of the foreign tribunal to federal court assistance—requires courts to consider "(1) whether United States assistance would offend the foreign country, and (2) whether the material sought is admissible in the foreign tribunal." *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, No. M19-88, 2006 WL 3844464, at *6 (S.D.N.Y. Dec. 29, 2006) (citations omitted). In weighing these factors, courts may only rely on "authoritative proof." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995). Here, there is no evidence that the discovery sought in this application would "offend" Monaco, France, or Singapore. Nor is there any indication that the documents sought would be inadmissible in those proceedings. To the contrary, the documents are sought from witnesses with knowledge that is central to the charges brought and claims filed against Bouvier, his company, and his associate. Given their relevance to the proceedings, Petitioners have good reason to believe that these documents could, and would, be considered. *See* Kornstein Decl. ¶ 5. Indeed, Bouvier has already received this Court's authorization to obtain documents from persons and entities in New York relating to the sale of

Modgliani's *Nu couché au coussin bleu*, *see* Kornstein Decl. Ex. R, and Bouvier agrees that the French and Monegaque tribunals are "receptive to receiving, and have previously received, Section 1782 discovery," ECF No. 9, at 12, 1:15-MC-00312-DLC (S.D.N.Y. Oct. 5, 2015). The parties to the Foreign Proceedings therefore concur that documentary evidence obtained by subpoena from persons in New York may be appropriate for use in certain of those proceedings.

The third factor also suggests that discovery should be granted, as this application is not an attempt to circumvent any foreign proof-gathering restrictions. The documents sought arise from arm's length negotiations over the sale of a painting. No materials would otherwise be covered by privilege.

The fourth factor is satisfied because this application is not burdensome. With respect to Respondents Adelson, Parish, and Simon, Petitioners are seeking documents relating to the negotiations over and sale of a single painting that took place over the course of several months. These requests are for a specific, discrete set of documents that are readily identifiable. *See In re Application of Olga Sumar*, 123 F.R.D. 467, 472-73 (S.D.N.Y. 1988) (finding that a subpoena and order issued under 28 U.S.C. § 1782 were "neither unreasonable nor oppressive" where they were "sufficiently specific" and specified "with reasonable particularity the subjects to which the documents relate"); Kornstein Decl. Ex. B (the proposed subpoenas). With respect to Sotheby's, Petitioners seek a somewhat larger set of documents relating to the sale of any of the thirty-eight Works. However, it appears unlikely that Sotheby's played a role in the sale of all of these Works, and it is does not place an undue burden on a large public corporation to produce documents relating to several discrete, specific consumer transactions, especially in light of the documents' significant probative value. *See In re Application of Hornbeam Corp.*, No. 14-MC-424, 2014 WL 8775453, at *3 (S.D.N.Y. Dec. 24, 2014) (request to major banks for wire transfer

records for all transactions involving a series of entities not unduly burdensome); *id.* at *5 (court may consider probative value of requested discovery in determining burdensomeness). Nor are any of the documents sought by Petitioners privileged or otherwise protected by law. *See In re Application of Microsoft Corp.*, 428 F. Supp. 2d 188, 196 (S.D.N.Y. 2006) (discovery request unduly burdensome insofar as it seeks privileged documents or documents that are confidential under foreign regulations).

Therefore, all of the factors identified by the Supreme Court militate in favor of the Court exercising its discretion to grant Petitioners the discovery they seek. By authorizing Bouvier to obtain documents from the Heller respondents for use in the Foreign Proceedings, Judge Cote has already concluded that the tribunals in Monaco and France are receptive to the assistance of the United States federal courts and that issuing subpoenas to persons in this District does not circumvent those tribunals' restrictions on proof-gathering. *See* Kornstein Decl. Ex. R. Here, as in Bouvier's application, the Respondents are not parties to the Foreign Proceedings. And, consistent with the scope of discovery authorized by Judge Cote, Petitioners seek tailored document discovery relating to transactions at issue in the Foreign Proceedings. *See id.* The Court should exercise its discretion to permit Petitioners to conduct discovery reciprocal to the discovery that Bouvier, their adversary, has already been authorized to conduct.

## CONCLUSION

Petitioners request the Court endorse the Proposed Order annexed to the Kornstein Declaration as Exhibit A, which grants leave, under 28 U.S.C. § 1782, to serve the subpoenas annexed to the Kornstein Declaration as Exhibit B.

Dated: March 25, 2016
     New York, New York

                EMERY CELLI BRINCKERHOFF
                & ABADY LLP

                Daniel J. Kornstein
                O. Andrew F. Wilson
                600 Fifth Avenue, 10th Floor
                New York, New York 10020
                (212) 763-5000

                *Attorneys for Petitioners Accent Delight International Ltd. and Xitrans Finance Ltd.*

17