# Exhibit O

This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.

# Bouvier, Yves Charles Edgar and another
## v
# Accent Delight International Ltd and another and another appeal

## [2015] SGCA 45

Court of Appeal — Civil Appeals Nos 80 and 81 of 2015, and Summonses Nos 235 and 256 of 2015
Sundaresh Menon CJ, Chao Hick Tin JA and Andrew Phang Boon Leong JA
6–7 July 2015

Injunctions — Mareva injunctions — Discharge

21 August 2015                                                Judgment reserved.

**Sundaresh Menon CJ (delivering the judgment of the court):**

### Introduction

1       Judges and lawyers, when speaking of Mareva injunctions, often allude to the famous description of them as one of the "nuclear weapons" of civil litigation: *Bank Mellat v Nikpour* [1985] FSR 87 at 92 *per* Donaldson LJ (as he then was). A worldwide Mareva injunction is that and even more. The reach of such an injunction, stretching far beyond the geographical confines of the jurisdiction of the court making the order, is such that it can have a crippling effect on those against whom it is directed. This underscores the need to scrutinise the basis for such an injunction with utmost care.

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

2     Even the English courts, which, in 1975, had been the first to articulate the court's power to grant Mareva injunctions (see *Nippon Yusen Kaisha v Karageorgis and another* [1975] 1 WLR 1093 at 1095 *per* Lord Denning MR), for some time resisted extending the exercise of that power to assets worldwide (see *Ashtiani and another v Kashi* [1987] 1 QB 888 at 899F–899G and 900G–902B *per* Dillon LJ). The English Court of Appeal departed from this only in 1988 in a trilogy of judgments handed down within just over a month of each other, namely: *Babanaft International Co SA v Bassatne and another* [1990] 1 Ch 13; *Republic of Haiti and others v Duvalier and others* [1990] 1 QB 202 ("*Republic of Haiti v Duvalier*"); and *Derby & Co Ltd and others v Weldon and others (No 1)* [1990] 1 Ch 49 ("*Derby v Weldon (No 1)*").

3     Lawrence Collins, writing before his elevation to the bench, described this trilogy of cases as the English Court of Appeal's response to the widespread abolition of exchange controls and the growth of offshore tax havens for cash and securities. These developments, he said, "made it easier for defaulters involved in international business to make themselves judgment proof, and for dishonest fiduciaries to enjoy the illegal fruits of breaches of trust": "The Territorial Reach of Mareva Injunctions" (1989) 105 LQR 262 at p 262.

4     The present case concerns two appeals brought by three well-heeled appellants against the refusal of a High Court judge ("the Judge") to set aside worldwide Mareva injunctions and ancillary disclosure orders that she had earlier made *ex parte* against them. The appellants are involved in international business and operate through companies, some of which are incorporated in offshore tax havens. The respondents' claims against the

*Bouvier, Yves Charles Edgar v*                                    [2015] SGCA 45
*Accent Delight International Ltd*

appellants include allegations that the latter were fraudulent or had dishonestly
breached their fiduciary duties. The sums involved are also sizeable. The
cumulative value of the assets subject to the worldwide Mareva injunctions is
US$1.1bn.

5       The central question in these appeals is whether it has been sufficiently
shown that there is a real risk that the appellants will dissipate their assets to
frustrate the enforcement of an anticipated judgment of the court. This
requirement lies at the heart of the court's power to grant Mareva injunctions.
In our judgment, the respondents have failed to establish that risk. For this and
other reasons, which we elaborate on below, we allow both appeals and set
aside the Mareva injunctions as well as the ancillary disclosure orders made
against the appellants.

**The facts**

*The parties*

6       The appellants in Civil Appeal No 80 of 2015 are Yves Charles Edgar
Bouvier and MEI Invest Limited ("MEI Invest"). Mr Bouvier is a Swiss
businessman who runs an art-related transport and storage business. He also
invests and deals in art. He resides in Singapore and holds a Singapore
permanent residency. Mr Bouvier has control over and often acts through MEI
Invest, a company incorporated in the Hong Kong Special Administrative
Region. He also holds substantial shareholdings in companies across multiple
jurisdictions, including the British Virgin Islands ("BVI"), Seychelles and the
Isle of Man.

7       The appellant in Civil Appeal No 81 of 2015 is Tania Rappo. She plays
a subsidiary part in the dispute between the parties. She resides in Monaco and
holds dual Swiss and Bulgarian citizenships. Her assets appear to be located
predominantly in Monaco and are held in the names of Monegasque
companies. Her assets are managed by asset management agencies in Monaco.

8       The respondents in both appeals are Accent Delight International Ltd
("Accent Delight") and Xitrans Finance Ltd ("Xitrans Finance"). Both are
BVI companies owned wholly by the family trusts of a well-known Russian
billionaire, Dmitry Rybolovlev. The trusts are constituted under Cypriot law.
The respondents appear to be controlled by Mr Rybolovlev, or at the very
least, have issued powers of attorney for Mr Rybolovlev to act on their behalf.
Mr Rybolovlev resides in Monaco. He was previously resident in Switzerland
until 2011.

*Outline of the dispute between the parties*

9       The dispute between the parties arises out of the respondents'
acquisition of 38 art masterpieces between 2003 and 2014. These are highly-
prized pieces and include the works of Picasso, van Gogh, da Vinci,
Modigliani and Rothko. All the acquisitions were arranged (to use a neutral
term) by Mr Bouvier, who was responsible for locating and obtaining the
artworks that the respondents wished to purchase. Mr Bouvier in turn acted
through either MEI Invest (which was the case for most of the 38 acquisitions)
or one of his associated companies. As it is not necessary to distinguish
between MEI Invest and these associated companies for the purposes of the
present appeals, we shall, for ease of narration, refer solely to MEI Invest as
the corporate vehicle which Mr Bouvier used in respect of the acquisition of
the 38 artworks.

t

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

10     The respondents contend that unbeknownst to them until late 2014, when it came to light, Mr Bouvier had secured these artworks at prices that were considerably less than those at which he told the respondents he had secured them. The nub of the dispute between Mr Bouvier and the respondents comes down to the capacity in which Mr Bouvier was acting when he arranged the respondents' acquisitions. Was Mr Bouvier acting as an *agent* who negotiated for and obtained the target artworks on behalf of the respondents, and who therefore owed the latter fiduciary duties? Or was Mr Bouvier acting as an *independent seller* transacting at arm's length with the respondents, such that he was entitled to sell the artworks to the respondents at the highest price he thought they would pay?

11     This dispute as to the true nature of the relationship between Mr Bouvier and the respondents is the subject of Suit No 236 of 2015 ("the Singapore action"), in which the respondents are the plaintiffs and the appellants are the defendants. The worldwide Mareva injunctions and ancillary disclosure orders mentioned at [4] above were obtained by the respondents in support of the claims which they make in that suit. The appellants have separately applied for a stay of the Singapore action on the ground of *lis alibi pendens* or *forum non conveniens*. These applications are pending and have been fixed to be heard by a High Court judge.

12     We will begin by tracing the relationship between Mr Bouvier and the respondents, which will set the context for their dispute. Next, we will set out the history of the litigation between the parties. It began in Monaco and eventually found its way to Singapore. The respondents also appear to have commenced related proceedings in France and Hong Kong. We will then

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

consider the orders that were made in the court below by the Judge before explaining our decision in these appeals.

## The acquisition of the 38 artworks

13      Mr Rybolovlev began collecting art in the early part of this century. He was introduced to Mr Bouvier in 2003 by Mrs Rappo on Mr Bouvier's request. Mrs Rappo was a close family friend of the Rybolovlevs and is the godmother of one of Mr Rybolovlev's children.

14      From the time of their introduction in 2003, Mr Bouvier played a critical role in helping Mr Rybolovlev build his private art collection. The 38 artworks which the latter acquired (using the respondents as his corporate vehicles) were all purchased through Mr Bouvier (acting through MEI Invest). These transactions appear to have followed a common pattern. Once Mr Rybolovlev confirmed his interest in a particular artwork, Mr Bouvier would locate it and try to persuade the owner to agree to sell it. The paperwork suggested that the artwork would be purchased by MEI Invest from the original owner; MEI Invest would then issue a sales invoice to either of the respondents for the purchase price. Once MEI Invest received payment, it would deliver the artwork to the respondents. The respondents paid Mr Bouvier a sum equivalent to 2% of the value of the artwork on each transaction that he arranged. The respondents say that this was a commission and was the extent of the profit that Mr Bouvier was entitled to earn on each transaction. Mr Bouvier, however, says that this was only an administrative fee paid to cover expenses such as shipment, storage and other miscellaneous expenses.

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                        [2015] SGCA 45

15      As a result of the way in which the transactions were arranged, the
respondents acquired the 38 artworks from MEI Invest without knowing the
identity of the original sellers from whom MEI Invest had obtained the
artworks. Mr Bouvier was the only person whom the respondents dealt with. It
appears that Mr Rybolovlev decided to make all his acquisitions through
Mr Bouvier because it was more convenient than sourcing for each piece
separately through multiple dealers. The only difference in the way the
transactions were arranged over the years is that the earlier few were
documented in formal written contracts between MEI Invest as the seller and
the respondent concerned as the buyer, and these appear to have been
specifically negotiated. This gave way to more informal dealings through
emails and invoices that served to document the transactions, and this came to
characterise all the transactions subsequent to 2007 or 2008.

16      It is not clear whether the acquisitions over the years were initiated by
Mr Bouvier or Mr Rybolovlev. Mr Bouvier paints Mr Rybolovlev as an art
aficionado who had definite ideas as to what he liked and formed his own
opinions as to which masterpieces he wished to acquire. Mr Bouvier claims
that it was always Mr Rybolovlev who gave instructions as to the artworks he
wished to purchase. The respondents, on the other hand, say that the spark for
their acquisitions invariably came from Mr Bouvier. On their version of the
events, Mr Bouvier would inform Mr Rybolovlev or his principal
intermediary, Mikhail Anatolievitch Sazonov, of the opportunity to acquire
artworks whenever this arose. Mr Bouvier would also advise Mr Rybolovlev
and Mr Sazonov as to the approximate value of the artwork in question and the
price at which it could be obtained. We digress to mention that Mr Sazonov is
a business associate of Mr Rybolovlev. He is employed by the Rybolovlev
family trusts and was the sole director of Xitrans Finance, the second

respondent in these appeals, until 2009. Mr Sazonov was the main
representative of the respondents in their dealings with Mr Bouvier. This was
because both Mr Sazonov and Mr Bouvier were conversant in English and
French, whereas Mr Rybolovlev spoke only Russian. Mr Sazonov affirmed the
affidavits that were filed on behalf of the respondents in these proceedings.

17      On either version of the facts, Mr Bouvier's role in the acquisition of
the 38 artworks was a crucial one. It appears that buyers and sellers of art
masterpieces prize secrecy and discretion, and as a result, masterpieces usually
change hands in discreet private sales, presumably so that the wealth of the
parties concerned will not be made public. But, this also means that the
ownership of many of these paintings is opaque. Mr Bouvier was able to
locate the target artworks, identify their owners and make the acquisitions
concerned due to his extensive network of contacts in the international art
market. The respondents say that this climate of secrecy and discretion was the
reason why they never had any direct dealings with the original sellers of the
artworks, and why the acquisitions were routed through MEI Invest. This also
protected Mr Rybolovlev's privacy as the ultimate purchaser of these
artworks.

18      Mr Bouvier's contacts arose from his well-established business
conducted through the Natural Le Coultre group of companies, which
specialises in the storage, packing and shipping of artworks. Natural Le
Coultre operates out of the Geneva "freeport", which is a secure and
confidential facility used by the wealthy to store expensive artworks, fine
wines and other luxury items. Mr Bouvier is credited with having successfully
transplanted the freeport model from Geneva to Singapore and Luxembourg.

**Mr Bouvier and Mr Rybolovlev fall out with each other**

19      Mr Bouvier and Mr Rybolovlev fell out with each other in late 2014. They disagree over how this came to pass.

20      Mr Bouvier says that in September 2014, Mr Rybolovlev ran into financial difficulties following his divorce settlement and was unable to finance the purchase of a Rothko, *No 6 (Violet, vert et rouge)*. The purchase of that artwork was the last acquisition that Mr Bouvier arranged for the respondents. MEI Invest did not receive the full purchase price of €140m from Accent Delight, and so did not deliver the masterpiece to the respondents. This apparently upset Mr Rybolovlev, and caused his relationship with Mr Bouvier to sour.

21      The respondents, on the other hand, say that Mr Bouvier and Mr Rybolovlev fell out with each other when the latter discovered that Mr Bouvier had been fraudulently inflating the prices of artworks that he had acquired for and on behalf of the respondents. On 31 December 2014, Mr Rybolovlev apparently found out that a Modigliani which Accent Delight had obtained through Mr Bouvier in January 2012 for US$118m had in fact been sold by the original seller for only US$93.5m. This meant that MEI Invest had sold the painting to Accent Delight at more than US$24m in excess of the price that it had paid for the painting. Mr Rybolovlev claims that he discovered this at a meeting which he had with an art expert, Sanford Heller, on 31 December 2014. Mr Heller was the art dealer representing the original seller of the Modigliani in that transaction, and he therefore knew the price at which it had in fact been sold. Sometime in late 2014, Mr Rybolovlev also discovered that the respondents had fallen for a similar ruse in respect of a da Vinci, *Le Christ comme Salvator Mundi* ("*Salvator Mundi*"), which had

9

*Bouvier, Yves Charles Edgar v .*
*Accent Delight International Ltd*                              [2015] SGCA 45

been bought through Mr Bouvier in May 2013. Accent Delight paid MEI
Invest US$127.5m for the painting, which MEI Invest had obtained from the
original seller for a sum of between US$75m and US$80m. According to the
respondents, this is what led to the breakdown of Mr Rybolovlev's
relationship with Mr Bouvier.

22      The respondents say that by selling the paintings at undisclosed mark-
ups, Mr Bouvier had breached the fiduciary duties which he owed them as
their agent. Mr Bouvier, they say, was in Mr Rybolovlev's "inner circle" and
was someone whom Mr Rybolovlev and the respondents trusted. Mr Bouvier
negotiated the price of the paintings on the respondents' behalf and was not
entitled to profit from the transactions beyond the 2% commission that he was
paid by the respondents.

23      The respondents also allege that Mr Bouvier's "fraud [or] deceit is not
limited to [these two paintings] but extends to all, or many of, the other
paintings which [the respondents] purchased through him". We shall refer to
the mark-ups that Mr Bouvier imposed as "the Excess Payments". The Excess
Payments are said to amount in total to around US$1bn. In the Singapore
action, the respondents make personal claims against Mr Bouvier and MEI
Invest for breach of fiduciary duties and dishonest assistance respectively.
There are also conspiracy claims against both Mr Bouvier and MEI Invest.
The respondents alternatively assert a proprietary interest in the Excess
Payments and their traceable proceeds.

24      Mr Bouvier does not dispute having received the Excess Payments. His
position is that he was perfectly entitled to receive those payments.
Mr Bouvier denies having acted as the respondents' agent. According to him,

10

the transactions between MEI Invest and the respondents took place on a "willing buyer-willing seller basis", with the respondents as the purchasers and MEI Invest as the seller. Mr Bouvier, through MEI Invest, would acquire any artwork that Mr Rybolovlev expressed sufficient interest in. Mr Bouvier would bear all the "risks of the acquisition" of the artwork from the original seller. If Mr Rybolovlev eventually decided not to purchase the artwork or if there were defaults in the payment obligations to Mr Bouvier, then Mr Bouvier would be solely and wholly liable to the original seller for the artwork. Mr Bouvier therefore says that he was entitled to sell the artworks to the respondents at any price which he wanted to. The respondents obtained the masterpieces, which were precisely what they wanted, and these were all transacted at the prices they had agreed to pay.

*Mrs Rappo's involvement*

25     Mrs Rappo was drawn into the dispute because she received payments from Mr Bouvier upon the completion of each acquisition that Mr Bouvier arranged with or for the respondents. Mrs Rappo is alleged to have received tens of millions of euros from Mr Bouvier in this way. The respondents say that Mrs Rappo "must have known what Mr Bouvier [was] up to". They also suggest that she deliberately concealed from the Rybolovlevs the fact that she was receiving payments from Mr Bouvier. In the Singapore action, the respondents make personal claims against Mrs Rappo for knowing receipt and conspiracy. They assert, alternatively, a proprietary interest in the payments made by Mr Bouvier to Mrs Rappo out of the Excess Payments and their traceable proceeds.

26     Mr Bouvier and Mrs Rappo do not deny having, respectively, made and received these payments. However, they say that these payments were

11

innocuous. Mr Bouvier's position is that he paid Mrs Rappo because he considered her to be a "business finder". She had a good relationship with Mr Rybolovlev and could have influenced Mr Rybolovlev away from transacting with Mr Bouvier if she had wanted to. As for Mrs Rappo, she says that the payments were to be seen as a "commercial arrangement" and represented a "finder's fee" that Mr Bouvier paid her. As far as she was aware, the payment of such fees was a regular practice in the art world. She had never actively concealed the fact of these payments from the Rybolovlevs. On the other hand, she never considered that she was under any obligation to inform them of the payments.

### The proceedings in Monaco

27     These events eventually culminated in the respondents filing a criminal complaint against Mr Bouvier "and any participant" in the Principality of Monaco on 9 January 2015 for fraud and complicity in money laundering. The criminal complaint set in motion a chain of investigative and judicial proceedings in Monaco. The Monaco authorities commenced initial investigations into the complaint on 12 January 2015. This in turn led to Mrs Rappo being investigated for money laundering on the basis that she was a "participant" in Mr Bouvier's activities. On 24 February 2015, the Monaco Public Prosecutor's Office requested the appointment of an investigating judge and also requested the investigating judge to initiate proceedings against Mr Bouvier and Mrs Rappo. It appears that during this period up to the time of their subsequent arrest, Mr Bouvier and Mrs Rappo were not aware of the criminal complaint or the investigations.

28     Mr Bouvier was arrested by the Monaco police in a sting operation on 25 February 2015 at Mr Rybolovlev's Monaco residence. Mr Rybolovlev had

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

invited Mr Bouvier to his home under the pretext of discussing business. The
Monaco police lay in wait at Mr Rybolovlev's residence and arrested
Mr Bouvier when he arrived. Mr Bouvier was detained for questioning for
three days, and was only released on 28 February 2015 on bail of €10m and
with reporting conditions. Mrs Rappo was also arrested by the Monaco police
and brought before an investigating judge for questioning on 25 February
2015. She was similarly detained for three days, and was released from police
custody on 28 February 2015 with reporting conditions. The Monaco
authorities have frozen Mrs Rappo's bank accounts in Monaco in the wake of
the proceedings there.

### The proceedings in Singapore

29     On 12 March 2015, the respondents commenced the Singapore action
and simultaneously applied *ex parte* to the Singapore High Court for Mareva
injunctions and ancillary disclosure orders against the appellants. This was a
little less than two weeks after Mr Bouvier and Mrs Rappo had been released
from detention in Monaco. The appellants were not given notice of either the
application or the hearing. On the same day (*ie*, 12 March 2015), the Judge
granted the Mareva injunctions and the ancillary disclosure orders sought. She
also gave leave for the court papers to be served either out of jurisdiction or
through substituted means. In addition, orders were made for the delivery up
of the Rothko, *No 6 (Violet, vert et rouge)*.

30     The worldwide Mareva injunctions against Mr Bouvier, MEI Invest
and Mrs Rappo prevented them from disposing or dealing with any of their
assets in Singapore or worldwide up to the sums of US$500m (in respect of
each of Mr Bouvier and MEI Invest) and US$100m (in Mrs Rappo's case)
respectively. There were also orders requiring them to disclose their assets

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                              [2015] SGCA 45

worldwide and other documents relating to the subject matter of the parties'
dispute.

31      Mr Bouvier, MEI Invest and Mrs Rappo applied to set aside the
Mareva injunctions and the ancillary disclosure orders. Their applications
("the appellants' setting-aside applications") were heard *inter partes* by the
Judge on 25 March, 6–8 and 10 April 2015. The Judge did not set aside either
the Mareva injunctions or the ancillary disclosure orders, but attenuated them.
Among other things, the carve-outs built into the Mareva injunctions for
Mr Bouvier's and Mrs Rappo's ordinary expenses were increased to €50,000
per month. Exceptions were also made for the payment of the legal fees of the
appellants' solicitors.

32      In addition, the scope of the ancillary disclosure orders was pared
down and conditions were imposed on the disclosure of information. These
conditions were put in place to meet the appellants' concern that the
respondents would make public the disclosed information or use it for
improper purposes. The ancillary disclosure orders were made conditional on
an undertaking by the respondents' solicitors that the affidavits filed pursuant
to those orders would be disclosed only to them (*ie*, the respondents'
solicitors) and no one else unless leave from the court was obtained. These
conditions prevented the disclosed information from being released to even the
respondents or their foreign lawyers, except for Ms Tetiana Bersheda, the
respondents' Swiss lawyer who was at that time (and currently is still)
instructing their Singapore solicitors. The Judge also ordered the respondents
to fortify their undertaking as to damages by providing a banker's guarantee in
the sum of US$20m.

14

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                    [2015] SGCA 45

33      It is against these orders that Mr Bouvier, MEI Invest and Mrs Rappo
have appealed. We did not have the benefit of a reasoned judgment from the
Judge because of the expedition with which these appeals were brought and
heard. We were nonetheless assisted by the Judge's comprehensive notes of
the arguments made at the *inter partes* hearing of the appellants' setting-aside
applications.

**The issues before this court**

34      Two broad issues arise for our consideration. The first is whether the
requirements for the grant of Mareva relief have been satisfied. The second is
whether we should alternatively grant interlocutory proprietary injunctions to
prevent the appellants from dealing with the Excess Payments and their
traceable proceeds pending the resolution of the dispute. In respect of the
latter, we note that the summons which the respondents filed in the court
below in applying for the Mareva injunctions did not include a prayer for
interlocutory proprietary injunctions. The respondents, nonetheless, presented
arguments on such injunctions before the Judge, although ultimately, no orders
were made on it. Each of the two broad issues we have just outlined in turn
raises subsidiary factual and legal issues. We will elaborate on these
subsidiary issues together with the parties' submissions in the course of our
analysis.

35      Mr Bouvier and MEI Invest were jointly represented in the court below
as well as in these appeals. As their positions are aligned, we will use
Mr Bouvier as shorthand for both unless it is necessary to distinguish between
them. Thus, when we refer to the respondents' claims and the Mareva
injunction against Mr Bouvier, we include their claims and the Mareva
injunction against MEI Invest; references to Mr Bouvier's assets include MEI

15

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                    [2015] SGCA 45

Invest's assets; and so on. This is purely for the sake of convenience, and is not the result of a finding that there is no separate personality between them. Also before us were two applications by Mrs Rappo. One was for the introduction of further evidence on appeal, which the respondents consented to. The other was for a stay, pending the resolution of these appeals, of the disclosure orders made against her by the Judge, which she has yet to comply with. We make no order on the latter application since it has become academic in the light of our decision to allow these appeals.

**Whether the requirements for the grant of Mareva relief have been satisfied**

36     The requirements for the grant of Mareva relief are well established. Two are relevant to these appeals, namely: (a) a good arguable case on the merits of the plaintiff's claim; and (b) a real risk that the defendant will dissipate his assets to frustrate the enforcement of an anticipated judgment of the court (referred to hereafter as a "real risk of dissipation" for short where appropriate to the context). A good arguable case is one which is "more than barely capable of serious argument, but not necessarily one which the judge considers would have a better than 50 per cent chance of success": *Ninemia Maritime Corporation v Trave Schiffahrtgesellschaft GmbH* [1983] 2 Lloyd's Rep 600 at 605 *per* Mustill J. In respect of a real risk of dissipation, there must be some "solid evidence" to demonstrate the risk, and not just bare assertions to that effect: *Guan Chong Cocoa Manufacturer Sdn Bhd v Pratiwi Shipping SA* [2003] 1 SLR(R) 157 at [18] *per* Chao Hick Tin JA.

37     Worldwide Mareva injunctions have rightly been said to be exceptional, but the same rationale and test informs the grant of a Mareva injunction, whether over assets within the jurisdiction or over assets without.

16

Lord Donaldson of Lymington MR put it this way in *Derby & Co Ltd and others v Weldon and others (Nos 3 and 4)* [1990] 1 Ch 65 at 79D–79F:

> ... [T]he key requirement for any *Mareva* injunction, *whether or not it extends to foreign assets*, is that it shall accord with the rationale upon which *Mareva* relief has been based in the past. That rationale, legitimate purpose and fundamental principle I have already stated, namely, that no court should permit a defendant to take action designed to frustrate subsequent orders of the court. If for the achievement of this purpose it is *necessary* to make orders concerning foreign assets, such orders should be made, subject, of course, to ordinary principles of international law. [emphasis added]

While the legal test for a worldwide Mareva injunction may be the same as that for a Mareva injunction over assets within the jurisdiction, the circumstances that will have to be established in order to cross the threshold of necessity will likely be more exacting where a worldwide Mareva injunction is concerned.

38     The appellants challenge the satisfaction of both requirements set out at [36] above. For reasons that will become apparent, we are unimpressed by their arguments that there is no good arguable case on the merits of the respondents' claims against them. The main focus at the hearing of these appeals was, instead, on the real risk of dissipation. We will address, first, the arguments made by Mr Bouvier and then the arguments made by Mrs Rappo, because they engage somewhat different factual considerations. We should also add that the analysis at [39]–[142] below proceeds on the assumption that Singapore law governs the respondents' claims as that is the basis on which the arguments were presented to us. We are nonetheless aware that there are cogent arguments that Swiss law should govern the respondents' claims instead. These arguments on the applicable law are touched on in greater detail

in the context of our analysis of the respondents' alternative request for interlocutory proprietary injunctions.

### The arguments by Mr Bouvier

*Overview*

39     Mr Bouvier says that there is no real risk of dissipation in his case for three main reasons. The first is his international standing. He runs a successful, well-established and reputable business that operates in multiple countries. Second, Mr Bouvier relies on his punctilious compliance with the asset disclosures ordered by the Judge. This, he contends, evinces his intention to "participate fully in [the] proceedings and to clear his name [through] the legal process". Third, Mr Bouvier says that a good arguable case of dishonesty is by itself insufficient to give rise to a real risk of dissipation. He argues that the High Court decision of *Spectramed Pte Ltd v Lek Puay Puay* [2010] SGHC 112 ("*Spectramed*") is wrong. *Spectramed* is a decision which, on one reading, appears to obviate the requirement of showing a real risk of dissipation once the court is satisfied that a good arguable case of dishonesty or unconscionability on the defendant's part has been established.

40     The respondents advance the contrary position, also in three parts. First, they contend that they have established a good arguable case of dishonesty against Mr Bouvier, in that he perpetrated the sophisticated fraud which lies at the heart of their claims in the Singapore action. This alone warrants an inference of a real risk of dissipation. The respondents say that *Spectramed* is consistent with authority and does "no more than apply the general principles" pertaining to Mareva injunctions. Second, the respondents highlight that Mr Bouvier is a sophisticated international businessman who is

capable of moving about large sums of money globally. In this regard, the respondents point to his shareholdings in companies across multiple jurisdictions. Third, the respondents argue that Mr Bouvier has been untruthful in his asset disclosures. This contributes to the degree of risk of dissipation by Mr Bouvier.

41    In our judgment, the Mareva injunction against Mr Bouvier should be discharged, and we arrive at this conclusion for these reasons. We accept that the respondents have established a good arguable case of dishonesty against Mr Bouvier, but it cannot be put higher than that. And it is insufficient to stop there. Rather, it is necessary to go further and inquire into the nature of the dishonesty that is alleged. As we see it, the nature of the dishonesty that is alleged against Mr Bouvier is not such that it can in itself fairly ground an inference of a real risk of dissipation. We are also not persuaded that the bare fact that Mr Bouvier operates through companies internationally is on its own relevant. The combined effect of these points is that the respondents have failed to establish a real risk that Mr Bouvier will dissipate his assets. We deal with these points in the two sections that follow (*ie*, [44]–[97] below).

42    We also find that the respondents' argument predicated on Mr Bouvier's asset disclosures is wrong in principle and is, in any event, unconvincing. We deal with this argument in the third section that follows (*ie*, [98]–[106] below).

43    The final reason why we discharge the Mareva injunction against Mr Bouvier is that it was an abuse of the court's process, and we deal with this point in the fourth and final section (at [107]–[130] below) of our analysis of Mr Bouvier's arguments.

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

*Good arguable case but no higher*

44     We mentioned at [10] above that the nub of the dispute between Mr Bouvier and the respondents turns on the characterisation of their relationship. The question is whether it was an agent-principal relationship or a principal-to-principal relationship. There is email correspondence which very strongly favours the former characterisation. But, in our view, the circumstances of the transactions concerned as a whole cast doubt on such a characterisation. While the respondents assert, and we agree, that their claims against Mr Bouvier cross the threshold of a good arguable case, there remain too many gaps in the evidence to put it any higher than that.

45     In support of the agent-principal characterisation, counsel for the respondents, Mr Alvin Yeo SC, took the court through numerous emails between Mr Bouvier and Mr Sazonov. These were communications between them in which they discussed the price and payment terms for the artworks, as well as the negotiating strategy that would be adopted when dealing with the original owners. We agree with Mr Yeo that the email correspondence appears damning and does suggest that Mr Bouvier presented himself to Mr Rybolovlev and Mr Sazonov as though he was negotiating on the respondents' behalf.

46     In this regard, there is no trace in the email correspondence of Mr Bouvier (or, for that matter, MEI Invest) being addressed as the "sellers". Instead, references to the "sellers" are consistently to third parties whose identities were not known to the respondents. There were numerous instances where Mr Bouvier held himself out as negotiating for the respondents with the "sellers". Mr Bouvier invariably also sought authorisation from Mr Rybolovlev, through Mr Sazonov, as to the maximum permitted price at

20

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

which he could deal before he met with the "sellers". Mr Bouvier, on most occasions, described to Mr Sazonov the negotiation strategy which he intended to employ in order to coax the "sellers" to bring down the prices of the artworks for the respondents' benefit. The complexion of the email correspondence as a whole strongly suggests that Mr Bouvier was acting as an agent of the respondents and was negotiating for the artworks on their behalf. It is thus consistent with the agent-principal relationship that the respondents are contending for.

47    The respondents' characterisation of the relationship between themselves and Mr Bouvier is that it was one built entirely on trust. There was no written agency agreement between them because they were prepared to work on the basis of a standing informal oral agreement. Among the essential terms of that agreement was one that they would pay Mr Bouvier a 2% commission for each transaction that he arranged. They and Mr Rybolovlev relied solely and entirely on Mr Bouvier for advice on which paintings to purchase and for how much. In short, they had complete confidence in Mr Bouvier.

48    However, the email correspondence, which we have referred to and which seems to corroborate the respondents' version of what transpired, presents at most a partial view of the entire factual landscape that is relevant to this dispute; and when the dealings are viewed in their totality, other aspects of them raise questions that hint at dealings on a principal-to-principal basis, or at the very least, that Mr Rybolovlev and the respondents were aware of and thus acquiesced in the profit which Mr Bouvier was making on the transactions concerned. Three points stand out in particular.

49     First, it is at least doubtful, even if not wholly incredible, that the respondents genuinely believed that the remuneration for Mr Bouvier's services was limited to the 2% fee that the respondents plainly knew they were paying him. There is a dispute over whether that amount represented a commission or payment for administrative and other related services. Both sides claim that there is documentary evidence in support of their respective positions. But, putting that dispute aside, it was urged upon us by Mr Bouvier's counsel, Mr Edwin Tong SC, that the 2% commission, if that was indeed the entirety of Mr Bouvier's return, would have been an implausibly slim margin for the expertise, experience and value that Mr Bouvier had to bring to bear in order to source and then secure the target artworks that Mr Rybolovlev was seeking.

50     There was evidence before the court which indicated that art houses such as Sotheby's and Christie's typically charged a buyer's premium that was upwards of 20% for art auctions. The exact percentage varied according to the price at which the particular piece was sold. Mr Bouvier also told the Monaco authorities that it was "impossible" and "unimaginable" that Mr Rybolovlev could think he (Mr Bouvier) was not making money from the transactions. According to Mr Bouvier, Mr Rybolovlev "knows the market practices, he knows the rates of the sales houses". If that was the case, then in the absence of any other explanation, it seemed to us improbable that the respondents could reasonably have thought that Mr Bouvier, who was acting for them to source specific artworks, negotiate the price, secure the artworks and then make them available to the respondents, would limit his takings to the 2% payment that was made on these transactions.

22

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

51     Second, the respondents' account of their discovery of Mr Bouvier's
fraud in late 2014 leaves a number of unanswered questions as to the true
characterisation of the relationship between Mr Bouvier and the respondents.
This point will require us to delve somewhat deeply into the events
surrounding the respondents' purchase of the da Vinci, *Salvator Mundi*, which
was made through Mr Bouvier in May 2013 (and which we have alluded to at
[21] above).

52     The respondents purchased *Salvator Mundi* on 3 May 2013 for
US$127.5m. About a year later, on 3 March 2014, the *New York Times*
reported that *Salvator Mundi* "was bought by an unidentified collector for
between *$75 million and $80 million in May 2013*, in a private sale" [emphasis
added]. This article ("the NYT article") is of considerable significance. Had
Mr Rybolovlev read the article, then in the absence of any compelling
explanation, he must have known that it was describing *his* purchase of
*Salvator Mundi*. The NYT article pinpointed the painting as well as the month
of the transaction through which the respondents purchased the painting. But,
there was one jarring discrepancy: the price that the respondents paid was
about US$50m in excess of the amount reported by the *New York Times*.

53     The evidence is unclear as to when the NYT article actually came to
Mr Rybolovlev's attention, although it was common ground that he became
aware of it at some stage before the end of 2014. Mr Rybolovlev told the
Monaco authorities that he read it when an associate, Yuri Bogdanov, showed
it to him "[s]ome time later" after the respondents had purchased *Salvator
Mundi*. What is clear is that Mr Rybolovlev brought up the NYT article and its
reference to *Salvator Mundi* at a meeting with Mr Bouvier in Monaco on
22 November 2014.

23

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

54     At that meeting, it does not appear that there was any serious argument or disagreement between Mr Rybolovlev and Mr Bouvier. The statements which Mr Rybolovlev gave to the Monaco authorities suggest that he was more concerned with the possibility of having overpaid for some of the artworks which he had acquired than the possibility of having been defrauded. He cited a Modigliani sculpture that he had purchased through Mr Bouvier which "sold at auction below the acquisition price". This is also consistent with Mr Bouvier's statements that when Mr Rybolovlev brought up the NYT article, Mr Rybolovlev expressed his concern over whether the respondents had purchased *Salvator Mundi* at "too high a price". But, it did not go further than that. Mr Rybolovlev did not think it necessary to inquire further into the purchase of *Salvator Mundi* or press Mr Bouvier for written proof of the amount that he had paid the original seller for the painting. It appears that Mr Bouvier was able to assuage Mr Rybolovlev's concerns by explaining that the art market at that time was "very difficult". Mr Bouvier told Mr Rybolovlev that "the Russians are no longer buying, the stock markets are weak, the Greek crisis is here, there is also the fall in oil prices, and the market in China has yet to be created". At the meeting on 22 November 2014, Mr Bouvier and Mr Rybolovlev also discussed other matters, including the financing for the purchase of the Rothko, *No 6 (Violet, vert et rouge)*.

55     It is notable, in this connection, that after the 22 November 2014 meeting, business continued as usual between the parties. There was upbeat correspondence between Mr Bouvier and Mr Sazonov in mid- and late December 2014 discussing the respondents' purchase of *No 6 (Violet, vert et rouge)*. The exchanges were convivial and nothing appeared out of the ordinary; indeed, one of the email threads was titled "Re: How are things going? :-)".

24

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

56    On the respondents' version of the events, the relationship between Mr Rybolovlev and Mr Bouvier only broke down on or after 31 December 2014, when Mr Rybolovlev met Mr Heller and discovered that he had overpaid for a Modigliani (see [21] above). Mr Yeo argued that the conversation between Mr Rybolovlev and Mr Bouvier on 22 November 2014 marked only the beginning of suspicions that took shape and eventually developed into a deep sense of betrayal, resulting in an irretrievable fissure by the end of that year. It was therefore not unusual that business carried on as usual after the 22 November 2014 meeting. As Mr Yeo put it, a relationship of trust that had been built up over many years did not simply "fall off a cliff".

57    With great respect, we find it impossible to accept this account of the events. If the characterisation of the relationship between Mr Bouvier and the respondents is as the latter suggest, Mr Rybolovlev could not possibly have been satisfied by *any* explanation of the market value of *Salvator Mundi* that Mr Bouvier might have given at or after the 22 November 2014 meeting. This is all the more so because based on Mr Bogdanov's statements to the Monaco authorities, there were already "some doubts [about Mr Bouvier] in *September or October 2014*" [emphasis added]. If that was true, then the discovery (assuming this was the first time Mr Rybolovlev found out) in November 2014 that there was a gulf of approximately US$50m between the price which the respondents had paid for *Salvator Mundi* and the reported selling price of that painting could not possibly be explained away on the basis of a residual sense of trust.

58    On the respondents' version of the facts, the question in Mr Rybolovlev's mind at the 22 November 2014 meeting could not have been whether he had overpaid for *Salvator Mundi* by reference to its market value.

25

Document

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                    [2015] SGCA 45



The foremost – indeed, the *only* – question on Mr Rybolovlev's mind must have been whether and, if so, how he had been cheated by Mr Bouvier. Mr Bouvier would not have been able to give *any* convincing explanation of this marked price differential when he was confronted with these facts by Mr Rybolovlev at the 22 November 2014 meeting. Significantly, there is nothing in the evidence to suggest that Mr Bouvier tried to deny the accuracy of the NYT article or any of the details contained therein. This seems almost impossible to reconcile with the notion that the respondents and Mr Rybolovlev all thought that Mr Bouvier was purely the fiduciary agent of the respondents earning nothing but the 2% "commission". Moreover, it seems to us inexplicable that business between the parties could carry on as usual after the 22 November 2014 meeting if the respondents' version is accepted.

59     We accept that we should not wade into the merits in a case such as this, which is very much at an interlocutory stage. But, we have examined the underlying evidence on the characterisation of the relationship between Mr Bouvier and Mr Rybolovlev in some detail because whereas the emails that we referred to at [45]–[46] above seem to weigh strongly in favour of the respondents' agent-principal characterisation, this aspect of the case seems to weigh just as strongly in the opposite direction.



60     The third and final reason why we consider that the respondents do no more than cross the threshold of a good arguable case is that the early transactions between the respondents and Mr Bouvier, at least, do not appear to have rested on a relationship built solely on trust. It will be recalled that Mr Bouvier was introduced to Mr Rybolovlev in 2003. The first of the 38 artworks that the respondents purchased through Mr Bouvier was a van Gogh on 26 August 2003. There is no documentation of that transaction in the

26

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*
                                                                [2015] SGCA 45

evidence. But, the next three transactions, which involved, respectively, a
Picasso (on 4 November 2004), a Modigliani (on 10 April 2006) and another
Picasso (on 25 October 2006), were all documented with formal contracts. For
each of these transactions, the respondents sent the contracts to their Swiss
lawyers, Lenz & Staehelin (Switzerland's largest law firm), for comment and
review before they were concluded. The email correspondence between
Mr Bouvier and Mr Sazonov in relation to these transactions was cordial and
polite, but reserved. The fifth to seventh transactions were for, respectively,
two pieces of furniture (one on 2 March 2007 and the other, on 10 July 2007)
and a Modigliani sculpture (on 25 October 2007). These transactions were
documented by invoices, and there is little correspondence relating to them in
the evidence.

61     It was only in the correspondence for the eighth transaction (dated
21 December 2007) for a Modigliani and onward that Mr Bouvier began to
employ language which suggested that he was negotiating as the agent for the
respondents. Even then, the email correspondence relating to that transaction
was warm, but not yet informal. The relationship between Mr Bouvier and the
respondents was therefore not a uniform one. If the relationship had started on
one footing, then there would have to be some explanation as to how that
changed. However, no evidence was put before the court to explain this. The
respondents' position before us was simply that the relationship between
Mr Bouvier and the respondents was a fiduciary one that was built on trust
from the outset.

62.    We recognise that seven artworks are but a fraction of the 38 artworks
which the respondents purchased through Mr Bouvier. But, these concerns add
up. Together, they bring home the point that at the interlocutory stage, the

27

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                    [2015] SGCA 45

court must tread cautiously. It must not treat allegations of dishonesty as established. This is not a case where the uncontroverted documentary evidence is so firmly in the respondents' favour that the court can comfortably descend into the merits and conclude that Mr Bouvier was dishonest, and then assess on this basis whether his dishonesty suggests a real risk of dissipation. There yet remain inflections in the narrative and gaps in the plot, which will have to be filled in due course. All that can be said at this stage is that there is a good arguable case of dishonesty on Mr Bouvier's part.

*Dishonesty and a real risk of dissipation*

63      The respondents argue that the court may infer a real risk of dissipation just from the fact that a good arguable case of dishonesty has been put forward against Mr Bouvier. The argument is grounded in part on the following passage in *Spectramed* at [19]:

> From the cases cited above, it is clear that allegations of dishonesty are relevant to the issue of whether there is a risk of dissipation of assets. *If there is a good arguable case in support of an allegation that **the defendant has acted fraudulently, dishonestly or unconscionably, it is unnecessary for there to be any further specific evidence on risk of dissipation** for the court to be entitled to take the view that there is a sufficient risk to justify granting Mareva relief* (see [Steven] Gee, *Mareva Injunctions and Anton Piller Relief* (Sweet & Maxwell, 4th ed, 1998 … at 198). [original emphasis in italics; emphasis added in bold italics]

We refer to this as "the *Spectramed* proviso". It appears to obviate the need to *separately* establish a real risk of dissipation once a good arguable case of dishonesty against the defendant has been established.

64      Chan Seng Onn J ("Chan J"), who decided *Spectramed*, cited two cases in support of this proviso. The first was his own earlier decision in

28

*Bouvier, Yves Charles Edgar v*                          [2015] SGCA 45
*Accent Delight International Ltd*

*Multi-Code Electronics Electronic Industries (M) Bhd and another v Toh Chun Toh Gordon and others* [2009] 1 SLR(R) 1000 ("*Multi-Code Electronics*"), and the second, the decision of the New South Wales Court of Appeal in *Patterson v BTR Engineering (Aust) Ltd and others* (1989) 18 NSWLR 319 ("*Patterson v BTR Engineering*"). Chan J also referred to the monograph by Steven Gee QC, *Mareva Injunctions and Anton Piller Relief* (Sweet & Maxwell, 4th Ed, 1998), which makes a statement (at p 198) to a similar effect. The same passage from *Mareva Injunctions and Anton Piller Relief* had been cited with approval in the earlier decision of the Singapore High Court in *OCM Opportunities Fund II, LP and others v Burhan Uray (alias Wong Ming Kiong) and others* [2004] SGHC 115 ("*OCM Opportunities*") at [73], where it was said to be "trite law" that "an appropriate case of risk of dissipation is made out, evidentially, where there is a good arguable case of fraud".

65      In our judgment, the *Spectramed* proviso goes too far. An allegation of dishonesty cannot obviate the need to establish a real risk of dissipation. This conclusion stands on three planks. The first is a matter of common sense. The fact that a defendant might be crooked does not in and of itself establish that there is therefore a real risk that he will bury his spoils to defeat a judgment that may in due course be rendered against him. The *Spectramed* proviso fails to distinguish between a defendant against whom a plausible allegation of dishonesty is made but who may turn out otherwise after defending the suit, and one who might be motivated by the pending litigation against him to behave even more dishonestly. Moreover, dishonest conduct can come in different shades and hues. The *Spectramed* proviso fails to distinguish between different types of dishonest conduct, some of which might more readily support an inference of a real risk of dissipation than others. To take an

29

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

obvious example, it seem to us wrong in principle to treat a case where there is really no dispute that a grave fraud has been committed with the defendant's involvement, leaving only the precise nature of his role to be determined, in precisely the same way as a case where there may or may not have been fraud or dishonest conduct on the defendant's part at all, that being a matter which can only be determined at the trial.

66      This leads us to our second point, which is that it is incorrect for the court to treat allegations of dishonesty made at an interlocutory stage as if they have already been established. Such allegations may eventually be refuted. As a matter of principle therefore, the grant of Mareva relief should not generally be *wholly* founded upon an unproven allegation of dishonesty. This does not mean that the evidence provided in support of an allegation of dishonesty is irrelevant. But, the objection from principle dictates that the existence of a real risk of dissipation must be assessed *independently* from the prospect of the plaintiff's eventual success (or failure) in establishing an allegation of dishonesty. This point was made by Chan Sek Keong J (as he then was) in *European Grain & Shipping Ltd v Compania Naviera Euro-Asia SA and others (CN Jaya SA, intervener)* [1989] 2 SLR(R) 445 ("*European Grain*") at [21], where he refused to consider allegations of fraud directed at a defendant when determining whether there was a real risk of dissipation. *European Grain* was not considered by the court in either *Spectramed* or *OCM Opportunities*.

67      Third, the *Spectramed* proviso is not borne out by either the case law cited in support of it or the larger body of jurisprudence dealing with Mareva injunctions. The fifth edition of Steven Gee's monograph on Mareva injunctions and Anton Piller relief, which was renamed *Commercial*

30

t

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

*Injunctions* (Sweet & Maxwell, 5th Ed, 2004), pulls back (at para 12.040)
from the absolute position that the fourth edition of the work (*ie*, *Mareva
Injunctions and Anton Piller Relief* (cited earlier at [64] above)) took.
*Commercial Injunctions* does not appear to have been drawn at all to the
court's attention in *Spectramed*, and it had not been published yet when *OCM
Opportunities* was decided.

68     We will discuss decisions from Singapore as well as other jurisdictions
in terms of how they weigh in on this third point. Many of these decisions
were raised either in counsel's written submissions or in the oral arguments
before us. We summarise our detailed observations on the relationship
between allegations of dishonesty and a real risk of dissipation at [93]–[94]
below. Following that, at [95]–[97] below, we examine the facts before us
against the backdrop of our review of the jurisprudence.

69     It will be evident from what we have said that our case law has not
taken a uniform approach to whether and, if so, when allegations of dishonesty
may in themselves ground an inference of a real risk of dissipation. In
*European Grain*, the plaintiff charterers brought claims against a defendant
shipowner for, among other things, damages for breach of a charterparty. The
plaintiffs argued that there was a real risk of dissipation because: (a) the
defendant was a Panamanian trading company with little or no assets to its
name and a small market capitalisation; (b) the defendant had not been
forthcoming with its financial records; and (c) the defendant was dishonest
and was being sued for fraudulent conspiracy in a separate pending suit. Chan
Sek Keong J disagreed with the plaintiffs and discharged the Mareva
injunction that they had obtained *ex parte*. He pointed out that the fact that the
defendant was a Panamanian one-ship company was not at all unusual. The

defendant had also been candid in its compliance with the asset disclosures that were ordered as ancillaries to the Mareva injunction. As for the allegation of dishonesty, this was given short shrift, as we have already noted (see [66] above). In our judgment, it was material that in *European Grain*, no allegation of dishonesty was made in the action in which the injunction was sought. Rather, the allegation of dishonesty was the subject of a separate, and as yet unconcluded, suit.

70     In *OCM Opportunities*, the plaintiff investors brought claims against the first to eleventh defendants for fraudulent misrepresentations. The misrepresentations allegedly induced the plaintiffs to invest in sophisticated financial instruments issued by the seventh and eighth defendants. The misrepresentations were said to include the following, amongst others:

(a)     Third-party receivables were reflected in the seventh defendant's financial statements when they were actually owed by parties related to or controlled by the first defendant's family.

(b)     Fictitious transactions were entered in the seventh defendant's accounts with the intent that they should create the appearance of genuine commercial sales.

(c)     The invested funds were not channelled into the seventh defendant's expansion plans as represented. They were instead diverted to illegal logging activities, and the proceeds from those activities were channelled back to the fourteenth and fifteenth defendants.

*Bouvier, Yves Charles Edgar v*          [2015] SGCA 45
*Accent Delight International Ltd*

The defendants "categorically denied any wrongdoing", and alleged that the plaintiffs' losses were no more than investment losses incurred in the distressed debt market: *OCM Opportunities* at [20]. The judge refused to discharge the Mareva injunctions which had earlier been granted to the plaintiffs because she thought that a good arguable case of fraud had been made out, and that was "evidentially" sufficient to establish a real risk of dissipation: *OCM Opportunities* at [73]. It seems to us that the judge may have been swayed by the passage in the fourth edition of Steven Gee's monograph (*viz, Mareva Injunctions and Anton Piller Relief*), but, as we have noted, this was later revised in the next edition (*viz, Commercial Injunctions*).

71     In *Multi-Code Electronics*, the plaintiff companies alleged that their assets had been misappropriated by the first and second defendants. The first defendant was the managing director of the first plaintiff and a director of the second plaintiff. The second defendant was a director of the second plaintiff. Together, they allegedly caused the plaintiffs to make unauthorised payments totalling about RM44m out of the plaintiffs' accounts. The plaintiffs asserted on affidavit that these payments were made against forged or fictitious documents. This was not disputed by the defendants: *Multi-Code Electronics* at [11]. The plaintiffs sought and obtained *ex parte* Mareva injunctions against the first and fourth defendants, amongst others. Chan J refused to discharge the Mareva injunctions. He said, after a close examination of the documents, that there was "more than *prima facie* evidence ... of [the first and fourth defendants'] participation in the alleged fraud": *Multi-Code Electronics* at [150]. The first defendant appeared to be the mastermind using the fourth defendant as a vehicle for his fraudulent conspiracy. Chan J concluded at [151]:

33

> ... The plaintiffs clearly had more than an arguable case
> against the first and fourth defendants. I would not need the
> plaintiffs to show me further evidence of the propensity or the
> risk of dissipation of assets to maintain the Mareva injunction
> against them. The probity, honesty and integrity of the first
> and fourth defendants, their trustworthiness and reliability to
> engage in fair dealing had already been called into question
> because of the nature of the claim based on their participation
> in a conspiracy to defraud. *The risk of dissipation of assets*
> *was no longer in the realm of mere possibility or imagination. In*
> *my view, it was very real in the case of the first and fourth*
> *defendants, given what they had done to defraud the plaintiffs*
> *as alleged.* [emphasis added]

In our judgment, it is evident from this passage as well as the other references
we have made above to the decision, that Chan J was satisfied, having regard
to: (a) the particular allegations of dishonesty; (b) the strength of the evidence
before him; and (c) the absence of any denial by the defendants of some of the
key damning facts, that there was more than sufficient basis to infer a real risk
of dissipation. We see no difficulty with this, but we do not read it as
supporting the broader statement of the law that is set out in *Spectramed*.

72    Chan J issued his decision in *Spectramed* more than a year after he
decided *Multi-Code Electronics*. In *Spectramed*, the plaintiff company brought
claims against the defendants for systematically and deceitfully running the
company to the ground by diverting its business to a competing company. The
first defendant and her husband, the second defendant, were employed by the
plaintiff as the managing director and the marketing manager respectively.
The third defendant was an administrator employed by the plaintiff. The
second defendant incorporated the fourth defendant while he was still in the
employ of the plaintiff, and, together with the first and third defendants,
diverted the plaintiff's business to the fourth defendant over a period of time.
The first to third defendants were alleged to have taken active steps to
dishonestly conceal their actions. The plaintiff sought Mareva injunctions

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                                      [2015] SGCA 45

against the first, second and fourth defendants. These defendants argued they had not done anything to dissipate their assets. Chan J disagreed and granted the Mareva injunctions. He held that there was a *prima facie* case that the defendants had dishonestly misappropriated the plaintiff's assets such that a risk of dissipation existed: *Spectramed* at [20].

73      Despite articulating the *Spectramed* proviso (which, on the face of its wording, should have been sufficient to dispose of the case since there was a good arguable case of dishonesty), Chan J *in fact* went on to consider evidence from the defendants as to the type of assets they held: *Spectramed* at [21]. He observed that a large part of their assets were held in bank accounts and unit trusts, and that these could be spirited away with ease. He also thought that there was a danger of the fourth defendant transferring its distributorships and goodwill (which were alleged to have been misappropriated from the plaintiff) to another company in the same way as they had allegedly been diverted from the plaintiff. Based on all these factors, Chan J concluded that there was a real risk of dissipation and granted the Mareva injunctions sought. Hence, it seems to us that the learned judge, despite having articulated the *Spectramed* proviso, did not base his decision solely on it, but went on to assess the evidence to determine whether it supported the inference that there was a sufficient risk or likelihood of dissipation of assets.

74      We turn, next, to the English authorities, which likewise have not been entirely consistent in their approach to the weight that the court may attribute to allegations of dishonesty when considering whether there is sufficient basis to infer a real risk of dissipation. Five cases stand out, and we take them in chronological order. They serve to illustrate the ebb and flow of English legal opinion on this point.

35

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

75      The first case is *Grupo Torras SA, Torra Hostench London Limited v
Sheikh Fahad Mohammed Al Sabah and others* 1997 WL 1105536 (21 March
1997, unreported) ("*Grupo Torras*"), a decision of the English Court of
Appeal. The plaintiffs in that case claimed that they had been defrauded of a
sum of about US$300m. US$20m of that larger sum was routed through a
Swiss lawyer's client account and distributed on the instructions of Sheikh
Fahad Mohammed al Sabah. The person responsible for distributing the
money on the Sheikh's instructions was a Mr Dawson, who himself received
US$2m out of the US$20m sum. The plaintiffs brought a claim against
Mr Dawson based on, amongst other causes of action, conspiracy, dishonest
assistance and knowing receipt. The plaintiffs obtained a Mareva injunction
against Mr Dawson. On appeal by the latter against the grant of that
injunction, one of the questions before the English Court of Appeal was
whether there was a real risk of dissipation. Mr Dawson argued that the judge
below had erred in concluding that such a risk existed merely because the case
involved allegations of fraud.

76      The English Court of Appeal rejected Mr Dawson's argument.
Saville LJ, with whom Judge LJ and Sir Patrick Russell agreed, said that in the
light of the nature of the fraud which was alleged, it was not surprising that the
judge concluded that there was "a strong fear of dissipation":

> What is clear from the judgment is that the judge took the
> view that there was a good arguable case that Mr Dawson was
> knowingly implicated in the fraud; and that *the nature of the
> allegations was such that there was a strong fear of
> dissipation. Since it is part of Mr Dawson's own case that he
> was expert in the sort of intricate, sophisticated and
> international financial transactions which feature in this case,
> and since the plaintiffs had established a good arguable case
> that Mr Dawson had used his expertise for dishonest purposes,*
> I am not in the least surprised that the judge reached the
> conclusion that it did. In short I remain wholly unpersuaded

36

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

> that the judge so erred in his assessment of the risk of
> dissipation that it would be right for this court to interfere.
> [emphasis added in italics and bold italics]

The Mareva injunction was therefore upheld by the English Court of Appeal, but we pause to observe that what seemed to have been decisive was the nature of the conduct that was at issue and how it bore on the inference of a real risk of dissipation.

77      The next case is *Thane Investments Ltd v Brian Tomlinson* 2003 WL 22073907 (29 July 2003, unreported) ("*Thane Investments*"), also a decision of the English Court of Appeal, which seemed to curtail any trend there might have been towards generously drawing inferences of a real risk of dissipation whenever dishonesty or fraud had been alleged and found to be seriously arguable. In that case, the plaintiff companies brought proceedings against two former directors, Mr Tomlinson and Mr Knopp, for misfeasance and breach of fiduciary duties. The English High Court had found, in separate proceedings which were already concluded, that Mr Tomlinson and Mr Knopp were errant directors who had run the plaintiff companies like "their private fiefdom". Mr Tomlinson was not a defendant in those earlier proceedings, although he did give evidence therein. After the judgment in those earlier proceedings was issued, the plaintiffs applied *ex parte* and obtained a worldwide Mareva injunction against Mr Tomlinson and Reyall, a company alleged to be controlled by him. Mr Tomlinson was resident in the Isle of Man, and Reyall was also incorporated there. The application to discharge the Mareva injunction was heard *inter partes* and dismissed by Neuberger J (as he then was). Mr Tomlinson and Reyall appealed.

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

78     The English Court of Appeal made some strongly-worded remarks on the procedural breaches occasioned at the *ex parte* hearing of the plaintiffs' injunction application. But, putting those breaches aside, the English Court of Appeal turned to consider whether it should continue the Mareva injunction against Mr Tomlinson and Reyall. It held that there was no real risk of dissipation and set aside the Mareva injunction. Peter Gibson LJ, with whom Sir Anthony Evans agreed, said at [28]:

> ... I regret that I do not see that the judgment [in the earlier proceedings] does support a conclusion that in the particular circumstances of Mr Tomlinson and Reyall there was a real risk of assets being dissipated. *[Counsel for the plaintiffs] submitted that it has now become the practice for parties to bring ex parte applications seeking a freezing order by pointing to some dishonesty, and that ... is sufficient to enable this court to make a freezing order. I have to say that, if that has become the practice, then the practice should be reconsidered. **It is appropriate in each case for the court to scrutinise with care whether what is alleged to have been the dishonesty of the person against whom the order is sought in itself really justifies the inference that that person has assets which he is likely to dissipate unless restricted.*** [emphasis added in italics and bold italics]

The English Court of Appeal also did not think it persuasive that Mr Tomlinson was resident in the Isle of Man or that Reyall was a Manx corporation. Peter Gibson LJ said that there was nothing to suggest any difficulty in enforcing English judgments in the Isle of Man. We note that the English Court of Appeal, in coming to its decision to set aside the Mareva injunction, did not appear to have cited or considered *Grupo Torras*.

79     Subsequent first-instance English decisions have cited *Thane Investments* with approval, for instance, *Michael Cherney v Frank Neuman* [2009] EWHC 1743 (Ch) ("*Cherney v Neuman*") and *Irish Response Limited v Direct Beauty Products Limited* [2011] EWHC 37 (QB) ("*Irish Response*"). In

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                                    [2015] SGCA 45

both cases, the court refused to infer a real risk of dissipation even though
there was a good arguable case of dishonest conduct by the defendant. In the
former, the defendant was alleged to have taken inconsistent positions in
related proceedings in Spain (see *Cherney v Neuman* at [78]–[90]); in the
latter, the defendant was alleged to have perjured himself before a Danish
court in proceedings that had already concluded and that arose from a
connected dispute (see *Irish Response* at [69]–[77]).

80      The third case that we consider is the English High Court decision of
Patten J in *Jarvis Field Press Limited v Chelton and others* [2003] EWHC
2674 (Ch) ("*Jarvis Field Press*"). In that case, the plaintiff company ("Jarvis")
sought the continuance of a Mareva injunction which it had previously
obtained *ex parte* against the defendants, Mrs Chelton and Mr Long. Mrs
Chelton was a director of Jarvis. Jarvis alleged that Mrs Chelton and Mr Long
had made unauthorised and unlawful payments out of its assets over a period
of two years. Mrs Chelton was also alleged to have caused Jarvis, through
deception, to make a loan to a third company, CSM Group Limited. Most of
the loan monies, however, were not paid to CSM Group Limited, but were
instead paid to Glenwise Limited, a company owned wholly by Mrs Chelton.
The documentary evidence and the particulars of claim against Mrs Chelton
were said to disclose (*Jarvis Field Press* at [5]):

> … [A] consistent and determined fraud on the part of
> Mrs Chelton and those associated with her, whereby
> significant sums of money were extracted from the claimant
> company in a devious and secret way, utilising in effect a
> secret account, with a total absence of disclosure to the board
> of the claimant company, or indeed to anybody else.

Jarvis asked the court to infer that there was a real risk of dissipation based on
the alleged dishonest conduct on Mrs Chelton's part and the fact that the

39

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*
[2015] SGCA 45

liquidator of CSM Group Limited had recently commenced proceedings against Mrs Chelton: *Jarvis Field Press* at [8].

81      Patten J cited the passage from *Thane Investments* quoted at [78] above, but did not consider it at odds with the proposition that an allegation of dishonesty *could in itself* justify an inference of a real risk of dissipation (*Jarvis Field Press* at [10]):

> I have no difficulty in accepting the general principle, emphasised by Peter Gibson LJ, that a mere unfocused finding of dishonesty is not, in itself, sufficient to ground an application for a freezing order. It is necessary to have regard to the particular respondents to the application and to ask oneself *whether, in the light of the dishonest conduct which is asserted against them, there is a real risk of dissipation. As Peter Gibson LJ made clear in the passage I have already quoted, the court has to scrutinise with care whether what is alleged to have been dishonesty justifies the inference. **That is not, therefore, a judgment to the effect that a finding of dishonesty (or, in this case, an allegation of dishonesty) is insufficient to found the necessary inference.** It is merely a welcome reminder that in order to draw that inference it is necessary to have regard to the particular allegations of dishonesty and to consider them with some care.* [emphasis added in italics and bold italics]

Patten J maintained the Mareva injunction which Jarvis had earlier obtained because he thought that there was a real risk of dissipation. He emphasised that there was a good arguable case that Mrs Chelton "will have systematically defrauded the claimant company in a dishonest and secretive way, and in a way that has every indication of being relatively sophisticated": *Jarvis Field Press* at [11]. He said that there was an "appreciable risk" in the case of a defendant who "appears to be guilty not merely of dishonesty, but [of] dishonesty in financial dealings in relation to the use or misuse of assets, that she will take steps to put some of those assets ... out of the [plaintiff's] reach": *Jarvis Field Press* at [17]. It is plain to see that it was the nature of the

40

dishonesty alleged in *Jarvis Field Press* that led Patten J to conclude that there was a sufficiently real risk of dissipation to warrant the Mareva injunction being maintained.

82      The fourth case is *Madoff Securities International Limited v Stephen Ernest John Raven and others* [2011] EWHC 3102 ("*Madoff Securities*"), a decision of Flaux J. The two plaintiffs in that case were the liquidators of the Madoff group of companies and were seeking to claw back payments made to the defendants. Amongst the defendants was Sonja Kohn, an Austrian who "lived and conducted her affairs internationally through a series of corporate vehicles" (she and her corporate vehicles were collectively referred to by Flaux J as "the Kohn defendants"): *Madoff Securities* at [4]. The Kohn defendants had received millions in payments from the Madoff group over the course of some 30 years for introducing investors to Bernard Madoff. The claimants did not plead that the Kohn defendants were actually party to Mr Madoff's fraud, nor did they allege that the Kohn defendants ought to have been aware of the fraud: *Madoff Securities* at [5]. Rather, the allegation of dishonesty arose from the fact that none of the invoices which the Kohn defendants issued for the payments from the Madoff group indicated that the payments were in the nature of commissions. The invoices contained, instead, vague references to "research, analysis and consulting", "market researching" and "strategic consulting and market researches": *Madoff Securities* at [7]. The plaintiffs alleged that these sham invoices were intended to conceal the true nature of the payments (*Madoff Securities* at [8]):

> ... [T]he payments were illegitimate payments amounting to secret kickbacks to Mrs Kohn for introducing money into Mr Madoff's scheme and ... Mrs Kohn knew that the real reason for the payments was secretly to pay her for introducing money into the scheme and that the various

invoices were sham documents intended to hide the true
nature of the payments to the Kohn defendants.

The plaintiffs applied for proprietary and Mareva injunctions against the Kohn
defendants. On a jurisdictional point, Flaux J found that he had jurisdiction
only over the claims made by one of the two plaintiffs. That plaintiff argued
that there was a real risk of dissipation by the Kohn defendants as they had
issued "a whole raft of sham invoices and disguised the true nature of
payments received"; this was said to be "evidence of deliberate misconduct on
a grand scale over a long period of time": *Madoff Securities* at [161].

83      Flaux J was referred to *Grupo Torras*, *Thane Investments* and *Jarvis
Field Press*. He agreed with Patten J's analysis in *Jarvis Field Press*. Flaux J
did not accept the Kohn defendants' submission that the fact of Mrs Kohn's
cooperation with the authorities upon Mr Madoff's arrest showed that there
was no real risk of dissipation. Flaux J said that Mrs Kohn's cooperation was
outweighed by her refusal to voluntarily disclose her assets. She had also been
evasive when questioned by an Austrian state prosecutor in separate
proceedings. Flaux J said that the false invoices which Mrs Kohn had
produced over many years "crie[d] out for a proper explanation". He
concluded at [169]:

> ... It seems to me that what emerges is a sufficiently arguable
> case of deliberate wrongdoing, *the issuing of sham invoices
> and the disguising of the true nature of the payments of millions
> of dollars made to the Kohn defendants over many years*. This
> demonstrates *in itself* a serious risk of dissipation. [emphasis
> added]

Flaux J granted the proprietary and Mareva injunctions sought, and also made
ancillary disclosure orders against the Kohn defendants. Once again, it will be
evident from the passage we have just quoted that what was material about

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

the nature of the alleged fraud in *Madoff Securities* is that it suggested a propensity to conceal assets and payments through the device of fictitious instruments. In that sense, the link to an inference of a real risk of dissipation was clear. Moreover, Mrs Kohn put forward no reason or explanation for what appeared to be a string of sham invoices issued by the Kohn defendants that were intended to conceal the nature of the payments to them.

84      The final case is the decision of the English Court of Appeal in *VTB Capital plc v Nutritek International Corporation and others* [2012] 2 Lloyd's Rep 313 ("*VTB v Nutritek (CA)*"). The plaintiff ("VTB"), a bank incorporated in London, lent a sum of more than US$220m to a Russian company ("RAP") for the purchase of Russian dairy plants from a BVI company ("Nutritek"). Nutritek was owned by Marcap BVI and Marcap Moscow, which were a BVI company and a Russian company respectively. RAP defaulted on the loan, and VTB only managed to recover US$40.5m. It subsequently transpired that the same person, Konstantin Malofeev, was effectively in control of RAP, Nutritek, Marcap BVI and Marcap Moscow, the parties on both sides of the transaction. VTB brought claims against Nutritek, Marcap BVI, Marcap Moscow and Mr Malofeev alleging conspiracy and joint liability for deceit. VTB obtained an *ex parte* worldwide Mareva injunction against Mr Malofeev.

85      Two applications by the defendants were before the court. The first was a challenge to the service of the writs out of jurisdiction. The second was an application to discharge the worldwide Mareva injunction against Mr Malofeev, who was resident in Russia. In the English High Court, Arnold J decided both issues in favour of the defendants. On the Mareva injunction, Arnold J said that the fact that Mr Malofeev had allegedly engaged in a major fraud and operated a "complex web of companies" was not sufficient to

establish a real risk of dissipation: *VTB Capital plc v Nutritek International Corp, Marshall Capital Holdings Limited, Marshall Capital LLC, Konstantin Malofeev* [2011] EWHC 3107 (Ch) ("*VTB v Nutritek (HC)*") at [233]. Arnold J said that Mr Malofeev's operation of a web of companies was relevant, but "not a strong pointer towards a risk of dissipation" as "[i]t is not uncommon for international businessmen, and indeed quoted UK companies, to use offshore vehicles for their operations, particularly for tax reasons": *VTB v Nutritek (HC)* at [233].

86     On appeal by VTB, the English Court of Appeal agreed with Arnold J's decision on jurisdiction and set aside the service of the writs out of jurisdiction. Since the court no longer had personal jurisdiction over the defendants, the issue of the Mareva injunction fell away. The English Court of Appeal nonetheless made some observations on the grant of the Mareva injunction since it had heard full arguments on the point. The English Court of Appeal thought that there was a real risk of dissipation and would not have set aside the Mareva injunction against Mr Malofeev. Lloyd LJ's observations on this point (at [172]–[175] of *VTB v Nutritek (CA)*) are instructive and bear setting out in full:

> 172.   If the question [of the Mareva injunction] had arisen, it would have been on the footing that VTB has a seriously arguable case for saying that Mr Malofeev had been engaged in a major fraud against VTB, by which VTB was persuaded to lend RAP US$220 million to fund what was represented as a sale of assets worth substantially more than that amount, whereas in fact, first, the assets were worth a great deal less, and secondly the transaction was not a true sale, and moreover a substantial part of the proceeds of the loan (it can be assumed) disappeared into the complex web of corporate entities in various jurisdictions, including several offshore, for the benefit of Mr Malofeev, and maybe for that of others involved. Furthermore, not only was the use of that web of corporate entities a significant part of the means whereby the fraud was committed, by concealing the true ownership of

RAP, but it would also make it difficult for VTB to enforce any judgment that it was able to obtain. ...

173.    It seems to us that these propositions would have provided a strong starting point for a case in favour of the grant of a [worldwide Mareva injunction]. It could be inferred that *a wealthy individual who uses such methods to defraud a bank in this way and on this scale might readily resort to similar methods to render his major assets proof against enforcement in response to proceedings being taken against him, at any rate if he had reason to fear that the proceedings might be pursued effectively.*

174.    The judge attached little, if any, weight to those basic elements of the situation, as regards the application for the [worldwide Mareva injunction], for particular reasons to do with the evidence and the presentation of the case, to which we need not refer. In addition to discounting, for those reasons, the factors to which we have referred at para 172 above, the judge observed at para 233 that it was common for international businessmen to use offshore vehicles for their operations, particularly for tax reasons, and that this may make it difficult to enforce a judgment, but that claimants such as VTB 'have to take defendants such as Mr Malofeev as they find them', the use of offshore companies not being sufficient evidence of a risk of dissipation. *It seems to us that while that may be a fair comment as regards international businessmen generally, the factor of a good arguable case as to fraud against the person in question, and the use of a web of offshore companies in connection with the fraud, could properly provide a basis for taking this into account in favour of the grant of an injunction.*

175.    Given that there is (as the judge held) a good arguable case against Mr Malofeev on an allegation of fraudulent misrepresentation used to procure a loan of US$220 million against wholly inadequate (and itself misrepresented) security, *on the part of a businessman with international connections and assets, using offshore companies in many parts of the world, it might not be difficult to suppose that, if Mr Malofeev thought he was at risk of having his assets seized to answer a judgment against him, he would dispose of those assets, or move them into a situation in which it would be difficult or impossible for the claimant to reach them.*

[emphasis added]

*Bouvier, Yves Charles Edgar v*                                    [2015] SGCA 45
*Accent Delight International Ltd*

87      Lloyd LJ also cited Flaux J's judgment in *Madoff Securities* at length
and with approval. The appeal against the English Court of Appeal's decision
in *VTB v Nutritek (CA)* was dismissed on the jurisdictional point by a majority
of the UK Supreme Court: *VTB Capital plc v Nutritek International
Corporation and others* [2013] 1 Lloyd's Rep 466. The UK Supreme Court
did not make any substantive remarks on the English Court of Appeal's
observations on the Mareva injunction against Mr Malofeev: at [72] *per*
Lord Mance JSC, at [150] *per* Lord Neuberger of Abbotsbury PSC and at
[159]–[160] *per* Lord Wilson JSC. It is evident once again that the material
considerations identified by Lloyd LJ included the fact that the methods
allegedly used to defraud VTB were precisely the sort of methods that could
be used to put Mr Malofeev's assets beyond the reach of a judgment creditor
(*VTB v Nutritek (CA)* at [173]), and that Mr Malofeev allegedly used a web of
companies to defraud VTB. These factors in turn could then be a basis for
inferring a real risk of dissipation (*VTB v Nutritek (CA)* at [174]–[175]).

88      We turn, finally, to two Australian cases. The first is *Patterson v BTR
Engineering*, one of the two cases relied on by Chan J in *Spectramed* (see [64]
above). In *Patterson v BTR Engineering*, the plaintiff company obtained a
Mareva injunction against a former senior employee. The ex-employee was
alleged to have interposed the fourth defendant, a company which he
apparently indirectly controlled, between the plaintiff and certain overseas
suppliers while he was still in the plaintiff's employ. Through this scheme, he
made a secret profit by fraudulently procuring the plaintiff to overpay on
equipment purchases which were routed through the fourth defendant. There
was little or no direct evidence showing a risk of the ex-employee dissipating
his assets. The Court of Appeal of New South Wales nonetheless upheld the
decision of the first-instance judge, Giles J, to maintain the Mareva injunction

46

:

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

which had been granted to the plaintiff. The appellate court inferred a real risk of dissipation from the allegations and the evidence placed before it. The decision was unanimous, but there were differences in the reasoning of Gleeson CJ and Meagher JA, who each delivered a judgment on the point. Rogers AJA, the third member of the court, agreed with Gleeson CJ.

89     Gleeson CJ said at 325E–326A:

> I consider that Giles J was correct in taking the view that *the evidence as to the nature of the scheme in which the [defendant ex-employee] was allegedly involved,* which established a prima facie case against him, *was such as to justify the conclusion that there was a danger that the [defendant] would dispose of assets in order to defeat any judgment that might be obtained against him and that such danger was sufficiently substantial to warrant the injunction. There is no reason in principle why the evidence which is relevant to the first [issue of establishing a* prima facie case*] might not also have a bearing on the second, and this will especially be so where the prima facie case that is made out against a defendant is one of serious dishonesty involving diversion of money from its proper channels.* ... This is a case in which the plaintiff claims that the defendant, making use of a corporation controlled by him, fraudulently misappropriated a large sum of money which, if it is still under the control of the [defendant], would be quite likely to constitute, directly or indirectly, the bulk of his assets. *As Giles J held, the nature of the scheme in which, on the evidence to date, the [defendant] appears to have engaged, is such that it is reasonable to infer that he is not the sort of person who would, unless retrained, preserve his assets intact so that they might be available to his judgment creditor.* [emphasis added]

90     Meagher JA put the proposition more broadly. He said at 326C–326E:

> Normally proof of [a *prima facie* case] alone will not suffice; normally one cannot infer a risk of dissipation of assets from the mere fact that the plaintiff has a prima facie cause of action. In normal circumstances this is particularly so in cases like the present, where there is no evidence at all what the defendant's assets are. However, in *exceptional* cases (of which the present is unfortunately one) *one can infer the existence of the latter ingredient partly or wholly from proof of*

47

*Bouvier, Yves Charles Edgar v*                                    [2015] SGCA 45
*Accent Delight International Ltd*

> the former. This may well be the situation in all cases where
> the plaintiff's prima facie case against the defendant involves
> proof of gross dishonesty. [emphasis added]

91     The way in which the point was put by Gleeson CJ is entirely
consistent with the approach taken in *Grupo Torras*, *Jarvis Field Press* and
*Madoff Securities*, as well as with the observations of Lloyd LJ in *VTB v
Nutritek (CA)*, which we cited earlier. In these instances, the focus of attention
was on the *nature* of the alleged fraud and whether it supported the drawing of
an inference of a real risk of dissipation. Meagher JA's *dictum*, in contrast,
was framed in wider terms. It formed the basis of an argument by the plaintiffs
in *Media World Communications Ltd (Administrator Appointed) v Clark*
[2004] FCA 1609 ("*Media World*") in their application for a Mareva
injunction. *Media World* was a first-instance decision of the Federal Court of
Australia. The plaintiffs in that case had, in a series of transactions, purchased
what was referred to as "the AP Technology" from the first defendant, Adam
Clark, and his associated companies, which were the corporate defendants.
The plaintiffs' suspicions were subsequently aroused and confirmed when
they discovered that the AP Technology was sub-optimal and did not perform
as represented. The plaintiffs argued that there was a strong case of serious
dishonesty and fraud against Mr Clark and the corporate defendants. Mr Clark
had made representations to the plaintiffs about the performance of the AP
Technology knowing that those representations were false. The plaintiffs
argued that the court could "infer a risk [of dissipation] from the nature of the
cause of action raised against the defendants": *Media World* at [22].

92     Goldberg J rejected the argument and refused to grant the Mareva
injunction sought. He pointed out that Meagher JA's reasoning in *Patterson v
BTR Engineering* differed "in a number of ... respects" from Gleeson CJ's:

48

*Media World* at [23]. Goldberg J then distinguished *Patterson v BTR Engineering* as a case that "involve[d] a diversion of funds". He said that cases where the courts had been prepared to draw an inference of a real risk of dissipation based on substantiated allegations of dishonesty and nothing more, were those that "involved ... cause[s] of action *which had a characteristic bearing upon dissipation*" [emphasis added]: *Media World* at [26]. Goldberg J thought that although the case before him included "appellations such as 'fraud' and 'serious dishonesty', the case [was] essentially one of misrepresentation": *Media World* at [27]. In the absence of other evidence pointing to a real risk of dissipation, Goldberg J dismissed the application for a Mareva injunction against the defendants.

93      It is time to round off this extended review of the authorities with some observations, and we begin with the last of the cases we have reviewed, namely, *Media World*. In our judgment, if there is a unifying principle that can adequately rationalise and explain the circumstances in which a court may legitimately infer a real risk of dissipation from nothing more than a good arguable case of dishonesty, it is this – the alleged dishonesty must be of such a nature that it has a real and material bearing on the risk of dissipation. It will be evident from our analysis of the cases that it is in such circumstances that the courts have been willing to draw the necessary inference. This is sensible because whether or not such an inference may be drawn is ultimately a question of fact. In assessing whether the inference is warranted as a matter of fact, it is appropriate, in our judgment, for the court to *segregate* the two questions (*ie*, whether there is a good arguable case on the merits of the plaintiff's claim and whether it has been shown that there is a real risk of dissipation) and answer them *separately*. We accept that the evidence relied on to answer the first question may be the same as that relied on to answer the

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

second. But, once the inquiries are segregated, it will be clear that whether the evidence pertinent to the first stage of the inquiry is sufficient also for the purposes of the second stage is an assessment that cannot – and emphatically must not – be made mechanistically; and in that context, if an allegation of dishonesty is all that is relied on, that allegation must be such as to say enough about a real risk of dissipation in the circumstances.

94       In our judgment, a well-substantiated allegation that a defendant has acted dishonestly can and often *will*, as we have said, be relevant to whether there is a real risk that the defendant may dissipate his assets. But, we reiterate that in each case, it is incumbent on the court to examine the precise nature of the dishonesty that is alleged and the strength of the evidence relied on in support of the allegation, keeping fully in mind that the proceedings are only at an interlocutory stage and assessing, in that light, whether there is sufficient basis to find a real risk of dissipation. That alone is the justification which lies at the heart of the court's jurisdiction to grant Mareva injunctions. An allegation of dishonesty does not in itself form a substitute for an examination of the degree of risk of dissipation unless, as we have said, that allegation is of a nature or characteristic that sufficiently bears upon the risk of dissipation. In this regard, we endorse the views of Choo Han Teck J in *PT Sariwiguna Binasentosa v Sindo Damai Shipping Ltd and others* [2015] SGHC 195, where he made observations to a similar effect at [10]–[14]. That judgment was handed down shortly after we heard the oral arguments in these appeals.

95       On the facts before us, we do not consider that the allegations of dishonesty levelled at Mr Bouvier have a real and material bearing upon the risk of dissipation. This is not a case where Mr Bouvier misappropriated the respondents' assets through a series of fictitious or illusory transactions. Nor is

50

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

this case akin to *Patterson v BTR Engineering*, where a former senior employee of the plaintiff company exploited his position to procure the plaintiff to purchase equipment from him at a mark-up by interposing an entity that he was thought to indirectly control, thus enabling him to make a secret profit by the "diversion of money from its proper channels". In the present case, the respondents, which are controlled by Mr Rybolovlev, are independent entities that received what they bargained for and at the price they were willing to pay. They knew that they were dealing with Mr Bouvier, and that he was sourcing the artworks concerned from others. The real issue is as to the legal nature of the respondents' relationship with Mr Bouvier.

96     The fraud or dishonesty that is alleged in this case is not in the nature of a complex machination or an elaborate scheme. The ploy in this case, if proved, was deceptively simple: Mr Bouvier exploited the asymmetries of information inherent in an opaque market to turn a profit. As we have already observed, the ultimate outcome in this case turns on the true characterisation of the relationship between Mr Bouvier and the respondents. On one view, there will be no fraud at all: Mr Bouvier can be seen as a wily businessman who employed a questionable (and perhaps barely legal), although ultimately profitable, approach to business. On another, Mr Bouvier can be seen as an errant agent who is liable to the respondents for fraudulent misrepresentation or breach of fiduciary duties.

97     We also consider it significant that there was, in this case, no use of a complex web of companies to conceal the dealings in question. Mr Bouvier made no attempt to conceal his identity or mask his connection with the transactions through which the 38 artworks were acquired by the respondents. He always dealt in person, acting through MEI Invest. The payments from the

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                                    [2015] SGCA 45

respondents were made over the course of a decade or so into the same bank
accounts held by MEI Invest at the Geneva branches of Banque SCS Alliance
and Compagnie Bancaire Helvétique. Mr Bouvier may be wealthy, well-
advised and sophisticated; he may also be experienced in international
financial transactions and corporate structures. But, to infer a real risk of
dissipation from these factors alone would be to penalise him for what some
may say are no more than the ordinary concomitants of his good fortune or his
success in plying his craft. In *Art Trend Ltd v Blue Dolphin (Pte) Ltd and
others* [1981–1982] SLR(R) 633 ("*Art Trend*"), Lai Kew Chai J frowned on a
similar argument, stating at [37] that experience or "knowledge of the practice
of international finance and transfers of funds is not evidence of a
predisposition to remove assets to frustrate any judgment". His decision was
upheld on appeal: *Art Trend Ltd v Blue Dolphin (Pte) Ltd and others* [1983–
1984] SLR(R) 105. In our view, Mr Bouvier has not misused his international
financial expertise in the commission or furtherance of the allegedly deceitful
behaviour, nor is there any solid evidence which suggests a real risk of
dissipation on his part.

*Unsatisfactory asset disclosures*

98      The ground that we have covered thus far is ground that was traversed
before the Judge, and we have, with respect, come to a different conclusion
from the Judge in this regard.

99      On appeal, the respondents added a new argument which was not
before the Judge. Indeed, there was no material to support such an argument
before the Judge. This argument is based on the information that Mr Bouvier
disclosed pursuant to the ancillary disclosure orders made by the Judge in
support of the Mareva injunction against him. The respondents argue that there

are doubts over how forthright Mr Bouvier has been in his asset disclosures; on this basis, they seek to persuade us to draw the necessary inference of a real risk of dissipation. This argument is cast in two ways. First, the respondents compare the amount of the Excess Payments that Mr Bouvier received over the years (alleged to be about US$1bn) with the total value of the assets that Mr Bouvier has disclosed. They say that there is a disparity between these two figures, which suggests that Mr Bouvier has not accounted for all his assets. Second, they raise questions over the type of assets that Mr Bouvier holds. They say that these assets are suspicious. Both these points feed into the respondents' broader argument attacking the veracity of Mr Bouvier's asset disclosures, which is in turn said to support an inference of a real risk of dissipation.

100     Arguments of this nature are not uncommon. Similar lines of attack were pursued by the plaintiffs in *European Grain* at [13], *VTB v Nutritek (HC)* at [242] and *Choy Chee Keen Collin v Public Utilities Board* [1996] 3 SLR(R) 812 at [16]–[18]. When one sets this type of argument against the purpose of ancillary disclosure orders and the nature of the information that is usually required to be disclosed, it is unsurprising that such arguments have generally not met with much success.

101     In *Petromar Energy Resources Pte Ltd v Glencore International* [1999] 1 SLR(R) 115, this court cautioned (at [21] *per* L P Thean JA) that the disclosure order that is granted ancillary to a Mareva injunction serves a limited but focused purpose:

> ... [T]he disclosure order is merely an ancillary order made in aid of a Mareva injunction in order for the plaintiff to determine the location of the defendant's assets and take appropriate steps to preserve them pending trial. ...

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

It aims to give the plaintiff a snapshot of the defendant's assets at the time of disclosure. This is to enable the plaintiff to police the injunction and ensure that the defendant's assets are kept at the steady state which the Mareva injunction seeks to preserve. After all, if the court is satisfied that there is a real risk of dissipation, then it generally follows, as a matter of logic, that there should be a capability to police the Mareva injunction granted. The ancillary asset disclosure order is thus an integral part of the court's Mareva jurisdiction and an ordinary adjunct to a Mareva injunction: *Grupo Torras SA v Shiekh Fahad Mohammed Al Sabah and others* (16 February 1994, unreported); *Motorola Credit Corporation v Cem Cegiz Uzan* [2002] EWCA Civ 98 at [28]–[29].

102     Where the Mareva injunction itself is ultimately found not to have been justified on the basis of the material before the court at the time it was granted, it seems to us inherently unfair to nonetheless allow the plaintiff to use information that he has obtained through the ancillary disclosure orders to try to shore up a case for a real risk of dissipation. Ancillary disclosure orders have been recognised to be highly intrusive and can entail potentially severe ramifications. But, these severe intrusions on privacy are tolerated because a Mareva injunction without an accompanying disclosure order will often be toothless. To further prejudice the defendant by allowing the plaintiff to use information extracted from an ancillary disclosure order to support an otherwise unsustainable Mareva injunction would be to provide the plaintiff with an unfair and improper advantage.

103     Further, the information obtained from an ancillary disclosure order will often have little, if any, bearing on a real risk of dissipation. The disclosed information does not provide a longitudinal view of the defendant's assets. All

54

t

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

that is disclosed are the assets standing to the defendant's name at the time disclosure is made. The information will not show whether there has been a systematic and unexplained attrition of the defendant's assets over time, which, presumably, would be the justification for inferring a real risk of dissipation. The disclosed information is also often rough and ready. Given that the disclosure affidavits usually have to be compiled and filed under stringent timelines, the information set out therein is not the type of information that tends to stand up well to the microscopic scrutiny of lawyers and forensic accountants. For example, in the present case, the value of Mr Bouvier's private companies was estimated based on either the amounts standing to their bank accounts or their net asset values at the time Mr Bouvier prepared his disclosure affidavits. These are by any measure an incomplete reflection of the true value of those companies. It will be unreliable or even misleading to rely on information of this nature to establish whether or not a defendant has been concealing his assets.

104     In our judgment, ancillary disclosure orders may only be relevant to the risk of dissipation in two narrow situations. The first is where the defendant refuses to provide any disclosure of his assets at all. This might, in appropriate circumstances, found the inference that there is a real risk that the defendant may dissipate his assets (see *Z Ltd v A and others* [1982] 1 All ER 556 at 566B–566C *per* Lord Denning; *Jarvis Field Press* at [14]; *Madoff Securities* at [172]–[173]). The second is where the information disclosed by the defendant reveals assets which are so glaringly inadequate or suspicious that the deficiencies cannot be attributed to the urgency with which the disclosures were made or other accounting or valuation inaccuracies. This latter situation would rarely arise because if the defendant were truly minded to conceal his assets, the likelihood is that he would not provide any disclosure

*Bouvier, Yves Charles Edgar v*                                    [2015] SGCA 45
*Accent Delight International Ltd*

at all. Even in these situations, the court would have to carefully consider whether, in all the circumstances, an inference of a real risk of dissipation may appropriately be drawn.

105    On the facts before us, we are not satisfied that the information disclosed by Mr Bouvier is suspicious. We shall not descend into the minutiae because the disclosures were ordered on condition of strict confidentiality. But, it suffices to say that the disclosure affidavits provided by Mr Bouvier were timeous and detailed. If the respondents had any doubts about the disclosed information, it was open to them to apply to cross-examine Mr Bouvier on it: *OCM Opportunities Fund II LP and others v Burhan Uray (alias Wong Ming Kiong) and others* [2004] 4 SLR(R) 74 at [34]–[35]. They did not, however, do so.

106    This brings us to Mr Bouvier's argument pertaining to his asset disclosures, which is an inversion of that made by the respondents. He argues that his exemplary compliance with the Judge's ancillary disclosure orders militates against the conclusion that there is a real risk of his dissipating his assets. Instead, he submits, his compliance with those orders evinces his intention to "participate fully in [the] proceedings and to clear his name [through] the legal process". We respectfully disagree. The court is entitled to expect from litigants nothing less than punctilious compliance with the orders that it makes. The fact that a litigant complies with an asset disclosure order does not necessarily diminish the risk of dissipation if it existed in the first place, just as his non-compliance would not necessarily fortify that risk if it was not sufficiently established to begin with.

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

*Abuse of process*

107     Mareva injunctions have been discharged where the applicants failed to "apply for the relief promptly", or used the Mareva injunction concerned to "oppress the defendants" (see *Meespierson NV v Industrial Commercial Bank of Vietnam* [1998] 1 SLR(R) 287 at [29] *per* Judith Prakash J) in the sense of the injunction being "calculated to pressurise the defendants and bring them to their knees" (see *Art Trend* at [41]).

108     In our judgment, the Mareva injunction obtained against Mr Bouvier in this case was an abuse of the court's process. The injunction was not obtained by the respondents to prevent the enforcement of an anticipated judgment from being frustrated. Instead, we are satisfied that it was deployed as an instrument of oppression to inflict commercial prejudice on Mr Bouvier. Four factors lead us to this conclusion:

(a) .    The first is the respondents' delay in making their application for a Mareva injunction and ancillary disclosure orders against Mr Bouvier. The lack of urgency in their application suggests that in fact, the respondents did not genuinely believe there was a real risk that Mr Bouvier would dissipate his assets.

(b)     This shades into the second factor, which is the respondents' failure to comply with the Supreme Court Practice Directions ("the Practice Directions"). There was, in the present circumstances, no reason for the respondents to make their injunction application *ex parte* without giving Mr Bouvier notice.

(c)     The third factor is the unjustifiable breadth of the Mareva injunction against Mr Bouvier. For no apparent reason, the respondents

57

included the assets and bank accounts of 14 companies owned by
Mr Bouvier (the 14 "affected companies") in the Mareva injunction as
it was worded when it was granted by the Judge on 12 March 2015.

(d)    The final factor is the respondents' conduct subsequent to their
obtaining the Mareva injunction against Mr Bouvier.

We elaborate on each of these factors below.

(1)    Delay in making the application

109    A plaintiff who is genuinely concerned that the defendant will dissipate
his assets would be expected to act with urgency in seeking Mareva relief. Of
course, delay by itself will not be dispositive of the plaintiff's application for
such relief. The length of the delay and any explanations for it should be
considered against all the circumstances of the case: *Madoff Securities* at
[156]–[157].

110    In our judgment, the relevant period of delay in this case is between, at
the latest, the time Mr Rybolovlev first confronted Mr Bouvier with the NYT
article on 22 November 2014 (see [53] above) and the time the respondents'
*ex parte* application for a Mareva injunction was made on 12 March 2015, a
little under four months later. A few significant events occurred between these
dates:

(a)    On 31 December 2014, Mr Rybolovlev met Mr Heller. The
respondents' counsel, Mr Yeo, submitted that this was the first time
Mr Rybolovlev actually understood what Mr Bouvier had been up to
and how the latter had been defrauding him.

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

> (b)    On 9 January 2015, the respondents filed the criminal complaint against Mr Bouvier with the Monegasque authorities.
>
> (c)    From 25 to 28 February 2015, Mr Bouvier was detained by the Monaco police for questioning.
>
> (d)    On 28 February 2015, Judge Loïc Malbrancke, the Monaco investigating judge, released Mr Bouvier on bail. Judge Malbrancke granted bail because he considered that Mr Bouvier posed only a limited risk of flight, and because the investigations were "to continue into the *relatively distant* future given their highly international dimension".

111    Mr Yeo argued that the respondents had in fact applied for Mareva relief promptly. As noted above, he argued that Mr Rybolovlev only uncovered the fraud on 31 December 2014, and that should therefore be taken as the relevant date from which to assess the promptness (or otherwise) of the respondents' reaction. Mr Yeo submitted that the respondents acted swiftly thereafter to prepare and file the criminal complaint against Mr Bouvier in Monaco on 9 January 2015. After doing that, the respondents did not commence proceedings elsewhere because they were waiting for the Monaco proceedings to be resolved. They also did not want to tip Mr Bouvier off as to the investigations by the Monaco authorities. According to Mr Yeo, the real urgency to prevent Mr Bouvier from dissipating his assets arose only after he was released on bail on 28 February 2015. The respondents thereafter immediately instructed solicitors in Singapore in early March 2015 and made their injunction application on 12 March 2015.

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                                    [2015] SGCA 45

112     With respect, we do not find this explanation persuasive at all. We
have explained at [51]–[58] above that if the facts are indeed as the
respondents contend, then Mr Rybolovlev *must* have known or at least had
very strong reason to suspect Mr Bouvier's alleged fraud by the time he
discussed the NYT article with Mr Bouvier on 22 November 2014. We
reiterate that there is nothing in the evidence to suggest that Mr Bouvier ever
denied the accuracy of the NYT article. Moreover, if the facts are as the
respondents contend, then by 22 November 2014, from Mr Bouvier's
perspective, he must have known that the game was nearly up and that it was
only a matter of time before the truth was uncovered. He would have been
improbably naïve to think otherwise. The necessity to prevent Mr Bouvier
from dissipating his assets, if there was one, would have crystallised at that
point in time.

113     We also do not find persuasive the respondents' explanation for
holding off their injunction application between 9 January and 28 February
2015 during the pendency of the Monaco criminal proceedings, until
Mr Bouvier was released on bail on the latter date. This is because it was
common ground before us that the Monaco courts do not have the power to
grant worldwide freezing orders. No permutation of the possible outcomes of
the proceedings in Monaco could have resulted in Mr Bouvier's assets being
subject to a worldwide asset freeze by the Monaco courts. The respondents
exhibited a legal opinion of their Monaco law expert, Dr Géraldine Gazo, in
the affidavit which Mr Sazonov filed in support of their application for a
Mareva injunction. Dr Gazo's legal opinion broached various issues, including
the civil and criminal jurisdiction of the Monaco courts as well as the nature of
the proceedings in Monaco. Significantly, the opinion also stated that "it is not
possible under Monaco civil procedure to obtain orders which freeze a

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

defendant's assets in another jurisdiction". There was therefore no good reason for the respondents to await the outcome of the Monaco proceedings before applying for a worldwide Mareva injunction against Mr Bouvier *if* they genuinely believed he would dissipate his assets. To put it plainly, there was no worldwide freezing order for the respondents to wait for or look forward to in the Monaco proceedings.

114   In our judgment, if the respondents were genuinely fearful of Mr Bouvier dissipating his assets, they would have instructed their solicitors to apply for a Mareva injunction immediately or shortly after the meeting between Mr Bouvier and Mr Rybolovlev on 22 November 2014. Even giving the respondents the benefit of any possible doubt, by the time they filed a criminal complaint against Mr Bouvier in Monaco on 9 January 2015, there was no basis to withhold seeking a worldwide freezing order against Mr Bouvier any further. Yet, they did not make the requisite application, and did not give any convincing explanation to account for this. Rather, it appears that the application for a Mareva injunction against Mr Bouvier was the respondents' response to his perhaps unanticipated release on bail on 28 February 2015. It is telling that no reason was ever put forward by the respondents as to why they waited until after that date before instructing lawyers here with a view to seeking a worldwide Mareva injunction against Mr Bouvier from our courts.

(2)   Non-compliance with the Practice Directions

115   The respondents' delay in making their injunction application segues into the next point, which is their non-compliance with the relevant procedure. It is established practice that an applicant for an *ex parte* injunction, including a Mareva injunction, *must* give notice of the application to the other concerned

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

parties prior to the hearing. Only in cases of "extreme urgency", or where the giving of prior notice would defeat the purpose of the *ex parte* application, will the applicant be excused from giving notice: paras 41(2) and 41(3) of the Practice Directions. In such cases, the affidavit in support of the *ex parte* application must give reasons for the urgency of the application (see para 42A of the Practice Directions) or explain why the giving of prior notice would defeat the purpose of the application (see para 41(3) of the Practice Directions).

116    In the present case, none of this was done. No justification was put forward by the respondents for not giving Mr Bouvier prior notice of their injunction application against him, or for contending that this was a case where giving prior notice would defeat the very purpose for which the application was being made. Indeed, given the progression of the litigation, it could not fairly be contended that this was either a case of extreme urgency or one where the giving of prior notice would have defeated the purpose of the application.

117    If Mr Bouvier was so naïve as to think the 22 November 2014 meeting was insignificant, he faced the virtual certainty of legal proceedings when he was arrested and detained by the Monaco police on 25 February 2015. Subsequent to his arrest, Mr Bouvier instructed lawyers who were present with him at the depositions before the Monaco authorities. On 28 February 2015, Mr Bouvier was released from custody and was presumably still getting legal advice. He was also informed that the investigations in Monaco would continue. Moreover, having filed a criminal complaint in Monaco, the respondents had applied to be joined as civil parties in the proceedings there.

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

118    On 1 March 2015, the respondents' Swiss lawyers wrote to banks in
Geneva, St Gallen, Zurich, Paris and Hong Kong. These letters were titled
"Urgent and anticipating the official requests from the authorities", and stated
that Mr Bouvier and Mrs Rappo were facing fraud and money laundering
charges in Monaco. The letters further stated:

> There are reasonable doubts that the above-mentioned
> persons would attempt to use your banking institution to
> impede the investigation of the currently pending criminal
> proceedings, in particular the identification and freezing of the
> products of the suspected criminal activities, which have
> already been discovered.
>
> We hereby put you on notice to **immediately** undertake all
> necessary measures to prevent this and draw your attention to
> *the fact that any financial transaction on the accounts related
> to Mr Yves Bouvier and Mrs Tania Rappo risk to become [sic]
> part of the criminal investigation currently pending in Monaco
> and* **therefore become the responsibility of your banking
> institution.**
>
> [emphasis in bold in original]

The letters also stated that copies had been "addressed to the Investigating
Judge Loïc Malbrancke". Similar letters were sent on the same day to the
police authorities in Bern, London and Singapore. The respondents' Swiss
lawyers sent further letters to Singapore's Commercial Affairs Department on
4 March 2015 and to the legal department of a Swiss bank on 11 March 2015
(the letter to the Swiss bank additionally indicated that Ms Bersheda, one of
the respondents' Swiss lawyers (see [32] above), had spoken to one of the
bank's employees over the telephone earlier that day).

119    On 8 March 2015, a Swiss magazine, *Economie – Le Matin Dimanche*,
published an article reporting the dispute between Mr Bouvier and
Mr Rybolovlev. The article quoted a press release issued by Ms Bersheda, on
28 February 2015, which stated that "[a]t present [the respondents] are *looking*

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

*into the possibility of starting parallel proceedings* in coordination with other victims of similar activities of which Mr Yves Bouvier has been accused" [emphasis added]. The article also reported that when Ms Bersheda was contacted the week before (*ie*, the week of 1 March 2015), she confirmed that "collaborative efforts coordinated with those parties have already been started".

120    In our judgment, the analysis of the events subsequent to Mr Bouvier's release on bail on 28 February 2015 confirms that by that stage, the respondents were in position for worldwide litigation against Mr Bouvier. The simple point of all this is that if the respondents believed that Mr Bouvier intended to dispose of his assets, they could not have missed the fact that he had ample opportunity to do so from the time of his release from detention on 28 February 2015. At that time, *both* criminal and civil proceedings initiated by the respondents were already afoot against Mr Bouvier in Monaco. In these circumstances, it is impossible for us to see how, at the time of the respondents' injunction application 12 days later, the matter could possibly be conceived as being of such extreme urgency or of such imminent risk that it excused the giving of prior notice. Nor could it reasonably have been thought that providing Mr Bouvier with notice at the time of the injunction application would have defeated the purpose of that application if, consistent with the fact of their making that application, the respondents thought Mr Bouvier had yet to dispose of his assets.

121    Mr Yeo said that it was the practice *not* to give notice whenever a Mareva injunction was sought. If that is true, it makes a mockery of the Practice Directions and is not a practice to be unthinkingly encouraged. In this

64

:

Bouvier, Yves Charles Edgar v
Accent Delight International Ltd

[2015] SGCA 45

regard, we echo the views expressed by Sir Anthony in *Thane Investments* at
[35]:

> Counsel says that it is normal practice to apply ex parte for an
> order of this sort, and he said also that it is common for no
> notice to be given. I am sure that may be right – I do not
> suggest that it is not – because the very nature of a freezing
> order, for the reasons he explained, is that it may be
> necessary to apply without notice, hence the importance of
> [the provision] which requires an explanation of the reason
> why no notice has been given in the particular case. *I would
> be very surprised to hear that it is common or normal practice to
> make an application without notice and, at the same time, to
> disregard the rules which expressly cover that very situation.*
> [emphasis added]

There was not even a faint attempt in this case to justify or explain why the
Mareva injunction against Mr Bouvier was applied for without giving him
prior notice.

(3)     Breadth of the Mareva injunction

122     We turn to the third point, which concerns the Mareva injunction
against Mr Bouvier as it was worded when it was granted on 12 March 2015.
To put it simply, the Mareva injunction, as worded at that time, was
unnecessarily broad. Among other things, it prevented Mr Bouvier from
dealing with the shares that he held in the 14 affected companies (as defined at
[108(c)] above). This is not, in itself, objectionable. But, the Mareva
injunction went further, and the schedule which was appended to it included
the assets and bank accounts held in the names of those 14 companies.

123     There was no apparent reason for the respondents to disregard the
separate legal personality of the 14 affected companies and include the assets
and bank accounts held by them in the Mareva injunction against Mr Bouvier.
Mr Sazonov asserted in the affidavit which he filed in support of the

65

respondents' injunction application that *one* of the 14 affected companies, Art Family Pte Ltd ("Art Family"), had issued an invoice to Xitrans Finance in 2009 and had received payment for it. As Art Family was owned wholly by Mr Bouvier, the affidavit stated, there was reason to "believe therefore that Mr Bouvier [had] control of bank accounts and any assets in the name of [Art Family], with the power to dispose of or deal with them as if they were his own". No explanation was given for the inclusion in the Mareva injunction of the assets and bank accounts held by the other 13 affected companies, of which only some were wholly owned by Mr Bouvier.

124    In any case, we do not see how the fact of Art Family having issued an invoice to and received payment from Xitrans Finance in 2009 could have justified the inclusion of the assets and bank accounts held by Art Family, much less those held by any of the other 13 affected companies, in the respondents' injunction application and the ensuing Mareva injunction granted. Art Family is not a party to the Singapore action. It is thus not subject to the *in personam* jurisdiction of the Singapore courts. There is no question that the court is entitled to exercise the jurisdiction articulated in *SCF Finance Co Ltd v Masri* [1985] 2 All ER 747 and *TSB Private Bank International SA v Chabra* [1992] 2 All ER 245 (see *Teo Siew Har v Lee Kuan Yew* [1999] 3 SLR(R) 410 at [14]–[19]) to include in a court order assets belonging to a third party on the basis that the assets are "in truth the assets of the defendant". However, in the present case, there was no evidence that Art Family was a sham company; nor was there any evidence that its assets and bank accounts belonged to Mr Bouvier. At least eight of the 14 affected companies were going concerns. Yves Meyer, a director of five of the 14 affected companies (including Art Family), affirmed an affidavit testifying that the businesses of those companies had been adversely affected. Art Family had two employees

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

in Singapore and owned a Swiss company, which in turn had seven employees. The Mareva injunction prevented Art Family from paying an invoice for IT engineering, and would have prevented it from paying the salaries of these employees if not for the attenuating orders made by the Judge pursuant to the appellants' setting-aside applications (see [31] above as well as [125] below).

125     The possible damage done to the 14 affected companies was mitigated by their early removal from the remit of the Mareva injunction against Mr Bouvier. As mentioned earlier at [31] above, the Judge subsequently varied the Mareva injunction as it was worded at the time of its grant on 12 March 2015. Among other things, on 25 March 2015 (the first of five days over which the *inter partes* hearing of the appellants' setting-aside applications took place), the Judge removed the 14 affected companies from the schedule to the Mareva injunction. However, it appears the respondents wrote to other parties appending the Mareva injunction against Mr Bouvier in a form that included the 14 affected companies as well as their assets and bank accounts in the accompanying schedule *even after* the Judge had varied the orders which she made on 12 March 2015 so as to remove them. We address this point at [128]–[129] below.

(4)     Conduct subsequent to obtaining the Mareva injunction

126     We turn finally to the respondents' conduct subsequent to the grant of the Mareva injunction against Mr Bouvier, which we consider also to have been unsatisfactory. The Mareva injunction was put into wider circulation than was necessary for its efficacy, and information was disseminated in a misleading manner. We cite two instances of this.

67

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

127    First, the respondents publicised the Mareva injunction against
Mr Bouvier just shortly after it was obtained. The *Financial Times* published
an online report of the Mareva injunction within hours of its being granted.
Ms Bersheda was quoted as saying that "'similar measures' were going to be
taken around other jurisdictions 'shortly'". Nothing was put forward by way of
a reasonable explanation as to why it was thought necessary to inform the
international press of the fact that a Mareva injunction and other ancillary
orders had been made against Mr Bouvier.

128    Second, we noted above (at [31] and [125]) that the Mareva injunction
against Mr Bouvier as it was worded at the time of its grant on 12 March 2015
was attenuated by various orders made by the Judge over the course of the
*inter partes* hearing of the appellants' setting-aside applications on 25 March,
6–8 and 10 April 2015. Among other things, some of the entities originally
affected were removed from the schedule to the Mareva injunction, certain
exemptions were provided for, restrictions on the disclosure of the information
obtained were imposed and the scope of some of the disclosure orders made
on 12 March 2015 was pared down. We reiterate that on 25 March 2015, the
first day of the aforesaid five-day *inter partes* hearing, the 14 affected
companies were removed from the schedule to the Mareva injunction. The last
of the attenuating amendments by the Judge was made on 10 April 2015. Yet,
as late as 26 June 2015, the respondents were still placing in circulation the
Mareva injunction against Mr Bouvier in the way it was worded when it was
granted on 12 March 2015, with the 14 affected companies as well as their
assets and bank accounts listed in the accompanying schedule. This was more
than three months after the orders originally made by the Judge on 12 March
2015 had been varied to remove those 14 companies, among other things.

129    In this regard, Mr Tong, counsel for Mr Bouvier, placed before us a letter from Herbert Smith Freehills LLP, the respondents' English solicitors, to Sotheby's dated 26 June 2015. The letter informed Sotheby's that the Singapore court had issued a worldwide Mareva injunction against Mr Bouvier, and appended the Mareva injunction as it was worded at the time of its grant on 12 March 2015, with (as we have just mentioned) the 14 affected companies as well as their assets and bank accounts listed in the schedule annexed thereto. Mr Tong went further to submit that this was done deliberately to damage the business interests of some of these companies, which had dealings with Sotheby's. We need not go that far. It is sufficient to note that the respondents had a powerful weapon in the form of a Mareva injunction (and a worldwide one at that) in their armoury, and it was incumbent on them to exercise due care to ensure that no greater damage was done than was *necessary* to uphold the efficacy of the injunction. The gravity of the consequences of a Mareva injunction, especially one that extends worldwide, mandates that close and careful consideration be given to details such as its proper scope and the parties who will be affected.

130    While it might be possible to discount one or another of the above factors had they transpired in isolation, the cumulative picture that emerges from their totality is that the Mareva injunction against Mr Bouvier was obtained by the respondents not out of a genuine fear that the enforcement of an anticipated judgment of the court would be frustrated, but rather, to oppress Mr Bouvier. This was an improper purpose and an abuse of the process of the court.

131    We will close off this discussion on the abuse of court process with an observation. When a plaintiff seeks a worldwide Mareva injunction from a

69

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                                    [2015] SGCA 45

Singapore court, the plaintiff should ordinarily undertake to the court that it shall not, without the court's leave, enforce the injunction or seek an order of a similar nature in any jurisdiction outside Singapore. This is a standard undertaking found in the prescribed form for a worldwide Mareva injunction: Form 7 of the Practice Directions at Schedule 1, para 8. This undertaking plays a vital role because it protects a defendant from the risk of oppression which may arise from a multiplicity of suits: *Dadourian Group International Inc v Simms and others* [2006] 1 WLR 2499 at [2] and [24]. Courts have gone so far as to say that a worldwide Mareva injunction should not be granted unless the plaintiff gives such an undertaking: *Re Bank of Credit and Commerce International SA* [1994] 3 All ER 764 at 794. This undertaking was not given by the respondents, and it appears that they have taken steps to enforce the Mareva injunction against Mr Bouvier overseas without obtaining any leave from the court to do so.

**The arguments by Mrs Rappo**

*Overview*

132    We turn now to the position in respect of Mrs Rappo. Her position is simpler than Mr Bouvier's. She argues that there is no real risk of dissipation in her case for three reasons. First, none of the pleaded allegations show that she was dishonest. The fact that she might have received tainted funds does not equate to dishonesty. Second, she says that even if there is a good arguable case of dishonesty against her, it does not equate to a real risk of dissipation. Third, she was not evasive about the sums of money which she received from Mr Bouvier. She voluntarily disclosed to the Monegasque police the fact that she had received payments from Mr Bouvier, and she was forthright with her

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

banks in her receipt of those payments. These factors, Mrs Rappo submits, are inconsistent with a real risk of dissipation.

133     To this, the respondents make three main arguments in rebuttal. First, they contend that there is a good arguable case of dishonesty against Mrs Rappo. Second, they point out that Mrs Rappo "conducts her affairs internationally" through corporate vehicles. They contend that given this "web of offshore companies and accounts", Mrs Rappo "clearly has the means and ability to move about her funds". Third, the respondents allege that Mrs Rappo has been untruthful and evasive. They claim that she lied to the court about her expenses when she asked for an increase in the carve-out for personal expenses in the Mareva injunction made against her. She has also not complied with the ancillary disclosure orders made by the Judge.

134     In our judgment, on the evidence before us, the respondents have not established a real risk that Mrs Rappo will dissipate her assets. There are two principal reasons that underlie our conclusion. First, the nature of the respondents' allegations against Mrs Rappo suggests a level of misfeasance akin to negligence or, perhaps, wilful blindness rather than dishonesty. Second, there is no basis for any suggestion that Mrs Rappo has attempted to conceal her assets. These two reasons are addressed at [135]–[142] below. In addition, the reasons which we gave at [108]–[130] above for finding the Mareva injunction against Mr Bouvier to be an abuse of court process, as well as a number of the points raised in those paragraphs, apply equally to Mrs Rappo. There is no need for us to repeat those reasons and the salient points here. They explain why we consider that the respondents' injunction application against Mrs Rappo was likewise motivated by an improper purpose. The respondents' abuse of court process therefore affords an

71

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                    [2015] SGCA 45

independent basis for setting aside the Mareva injunction and the ancillary disclosure orders made against Mrs Rappo.

*Nature of the allegations of dishonesty*

135    The respondents' position is that Mrs Rappo had been dishonest in receiving the payments from Mr Bouvier. They invite us to draw this inference on the basis of the following four propositions:

> (a)    Mrs Rappo knew that Mr Bouvier was acting as an agent and not a seller.

> (b)    Mrs Rappo knew that Mr Bouvier was being paid a 2% commission for his services as an agent.

> (c)    Mrs Rappo knew the price which the respondents paid for the artworks, and so must have known that what she was being paid by Mr Bouvier was in excess of the 2% commission that he was receiving.

> (d)    Mrs Rappo lied to her bankers and told them that she was receiving substantial sums from Mr Rybolovlev in her capacity as his advisor.

The respondents' position is premised on the notion that Mrs Rappo had a keen understanding of the details of the commercial relationship between Mr Bouvier and the respondents.

136    In our judgment, support for that underlying notion is thin. Many of the source documents which the respondents rely on do not bear out the inference that Mrs Rappo had dishonestly received the payments from Mr Bouvier. For example, neither Mr Bouvier's nor Mrs Rappo's statements to the Monaco

t

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

authorities suggest that Mrs Rappo was aware of the workings of the relationship between Mr Bouvier and the respondents. The transcripts in fact show the opposite. As for the respondents' contention that Mrs Rappo lied to her bankers and informed them that the payments which she received from Mr Bouvier were from Mr Rybolovlev instead for acting as the latter's advisor, the bank documents tendered by the respondents in support of their position are mostly equivocal. One of them in fact refutes the respondents' contention as it states clearly that "TR [*ie*, Mrs Rappo] was paid by *YB* [*ie*, Mr Bouvier] for her contribution in the business ... *YB* pays a commission to TR for the introduction of potential buyers ..." [emphasis added].

137    Based on the evidence before us, an equally plausible account of Mrs Rappo's role is that she interacted with Mr Bouvier and Mr Rybolovlev primarily at a social level, but was not privy to their business dealings. She did not know how the actual purchases of the 38 artworks concerned were arranged. That was a matter between Mr Bouvier and Mr Rybolovlev (acting through the respondents). The extent of Mrs Rappo's involvement was limited to her facilitation of Mr Bouvier's access to the Rybolovlevs. In our view, this alternative account coheres more readily with the documentary evidence before us. Mr Rybolovlev's evidence to the Monaco police was that Mrs Rappo often spoke highly of Mr Bouvier, arranged meetings between him (Mr Rybolovlev) and Mr Bouvier, and was present at viewings with the Rybolovlevs and Mr Bouvier. This view is also consistent with Mr Bouvier's statements to the Monaco police that "without [Mrs Rappo,] [he] would not have maintained [his] relationship with Mr Rybolovlev", and that Mrs Rappo did not otherwise know much about the transactions between him (Mr Bouvier) and the respondents.

138    But, even if the respondents' case is taken at its highest, the dishonesty alleged against Mrs Rappo goes no further than her actual or imputed knowledge that she was receiving from Mr Bouvier money which was being paid out of the latter's undisclosed profits. The complaint is that she was content to receive the substantial sums that Mr Bouvier was paying her without inquiring further into the source of those payments. To put it another way, she might have known or had reason to suspect that the water supplied to her came from a tainted well, but she drank it anyway. This is not a situation where Mrs Rappo took any steps to deceive the respondents; nor is there anything to suggest that she was involved with Mr Bouvier in the perpetration of a fraudulent scheme against the respondents. It is telling that Mr Rybolovlev saw Mrs Rappo's dishonesty as stemming from (as he put it himself) her "betrayal". In our judgment, the allegations made against Mrs Rappo, even if eventually found to be true, fall far short of having a real and material bearing on the risk of her dissipating her assets.

*Alleged concealment of assets*

139    There is also no evidence which suggests that Mrs Rappo attempted to conceal the payments which she received from Mr Bouvier and what she did with them.

140    Mrs Rappo was transparent with the banks where she maintained the accounts into which Mr Bouvier's remittances were paid. She provided those banks with documentation relating to the payments, including descriptions of the payments as "commission[s]" from Mr Bouvier, the invoices that MEI Invest issued to the respondents, as well as descriptions of the artworks that had been sold. The money which Mrs Rappo received from Mr Bouvier was paid into bank accounts held by companies that she owned, and the visibility

t

of her ownership of these companies was unobscured. Those companies listed either Mrs Rappo, or both her and her husband, Jacques Rappo, as the beneficiaries of the bank accounts concerned. Indeed, our attention was drawn to the fact that HSBC Monaco had erroneously informed the Monaco police that Mrs Rappo and *Mr Bouvier* were listed as joint beneficiaries for the accounts held by Mrs Rappo's companies at that bank. Mrs Rappo's counsel, Mr Kenneth Tan SC, suggested that this was the basis on which she had been detained by the Monaco authorities, and submitted that this was a consequence of the considerable influence which Mr Rybolovlev exercised in Monaco. We do not need to say much on this beyond observing that HSBC Monaco's statement to the above effect was found and later admitted to have been made in error – the other joint beneficiary of the bank accounts concerned was in fact *Mr Rappo* and not Mr Bouvier. Moreover, when Mrs Rappo was questioned by the Monaco authorities, she was candid in admitting that she had received payments from Mr Bouvier. She also gave information as to the bank accounts into which the money had been paid and what the money had been used for.

141    The respondents' assertion that Mrs Rappo is "experienced in intricate, sophisticated, international transactions involving movements of large sums of money" is irrelevant and also unsubstantiated. It is irrelevant because Mrs Rappo's alleged financial experience has nothing whatsoever to do with any *allegedly fraudulent conduct* on her part. And it is *unsubstantiated* because apart from the fact that Mrs Rappo holds her assets through Monaco companies, there is nothing to suggest that she in fact possesses unusual international financial expertise or sophistication. The evidence suggests, rather, that she leaves financial matters to her financial advisors, Monaco Asset Management and Moores & Rowland, who control her companies and

manage her assets. Mrs Rappo's reason for holding her assets through companies instead of directly is, in her words, for the "transmission of wealth". Even if this may seem implausible, it nonetheless does not advance the respondents' case because we do not think that the mere fact that Mrs Rappo holds her assets through companies is sufficient in itself to suggest anything sinister so as to warrant drawing the inference that she is therefore likely to dissipate her assets.

142    The respondents also rely on some inconsistencies in Mrs Rappo's position in the Monaco proceedings as compared to the Singapore proceedings. They further point to the fact that Mrs Rappo did not comply with the asset disclosures ordered by the Judge, even after her application for a stay of the ancillary disclosure orders against her was dismissed. These factors may in exceptional circumstances prove to be relevant, but, in the absence of little else to go on in the present case, they do not suffice to establish a real risk of dissipation where Mrs Rappo is concerned.

**Whether interlocutory proprietary injunctions should be granted to prevent the appellants from dealing with the Excess Payments and their traceable proceeds**

*Overview*

143    We turn to the second species of interlocutory injunctions sought by the respondents, namely, the interlocutory proprietary injunctions (see [34] above). These are different from Mareva injunctions, and the difference between them was elucidated by the English Court of Appeal in *Polly Peck International Plc v Asil Nadir and others* [1992] 2 Lloyd's Rep 238 ("*Polly Peck v Nadir*"). A Mareva injunction is granted in support of a claim for personal relief. It is ambulatory and does not latch on to any specific asset of

the defendant. What it does is to prevent the defendant from dissipating his assets beyond a certain value to defeat a possible judgment that may in due course be rendered against him. The Mareva injunction is a specialised form of injunction to which the principles that generally govern interlocutory injunctions, as laid down in *American Cyanamid Co v Ethicon Ltd* [1975] AC 396 ("*American Cyanamid*"), have *no* application: *Polly Peck v Nadir* at 242.

144    An interlocutory proprietary injunction, on the other hand, is granted in support of a claim for proprietary relief. It is a prohibitory injunction that fastens on the specific asset in which the plaintiff asserts a proprietary interest. It prevents the defendant, pending the resolution of the dispute, from dealing with that asset and its traceable proceeds. An interlocutory proprietary injunction *is* governed by the *American Cyanamid* principles: *Polly Peck v Nadir* at 248 *per* Scott LJ and at 250 *per* Lord Donaldson.

145    The respondents, as an alternative to Mareva injunctions, seek interlocutory proprietary injunctions to protect their alleged equitable proprietary interest in the Excess Payments and their traceable proceeds. This is presumably on the basis that the Excess Payments (which, at present, have yet to be ascertained and quantified) are secret profits that were impressed with a constructive trust upon their receipt by Mr Bouvier in breach of his fiduciary duties (see *Thahir Kartika Ratna v PT Pertambangan Minyak dan Gas Bumi Negara (Pertamina)* [1994] 3 SLR(R) 312 ("*Thahir v Pertamina*") at [57] *per* Thean JA; *FHR European Ventures LLP and others v Cedar Capital Partners LLC* [2015] AC 250 at [46]–[50] *per* Lord Neuberger). The respondents' claims for proprietary relief are *distinct from and made in the alternative* to their claims for personal relief against the appellants for breach of fiduciary duties, knowing assistance and knowing receipt.

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

146    The respondents argue that "the balance of convenience plainly lies in favour of granting" them the interlocutory proprietary injunctions sought. They rely on *Madoff Securities*, where Flaux J granted (among other freezing orders) interlocutory proprietary injunctions in similar circumstances. The respondents contend that if the interlocutory proprietary injunctions which they seek are not granted, the Excess Payments and their traceable proceeds may be disposed of, leaving the respondents with only claims for personal relief against the appellants.

147    Apart from seeking interlocutory proprietary injunctions in respect of the Excess Payments and their traceable proceeds, the respondents also seek an interlocutory proprietary injunction over a distinct and more limited pool of funds. The respondents claim that in December 2014, they instructed Mr Bouvier to sell a Toulouse-Lautrec which they owned. Mr Bouvier did so in February 2015 through his BVI company, Blanca Flor, at a public auction at Sotheby's. Blanca Flor then transferred the sale proceeds ("the Toulouse-Lautrec sale proceeds"), which amounted to £10,789,000, to a bank account held by MEI Invest. The respondents say that Mr Bouvier has refused to hand those sales proceeds over to them, which is in breach of his fiduciary duties. Mr Bouvier's position, on the other hand, is that he had agreed with Mr Rybolovlev that the Toulouse-Lautrec sale proceeds would be applied towards discharging the debt which the respondents owed for the Rothko, *No 6 (Violet, vert et rouge)*.

148    The appellants argue against the grant of interlocutory proprietary injunctions at two levels. First, both Mr Bouvier and Mrs Rappo argue that there is no serious question to be tried. Specifically, Mr Bouvier submits that there is no serious question that the respondents will *not* be able to establish a

78

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                    [2015] SGCA 45

proprietary interest in the Excess Payments and their traceable proceeds. He
says that the respondents' claims in respect of those payments are governed by
Swiss law, which does not recognise proprietary claims. Under Swiss law,
therefore, the respondents will be limited to claims for personal relief against
him. It follows, Mr Bouvier submits, that the respondents' arguments in
support of the interlocutory proprietary injunctions sought do not even get off
the ground. As for Mrs Rappo, her argument is that there is no serious
question to be tried that she is *not* liable for knowing receipt.

149    At the second level, Mr Bouvier argues that the balance of convenience
does not lie in favour of granting the interlocutory proprietary injunctions
which the respondents seek. It would be oppressive to him if interlocutory
proprietary injunctions were imposed on the Excess Payments and their
traceable proceeds. No written submissions were filed on this second point,
but Mr Bouvier's counsel, Mr Tong, made very brief oral arguments touching
on it at the hearing of these appeals.

150    We have considerable reservations over whether Singapore law applies
to the respondents' claims in respect of the Excess Payments, and thus,
whether the respondents have established a serious question to be tried that
they have a proprietary interest in those payments and their traceable proceeds
under the applicable law. Be that as it may, we need not dismiss the
respondents' application for interlocutory proprietary injunctions on this basis.
Rather, we are satisfied that that application should be dismissed because, on
the facts of the present case, the balance of convenience does not lie in favour
of granting the interlocutory proprietary injunctions sought.

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

### A serious question to be tried

151    It is trite that the court does not engage in complex questions of law or fact at the interlocutory stage. In respect of an application for an interlocutory proprietary injunction, the first requirement of showing that there is a serious question to be tried will be satisfied as long as "the plaintiffs have a seriously arguable case that they [have] a proprietary interest": *Derby v Weldon (No 1)* at 64A–64B *per* Nicholls LJ. It is also trite that if any question of foreign law arises in this regard, the foreign law concerned has to be pleaded and proved. In the absence of such proof, the law of the forum applies by default to the claim in respect of which the interlocutory proprietary injunction is sought.

152    In our judgment, there is some force in Mr Bouvier's argument that the governing law of the respondents' claims against him in respect of the Excess Payments is Swiss law. The first step in the choice of law methodology is the characterisation of the issue before the court. There are two possible characterisations of the respondents' claims in respect of the Excess Payments. The first characterisation is contractual, with the alleged breaches of fiduciary duties by Mr Bouvier arising out of and having their "root source" in the alleged agency contract between the respondents and Mr Bouvier. On this characterisation, the applicable choice of law rule will be the proper law of the contract: *Rickshaw Investments Ltd and another v Nicolai Baron von Uexkull* [2007] 1 SLR(R) 377 at [83]. The second possible characterisation of the respondents' claims in respect of the Excess Payments is restitutionary, with the claims being seen as an attempt to enforce an obligation to restore the benefit of an alleged unjust enrichment. On this characterisation, the applicable law will be: (a) the proper law of the contract (if the obligation to restore the alleged unjust benefit arises in connection with a contract); or

Bouvier, Yves Charles Edgar v                    [2015] SGCA 45
Accent Delight International Ltd

(b) the proper law of the country where the enrichment occurs: *Thahir v
Pertamina* at [37].

153     There are strong arguments that an application of any of these choice
of law rules will lead to Swiss law as the applicable law for the respondents'
claims in respect of the Excess Payments. There are multiple connections
between Mr Bouvier's dealings with the respondents and Switzerland. The
first few transactions between Mr Bouvier and the respondents, which we
described at [60] above, were expressly stipulated to be governed by Swiss
law and subject to the jurisdiction of the Geneva courts. The parties thereafter
dealt on the basis of an alleged oral agency agreement as well as over emails
and invoices, but on very similar terms. Many of the meetings between
Mr Bouvier on the one hand and Mr Rybolovlev or Mr Sazonov on the other
concerning the acquisition of the 38 artworks continued to take place in
Geneva. The payment for these artworks was always made to MEI Invest's
bank accounts in Geneva. We accept that the dealings in question also had
links to other foreign jurisdictions apart from Switzerland. For example, there
were meetings in Monaco between Mr Bouvier and Mr Rybolovlev at the
latter's residence, but these were mostly for leisure; Mr Bouvier only went to
Monaco to talk to Mr Rybolovlev solely about art on one or two occasions
each year. The respondents also made payment for a number of the 38
artworks out of their bank accounts in Monaco. However, notwithstanding
such links between the transactions concerned and foreign jurisdictions other
than Switzerland, the facts before us suggest that Swiss law has the closest and
most real connection to the relationship between Mr Bouvier and the
respondents. It is also the law of the place where the enrichment occurred.

81

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*
                                             [2015] SGCA 45

154    Swiss law does not recognise proprietary claims for breaches of fiduciary duties; nor does it recognise the concept of a constructive trust. Under Swiss law, any relief which the respondents may have for their claims in respect of the Excess Payments will be limited to a claim in damages. In the expert reports that were filed in the pending stay applications in Singapore mentioned at [11] above, both Professor Corinne Widmer Lüchinger (Mr Bouvier's expert) and Mr Marc Abby Joory (the respondents' expert) were in agreement on this point. Both acknowledged the non-availability of claims for proprietary relief and the absence of tracing rules under Swiss law.

155    But, we prefer not to dismiss the respondents' application for interlocutory proprietary injunctions solely on this ground because little, if any, argument was made on the governing law of the respondents' claims in respect of the Excess Payments. Mr Tong raised the applicability of Swiss law as the governing law as a parting shot towards the end of his oral arguments, and his written submissions on this point were very brief, consisting mostly of bare assertions. The respondents have not made any submissions on the law applicable to their claims in respect of the Excess Payments. It suffices for us to say that even if the respondents' arguments in support of the governing law and the merits of their claims for proprietary relief cross the seriously arguable threshold, they do so only barely.

156    We turn to address the second requirement which must be satisfied before the interlocutory proprietary injunctions sought by the respondents can be granted, which is that the balance of convenience must lie in favour of granting them such injunctions, assuming that they have a seriously arguable case as to the existence of a proprietary interest in the Excess Payments and their traceable proceeds.

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*

[2015] SGCA 45

## The balance of convenience

157     The balance of convenience affords a firmer basis for us to rest our decision to dismiss the respondents' application for interlocutory proprietary injunctions. We should emphasise that the respondents are asserting a proprietary interest in a fungible asset – money. They do not assert a proprietary interest in unique property, or property that cannot be readily purchased or substituted on the market.

158     There are benefits to asserting a proprietary interest in a specific ascertained pool of funds, in that the claimant will be able to prove as a secured creditor in the event of the defendant's insolvency, and will be entitled to any accretions traceable to that pool of funds. In the present case, however, there is nothing in the evidence that suggests that either Mr Bouvier or Mrs Rappo or any of their companies face the risk of bankruptcy or insolvency. There is no suggestion that either Mr Bouvier or Mrs Rappo has made a windfall from what they applied the Excess Payments (in Mr Bouvier's case) and the sums received out of the Excess Payments (in Mrs Rappo's case) to. Nor is the respondents' application for interlocutory proprietary injunctions made in respect of a specific ascertained pool of money, except where the Toulouse-Lautrec sale proceeds are concerned (see [159] below). The respondents have provided no justification as to why the balance of convenience lies in favour of granting them the interlocutory proprietary injunctions sought. All that their argument hangs on is an assertion in their submissions that:

> If the injunction[s] were not granted and the Respondents succeed in the Suit, the Excess Payments, the [Toulouse-Lautrec sale proceeds] (and any product in which they can be traced) may very well have been disposed of or are no longer traceable, leaving the Respondents with only a monetary

      claim, when such Payments, proceeds (and/or traceable product) belonged, in equity, to the Respondents.

In other words, according to the respondents, the only prejudice that will be caused by the court's refusal to grant them the interlocutory proprietary injunctions which they seek is the prejudice arising from their being *wrongly* refused the injunctions.

159    Of course, such prejudice can notionally constitute sufficient prejudice; but, stacked against this is the prejudice that would be occasioned to the appellants should the interlocutory proprietary injunctions sought eventually be found to have been wrongly granted. We have just highlighted (at [158] above) that, with the exception of the Toulouse-Lautrec sale proceeds, the interlocutory proprietary injunctions which the respondents seek are not directed at any specific and ascertained fund. Instead, the interlocutory proprietary injunctions sought cover vast and presently unquantified sums of money which were paid over the course of more than a decade. A concomitant to the grant of the interlocutory proprietary injunctions sought would be disclosure orders that would allow the respondents to locate the traceable proceeds of this undefined pool of money down to the last cent. This will place an immensely oppressive burden of disclosure on the appellants. The effort, expense and disruption that would be occasioned to the appellants by the grant of such interlocutory proprietary injunctions and ancillary disclosure orders will be considerable, to say the least. In our judgment, this shifts the balance of convenience decisively against granting the interlocutory proprietary injunctions which the respondents seek.

160    Against such a conclusion stands Flaux J's decision in *Madoff Securities*, which the respondents rely heavily on and which we have

*Bouvier, Yves Charles Edgar v*                    [2015] SGCA 45
*Accent Delight International Ltd*

considered most anxiously because of the eminence and experience of the learned judge. We earlier set out the facts in *Madoff Securities* at [82] above. In that case, Flaux J granted interlocutory proprietary injunctions over millions of dollars that the Kohn defendants were alleged to have received in secret kickbacks over some 30 years. He also granted ancillary disclosure orders in support of the injunctions. At [140], Flaux J rejected the argument that the injunctions would be oppressive to the Kohn defendants:

> In my judgment, once the position has been reached, as it has in the present case, that the claimant shows a sufficiently arguable case for a proprietary remedy, then, as Staughton LJ stated in the Duvalier case [*ie, Republic of Haiti v Duvalier* (cited at [2] above)], the court will more readily afford that claimant with interim remedies by way of injunction and disclosure orders. ...

161     We respectfully part company with Flaux J on this point for three reasons. First, it is unclear whether Flaux J was applying the *American Cyanamid* balance of convenience test at all. His answer to the potentially oppressive ramifications of the interlocutory proprietary injunctions sought by the plaintiffs is set out at [140] of *Madoff Securities* as follows:

> ... As I said during the course of the argument, given a sufficiently arguable case that the Kohn defendants have had [the plaintiffs'] money, arguments by Mrs Kohn along the lines of: 'it would be frightfully inconvenient to tell you what I've done with your money or to be prevented from continuing to use it' when, *on this hypothesis she should not have had the money in the first place, do not cut much ice.* [emphasis added]

With respect, the correct approach to assessing the balance of convenience, in our judgment, is to consider the prejudice to the defendant *in the event that the plaintiff's hypothesis is refuted at the trial*, rather than to analyse the matter primarily on the assumption that the plaintiff's hypothesis will eventually be proved. Perhaps, Flaux J adopted the approach which he took because the

85

*Bouvier, Yves Charles Edgar v*                              [2015] SGCA 45
*Accent Delight International Ltd*

documentary evidence against the Kohn defendants was overwhelming (he said at [12] of *Madoff Securities* that some of the evidence against the Kohn defendants "crie[d] out for a proper explanation"), and he was therefore comfortable to proceed on the assumption that the plaintiffs would succeed at the trial given the exceptional circumstances of that case. In *Madoff Securities*, there was also no dispute that if the plaintiffs' allegations were proved, the plaintiffs would have been entitled to a proprietary interest in the monies concerned. In the present appeals, in contrast, as we pointed out earlier, there remain many unanswered questions and, indeed, it is doubtful whether the respondents are even entitled to a proprietary remedy in respect of the Excess Payments (and their traceable proceeds) and the Toulouse-Lautrec sale proceeds even assuming they make good their factual allegations.

162    Second, Flaux J's reasoning in *Madoff Securities* was based in part on *Republic of Haiti v Duvalier* (cited earlier at [2] above), a decision of the English Court of Appeal. In the passage from *Madoff Securities* which we quoted at [160] above, Flaux J referred to what Staughton LJ "stated in the Duvalier case", *ie*, to Staughton LJ's judgment at 213–214 of *Republic of Haiti v Duvalier*:

> It may be that the powers of the court are wider, and certainly discretion is more readily exercised, if a plaintiff's claim is what is called a tracing claim. For my part, I think that the true distinction lies between a proprietary claim on the one hand, and a claim which seeks only a money judgment on the other. A proprietary claim is one by which the plaintiff seeks the return of chattels or land which are his property, or claims that a specified debt is owed by a third party to him and not to the defendant.
>
> Thus far there is no difficulty. A plaintiff who seeks to enforce a claim of that kind will more readily be afforded interim remedies, in order to preserve the asset which he is seeking to recover, than one who merely seeks a judgment for debt or damages.

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                          [2015] SGCA 45

With respect, this passage must be considered in its proper context. Staughton LJ's remarks were not directed at the balance of convenience test in the context of an application for an interlocutory proprietary injunction. Instead, Staughton LJ was discussing the exercise of the court's *power* to grant interim relief in relation to assets outside the jurisdiction. The point which Staughton LJ was making was that the exercise of extraterritorial power at the interlocutory stage was less objectionable where a proprietary rather than a personal remedy was being asserted. The above *dictum* therefore does not support the view that the balance of convenience will always or even generally lie in favour of granting an interlocutory proprietary injunction whenever a proprietary claim is asserted.

163    Our third and final reason for distinguishing *Madoff Securities* is that we have found no other decision where an interlocutory proprietary injunction has been granted over a diffuse and unascertained pool of funds, although, even in the absence of this point, we would still not have granted the *interlocutory proprietary injunctions sought by the respondents as the balance of convenience does not lie in their favour*. In *Republic of Haiti v Duvalier*, Staughton LJ referred to "chattels or land" or "a specified debt" as being the possible subjects of an interlocutory proprietary injunction. In *A and B v C, D, E, F, G and H* [1980] 2 Lloyd's Rep 200, Goff J granted an interlocutory proprietary injunction over a specified sum of £383,872.44 in the account of the defendant bank or the traceable proceeds of that sum. In *Polly Peck v Nadir*, the interlocutory proprietary injunction sought was over a sum of £8.9m in the account of the defendant bank. In *Cherney v Neuman*, Judge Waksman QC granted an interlocutory proprietary injunction over a sum of £1m, being the amount received by the defendant from specific share purchases, and any value-added tax reclaim monies arising from that.

87

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                              [2015] SGCA 45

Judge Waksman QC was evidently persuaded to grant the interlocutory proprietary injunction because "[it was] much more *specific and limited* than the general freezing relief sought" [emphasis added]: *Cherney v Neuman* at [102].

164     We note that this final objection of the respondents seeking interlocutory proprietary injunctions over a diffuse and unquantified pool of funds does not apply with equal force to the Toulouse-Lautrec sale proceeds, which form a specific and quantified sum of money. But, we reiterate that even in the absence of this factor, we do not think the balance of convenience lies in favour of granting the respondents the interlocutory proprietary injunctions which they seek. The respondents' claims for proprietary relief in respect of the Excess Payments and their traceable proceeds are, as indicated earlier, barely arguable, and no cogent reasons have been proffered as to why the balance of convenience lies in favour of granting them the interlocutory proprietary injunctions sought. To the extent that the injunctions are sought in respect of the entirety of the Excess Payments and their traceable proceeds, we have explained our concerns in the context of orders which affect funds that are neither specific nor ascertained. And to the extent that the injunctions are limited to the Toulouse-Lautrec sale proceeds, even assuming there is a serious question to be tried as to the respondents' claims for proprietary relief in respect of those sale proceeds, two factors tilt the balance of convenience *against* granting even such limited injunctions, namely: (a) the Toulouse-Lautrec sale proceeds constitute a fungible asset — money — as opposed to unique property or property that cannot be readily purchased or substituted on the market (see [157] above); and (b) on the evidence before us, there is simply *nothing* to suggest that it would be beyond Mr Bouvier's means to meet a monetary judgment for the amount of the Toulouse-Lautrec sale

88

*Bouvier, Yves Charles Edgar v*
*Accent Delight International Ltd*                    [2015] SGCA 45

proceeds, and in the final analysis, that is all that the respondents seek where those sale proceeds are concerned. We therefore refuse to grant the respondents the interlocutory proprietary injunctions which they seek.

**Conclusion**

165    In the circumstances, and for the reasons elaborated above, we allow the present appeals and discharge the Mareva injunctions and ancillary disclosure orders made by the Judge. We will hear the parties on costs and on whether an inquiry as to damages should be ordered.

Sundaresh Menon            Chao Hick Tin            Andrew Phang Boon Leong
Chief Justice              Judge of Appeal          Judge of Appeal

Edwin Tong SC, Kristy Tan, Peh Aik Hin and Leong Yi-Ming (Allen
& Gledhill LLP) for the appellants in Civil Appeal No 80 of 2015;
Tan Wee Kheng Kenneth Michael SC (Kenneth Tan Partnership),
Seah Zhen Wei Paul, Liang Hanwen Calvin, Ho Xin Ling and Lau
Qiuyu (Tan Kok Quan Partnership) for the appellant in Civil Appeal
No 81 of 2015;
Alvin Yeo SC, Monica Chong, Wendy Lin, Chan Xiao Wei, Jill Ann
Koh and Reka Mohan (WongPartnership LLP) for the respondents in
Civil Appeals Nos 80 and 81 of 2015.