UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of ACCENT DELIGHT INTERNATIONAL LTD. and XITRANS FINANCE LTD. for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings. | Civil Action No. 16 Misc. 125 (JMF) |

**MEMORANDUM OF LAW IN OPPOSITION TO
PETITIONERS' MOTION TO AMEND THE PROTECTIVE ORDER
TO ALLOW USE OF DOCUMENTS IN UNITED KINGDOM**

Oral Argument Requested

McKool Smith, P.C.
Daniel W. Levy
One Bryant Park
47th Floor
New York, New York  10036
Telephone: (212) 402-9400
Telecopier: (212) 402-9444

Rebecca T. Matsumura, *pro hac vice*
300 West 6th Street
17th Floor
Austin, Texas  78701
Telephone: (512) 692-8740
Telecopier: (512) 692-8744

Attorneys for Intervenors
Yves Bouvier and MEI Invest Ltd.

1342305

# TABLE OF CONTENTS

I.  Preliminary Statement ........................................................................................1

II.  Factual Background .........................................................................................5

    A.  The Court of Appeal Stays Use of the Discovery, But
Not Before Petitioners Use the Documents in Monaco ..........................5

    B.  The Singapore Court of Appeal's Decision
on *Forum Non Conveniens* and Choice of Law ....................................6

    C.  Petitioners Bring a Criminal Complaint in Switzerland .........................8

    D.  Problematic Conduct Taints Petitioners' Case in Monaco .....................9

    E.  The Recently Filed Conciliation Action in Geneva ..............................10

III.  Argument .......................................................................................................11

    A.  This Court Has Discretion to Deny Petitioners' Application ...............11

    B.  Petitioners' Attempt to Initiate Yet Another Frivolous
and Vexatious Proceeding is an Abuse of Section 1782........................13

    C.  Petitioners' Proposed Use of the Discovery is
Inconsistent With the Intention and Letter of Section 1782 .................17

        1.  Section 1782 Does Not Permit Fishing Expeditions.................................17

        2.  Petitioners Cannot Use the Discovery in the Proposed U.K.
Proceedings Because Those Proceedings Will Never Go
Forward ....................................................................................18

        3.  Section 1782 Does Not Allow Discovery
From Parties to the Foreign Proceedings ...................................19

    D.  In the Alternative, The Court Should Defer Ruling on This Motion
Until Jurisdiction is Established in Either Switzerland or the
United Kingdom....................................................................20

    E.  Paragraphs 13 through 18 of the Edwards Declaration
and Exhibits E through Q to It Should Remain Sealed........................20

        1.  The Materials Intervenors Seek to
Keep Sealed Are Not Judicial Documents.................................21

        2.  Unsealing the Exhibits Would Eliminate Any
Limit on Use that Is in the Protective Order .............................23

i

4.    The Interests of Foreign Courts Should Be Considered ............................24

5.    In the Alternative, the Court Should Redact Confidential
and Proprietary Business Information From the Exhibits.........................24

IV.    Conclusion ...........................................................................................................................25

1342305

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Dandong v. Pinnacle Performance Ltd.*,
No. 10 Civ. 8086 (LBS), 2011 WL 6156743 (S.D.N.Y. Dec. 12, 2011), *aff'd in part*, 474 F. App'x 810 (2d Cir. 2012)..................................................................15

*E.E.O.C. v. Kelley Drye & Warren LLP*,
No. 10 Civ. 655(LTS) (MHD), 2012 WL 691545 (S.D.N.Y. Mar. 2, 2012).........................21

*Eastman Kodak Co. v. Asia Optical Co.*,
118 F. Supp. 3d 581, 589-90 (S.D.N.Y. 2015) ........................................................15

*Heraeus Kulzer, GmbH v. Biomet, Inc.*,
633 F.3d 591 (7th Cir. 2011) ................................................................13

*In re Accent Delight Int'l Ltd.*,
869 F.3d 121 (2d Cir. 2017).......................................................6, 9, 12, 13

*In re Appl. of OOO Promnefstroy*,
No. M 19-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) ........................................20

*In re Appl. of Accent Delight Int'l Ltd.*,
16-MC-125 (JMF), 2016 WL 5818597 (S.D.N.Y. Oct. 5, 2016) ........................................5, 12

*In re Appl.of Grabski Inwestycje Finansowe Sp. z.o.o.*,
No. M19-117, 2004 WL 1234046 (S.D.N.Y. June 2, 2004)..............................................13, 17

*In re Appl. of XPO Logistics, Inc.*
No. 15 Misc. 205, 2016 WL 3528195, at *3 (S.D.N.Y. June 22, 2016) ................................20

*In re Cathode Ray Tube Antitrust Litig.*,
2013 WL 183944 (N.D. Cal. Jan. 17, 2013) ........................................................14

*In re Ex Parte Gov't of the Lao People's Democratic Republic*,
15-mc-08232-EJL-REB, 2017 WL 2838951 (D. Idaho June 30, 2017) ................................16

*In re Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions*,
No. 15-MC-127, 2015 WL 4040420 (S.D.N.Y. June 29, 2015)..............................................17

*In re Kegel*,
67 F.Supp.3d 1054, 1055 (D.N.D. 2014)..............................................................13

*In re Kreke Immobilien KG*,
No. 13 Misc. 110 (NRB), 2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013) ................................19

*In re Microsoft Corp.*,
    428 F. Supp. 2d 188 (S.D.N.Y. 2006) .................................................................20

*In re Posco*,
    794 F.3d 1372 (Fed. Cir. 2015) ..........................................................................12

*In re Sargeant*,
    No. 17-MC-374, 2017 WL 4512366 (S.D.N.Y. Oct. 10, 2017) .............................17

*In re WinNet R CJSC*,
    No. 16-MC-484 (DLC), 2017 WL 1373918 (S.D.N.Y. Apr. 13, 2017),
    *reconsideration denied*, 2017 WL 2728436 (S.D.N.Y. June 23, 2017) .................16

*INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*,
    No. 11-1007-SLR-CJB, 2013 WL 1867345 (D. Del. Mar. 28, 2013) ....................13

*Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*,
    No. 10 Civ. 1611 (PKC), 2012 WL 1022258 (S.D.N.Y. Mar. 22, 2012) ...............23

*Louis Vuitton Malletier SA v. Sunny Merch. Corp.*,
    97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015) ...........................................................25

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006) ................................................................................21

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015) ................................................................................13

*Nikon Corp. v. ASML US Inc.*,
    No. MC-17-00035-PHX-JJT, 2017 WL 4024645 (D. Ariz. Sept. 12, 2017) .........19

*S.E.C. v. TheStreet.Com*,
    273 F.3d 222 (2d Cir. 2001) ................................................................................21

*Saleem v. Corporate Transp. Grp., Ltd.*,
    No. 12 Civ. 8450 (JMF). 2013 WL 6061340 ......................................................23

*Seguros Del Estado, S.A. v. Scientific Games, Inc.*,
    262 F.3d 1164 (11th Cir. 2001) ............................................................................7

*Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.*,
    No. 07 Cv. 2014 (SWK), 2008 WL 199537 (S.D.N.Y. Jan. 22, 2008) ............24, 25

*Strauss v. Credit Lyonnais, S.A.*,
    No. 06-CV-702 (DLI) (MDG), 2011 WL 4736359 (E.D.N.Y. Oct. 6, 2011) .........24

*T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*,
    No. 13-CV-5356 (JMF), 2015 WL 394075 (S.D.N.Y. Jan. 29, 2015) ...................24

iv

*United Kingdom v. United States*,
    238 F.3d 1312 (11th Cir. 2001) ..........................................................................................14

*United States v. Amodeo*,
    71 F.3d 1044 (2d Cir. 1995)..............................................................................................23

*United States v. Smith*,
    985 F. Supp. 2d 506 (S.D.N.Y. 2013)................................................................................22

*Winfield v. City of New York*,
    No. 15-cv-05236 (LTS) (KHP), 2017 WL 2880556 (S.D.N.Y. July 5, 2017) .......................21

v

## I.       **Preliminary Statement**

This dispute has been ongoing for nearly three years.  Despite that lengthy period, the

merits of Petitioners' claims against Intervenors have still not been resolved.  This is largely

because Petitioners instituted multiple proceedings in multiple jurisdictions, including Singapore,

which had only threadbare connections to the dispute.  The delay in an adjudication on the merits

is also the result of their studiously avoiding the one jurisdiction -- Switzerland -- where the

alleged "oral agreement" that underlies Petitioners' claims was supposedly formed.  After two

trips to the highest court of Singapore, the Singapore Court of Appeal gave Petitioners in April

2017 clear direction as to how to proceed to having their claims finally adjudicated on the merits.

First, the Singapore Court of Appeal determined without hesitation that the relationship

between the parties -- including on the fundamental question of whether Bouvier was an agent --

is governed by Swiss law and that Switzerland is clearly or distinctly a more appropriate forum

for the resolution of the parties' dispute.  With that ruling, the Court of Appeal pointed

Petitioners to the only appropriate forum in which to continue their civil litigation, Switzerland,

which is where Intervenors have contended from the beginning this dispute should be resolved.

Petitioners did not quite follow the directive of the Singapore Court of Appeal.  They did

elect Switzerland as a forum, but did not initiate civil litigation there.  Rather, in around May

2017, they instituted criminal proceedings against Bouvier and MEI in Switzerland, alleging

violations of Swiss law, and appended their civil claims to that criminal case.  Bouvier and MEI

have no access to these proceedings and, as such, cannot expedite a resolution through the

adversarial process in the same way that they could if Petitioners had instituted civil litigation.

Beyond that, the manner in which Petitioners filed their criminal case betrayed a significant lack

of seriousness about their commitment to having the dispute resolved once and for all in

Switzerland.  They brought their complaint in a canton (member state) of Switzerland with

virtually no connection to the parties' dispute.  It was, in effect, a jurisdictional laydown.  Their apparent hope was that the Swiss authorities in that canton would decline jurisdiction, which was the narrow window left open by the Singapore Court of Appeal for Petitioners to return to there.

Beyond bringing an intentionally weak complaint in Switzerland, Petitioners have seemingly abandoned their Monaco case because significant irregularities in the manner in which the Monégasque police conducted the investigation and significant misconduct by the Minister of Justice in connection with this dispute have come to light, according to press reports.  Among other things, the Minister of Justice resigned within hours of publication by the French newspaper *Le Monde* of text messages that demonstrated that he had received gifts from Dmitry Rybolovlev ("Rybolovlev"), the wealthy Russian industrialist in control of Petitioners, in the months leading up to Bouvier's being lured to, and arrested in, Monaco.

With that as background, Petitioners are now before this Court seeking a modification of the Protective Order entered in this case.  Petitioners seek this relief in order to institute yet another case against Bouvier in yet another jurisdiction, the United Kingdom, and apparently to apply the law of the United Kingdom to the new claims against Bouvier.

The anchor for its claims in the United Kingdom is that Accent Delight now wishes to sue Bouvier together with the London subsidiary of Respondent Sotheby's Inc. and a person alleged to be an employee of Sotheby's London subsidiary (the "Employee").  And in an apparent effort to avoid the preclusive effect of the Singapore Court of Appeal decision, Rybolovlev -- never himself a party to the Singapore proceeding -- seeks to participate in this new U.K. lawsuit as a claimant.

The Court should see all of this -- (1) the introduction of Rybolovlev as a plaintiff in the putative U.K. action; (2) the identification of Sotheby's U.K. subsidiary as a defendant; and (3) the attempt to apply English law to Accent Delight's worldwide litigation campaign -- for

what it is: a tactical ploy aimed at frustrating the Singapore Court of Appeal's decision that Switzerland is the appropriate forum for this dispute and that Swiss law applies to the dispute.

In order to ensure that Petitioners' claims are resolved conclusively and not in piecemeal fashion, to avoid inconsistent judgments, and to protect the integrity of the directive of the Singapore Court of Appeal that this dispute be resolved under Swiss law and in competent forum, Intervenors were forced to institute litigation in Switzerland. They did so on Friday, November 17, 2017, in the Court of First Instance of the Canton of Geneva, Switzerland. Specifically, Intervenors and related parties brought a *requête de conciliation*, a request for conciliation seeking the Swiss equivalent of a declaration that they have no liability to Rybolovlev, various related entities, and others.

Sotheby's, its subsidiaries, and the Employee targeted by Accent Delight for litigation in the U.K. also appear to want to resolve this dispute in one case and have it occur in a competent jurisdiction the law of which provides the rule of decision, *i.e.*, Switzerland. They have joined as co-claimants in the conciliation action instituted by Bouvier, MEI, and others.

With this background, the Court should deny Petitioners' application.

First, the litigation that Accent Delight threatens to bring in the United Kingdom is abusive and vexatious and, as such, Section 1782 relief should be denied. Accent Delight blithely suggests that there is no evidence of bad faith. But evidence of exactly that abounds. Under the unique circumstances of this case, Accent Delight should not be permitted to avail itself of the discovery obtained in the U.S. in order to perverse and otherwise frustrate the orderly resolution of this dispute. Petitioners simply refuse to accept the judgment of the highest court of Singapore -- a jurisdiction in which they initiated litigation -- that they sue Bouvier in a convenient forum and that Swiss law determine this dispute. When one jurisdiction ceases to appeal to them or unpleasant facts about Petitioners' case come to light (Monaco) or a court rules

3

against them (Singapore), Petitioners simply move on to the next jurisdiction (the United Kingdom), all while avoiding the forum whose law applies (Switzerland).

Second, much like when the Court first considered Petitioners' Section 1782 Application in May 2016, there is real doubt that litigation in the United Kingdom will proceed, if indeed it is ever filed.  If Accent Delight and Rybolovlev do institute future litigation in the United Kingdom, as they have threatened, their claims will be dismissed because the newly instituted conciliation action in Switzerland will be deemed *lis alibi pendens* by the U.K. court, and the U.K. action will be subject to mandatory dismissal.  Accordingly, if the Court is not inclined to immediately deny the requested relief, it should defer resolution of Accent Delight's application until it is conclusively determined that the putative U.K. litigation will (or will not) go forward.

Third, use of the documents obtained by Accent Delight is inconsistent with Section 1782.  Section 1782 is typically not a mechanism to obtain discovery from a participant in the foreign proceeding and, therefore, subject to discovery in the foreign tribunal.  Here, Accent Delight seeks to use the discovery it obtained from Sotheby's to sue, among other parties, a Sotheby's subsidiary and the Employee.  Accent Delight should resort to traditional means -- discovery in the foreign proceeding -- to get discovery for any new U.K. case.

Finally, the Court should maintain various paragraphs of the declaration of Accent Delight's English counsel and the exhibits attached to it under seal because they are not judicial documents.  Beyond that, if they are unsealed, then they may become freely usable by persons not party to the Protective Order.  In effect, unsealing these documents allows anyone who is a stranger to the Protective Order to use these documents without restriction.  At a minimum, the Court should permit Intervenors to propose limited redactions to the documents to keep under seal important and confidential business information.

4

II.     **Factual Background**

The contours of the worldwide dispute between, on the one hand, Intervenors Yves Bouvier ("Bouvier") and a MEI Invest Ltd. ("MEI"), and Petitioners Accent Delight International Ltd ("Accent Delight") and Xitrans Finance Ltd. ("Xitrans"), and the proceedings in Monaco, Singapore, Paris, and Hong Kong arising out of that dispute are described in various documents previously filed with the Court.  *See especially* Docket Entry No. 16 at 2-12; Docket Entry No. 35 at 2; and Docket Entry No. 47 at 1-2 (attached as Exh. A-C to the accompanying Declaration of Daniel W. Levy, dated November 20, 2017 ("Levy Decl.")).

The remainder of this section sets out pertinent developments since the Court's October 5, 2016, Order granting Petitioners Section 1782 Application.  *See In re Appl. of Accent Delight Int'l Ltd.*, 16-MC-125 (JMF), 2016 WL 5818597 (S.D.N.Y. Oct. 5, 2016).  Notably, Petitioners mention virtually none of the overseas events in their application.

A.     **The Court of Appeal Stays Use of the Discovery, But Not Before Petitioners Use the Documents in Monaco**

On November 1, 2016, this Court entered the Protective Order limiting use of any discovery obtained by Petitioners to the specifically identified proceedings in Singapore, Monaco, and Paris.  *See* Protective Order, dated Nov. 1, 2016, at §§ 2.1, 5.1 (attached as Exh. A to the Declaration of Daniel J. Kornstein, dated Nov. 6, 2017) (Docket Entry No. 84).

Of particular relevance to the present application, the Protective Order provided that "[t]he limitations on the use of Discovery Material in this Protective Order are without prejudice to an application by Petitioners to this Court, on notice to Respondents and Intervenors, to use Discovery Material in other legal proceedings."  *Id.*, § 5.2.

In this regard, the Court had previously indicated how, in general, it was inclined to consider an application to use the discovery in proceedings other than those initially permitted. During oral argument over use of the discovery in other proceedings, the Court indicated:

5

> Given the procedural and factual complexities here, I'm inclined to think that perhaps the intervenors' alternative proposal makes sense.  That is to say that the use of the materials should be limited at least in the first instance to the foreign proceedings referenced in the petition -- namely, Monaco, France, and Singapore -- but without prejudice to an application for leave to use them in other proceedings when that becomes relevant, the theory being at that point (a) the law may well be further developed, but (b) regardless, the factual record will be more fully developed for me to evaluate whether the use is appropriate and consistent with the intention and letter of section 1782.

*See* Transcript of Proceedings, dated Oct. 19, 2016, at 4 (attached as Exh. D to Levy Decl.).

The next day, the Court denied Intervenors' request to stay the production of any discovery pending an appeal.  *See* Order, dated Nov. 2, 2016 (Docket Entry No. 87).  Thereafter, the Court of Appeals, upon an emergency application of Intervenors, "granted a temporary stay of the [Court's] order to the extent that it allowed use of the discovery in the Singaporean and French proceedings.  A three-judge motions panel later granted Bouvier's motion for a stay in its entirety and thus prohibited also the use of the documents in Monaco, *but not before* Petitioners had submitted the documents produced pursuant to the [Court's] order in the Monégasque proceeding."  *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017) (emphasis added).

Since Petitioners submitted all of the discovery to the Monaco investigating magistrate, Intervenors are unaware that Petitioners have taken any steps to make further use of these documents in Monaco, *e.g.*, to provide translations of them, draw any particular documents to the attention of the investigating magistrate, or engage in any advocacy about what the documents might mean and what inferences the investigating magistrate might draw from them.  As set forth below, there is a reason why Petitioners have lost interest in the Monaco proceedings.

### B.   The Singapore Court of Appeal's Decision on *Forum Non Conveniens* and Choice of Law

On April 18, 2017, the Singapore Court of Appeal reversed the lower court's denial of Bouvier and MEI's *forum non conveniens* motion.  Among other things, the Court of Appeal held that Swiss law applies to the relationship between Petitioners and Intervenors.  In particular,

Swiss law applies to the crucial question of whether Bouvier was the agent of Accent Delight, Xitrans, and Rybolovlev, or whether Bouvier was an independent seller transacting at arm's length with Rybolovlev and his entities.  *See Rappo v. Accent Delight Int'l Ltd.*, [2017] SGCA 27 ¶¶ 75, 79, 81, 82, 108 (Apr. 18, 2017) (attached as Exh. E to Levy Decl.).

The Singapore Court of Appeal also held that Singapore is an inconvenient forum and stayed the litigation there.  It so held principally because "Switzerland is clearly or distinctly a more appropriate forum than Singapore for the determination of the parties' dispute."  *Id.* ¶¶ 104, 125; *see also id.* ¶ 65 (noting goals of doctrines of forum election and *forum non conveniens* and indicating that "[j]ust as a plaintiff is not entitled to try its luck in two different fora, so it is not entitled to proceed in a forum that is less well-suited for the determination of the dispute.").

That left the Singapore Court of Appeal with the question of whether the criminal and civil proceedings already initiated by Petitioners in Monaco would be *lis alibi pendens*, if Petitioners were to commence an action against Intervenors in Switzerland.  *Id.* ¶ 125.[1] Ultimately, the Singapore court did not need to decide how new Swiss proceedings would impact the pending Monaco proceedings, concluding that "[i]n the light of our decision on *forum non conveniens*, it is now for [Accent Delight and Xitrans] to choose their forum."  *Id.* ¶ 126.

Finally, the Singapore Court of Appeal indicated that, if, despite Bouvier and MEI's broad undertakings to submit to the jurisdiction of Switzerland, a Swiss court were to decline to exercise jurisdiction over the parties' dispute, "it will be open to [Accent Delight and Xitrans] to return to the Singapore courts to seek an order lifting the stay so that they might continue to pursue their action here."  *Id.* ¶¶ 97, 101-02.

---

[1] *Lis alibi pendens*, literally "dispute pending elsewhere," is a doctrine rooted in international comity that permits a court to refuse to exercise jurisdiction where parallel litigation is ongoing in another country.  *See Seguros Del Estado, S.A. v. Scientific Games, Inc.*, 262 F.3d 1164, 1169-70 (11th Cir. 2001).

7

C.     **Petitioners Bring a Criminal Complaint in Switzerland**

Thereafter, Petitioners initiated civil and criminal proceedings in Switzerland against
Bouvier and MEI.  Records of those proceedings, including the complaint by which they were
initiated, are not currently accessible to Bouvier and MEI.  Petitioners would not provide a copy
of their Swiss criminal complaint to the Singapore court and Intervenors.  Tellingly, Petitioners
did not say anything about them in their pending application before this Court.

Petitioners have, however, described the action to the Singapore court.  They did so for
the purposes of postponing an inquiry on the damages that they should pay for having
improperly obtained a *Mareva* injunction.  Their argument was that the inquiry on damages
sustained by Bouvier and MEI should be deferred until after resolution of the Swiss criminal and
civil proceedings, which they suggested would be reasonably speedy.

As described by Swiss counsel for Petitioners, the Swiss proceedings "include all claims
made by [Accent Delight and Xitrans] in the [Singapore litigation]."  *See* Letter, dated May 29,
2017, from Tetiana Bersheda and Pierre de Preux (attached as Exh. F to Levy Decl.); *see also*
Letter from Drew & Napier, dated May 29, 2017, ¶¶ 4-5 (attached as Exh. G to Levy Decl.).  As
Petitioners' counsel described the Swiss case, "our clients consider themselves victims of
criminal offences allegedly *committed under Swiss law* by [Bouvier; MEI; and Tania Rappo,
Bouvier and MEI's co-defendant], which offences have caused substantial financial losses to
[Petitioners], giving rise to a civil claim for damages."  Exh. F at 2 (emphasis added).
Petitioners' Swiss and Singapore counsel both went out of their way to note that "[t]here remains
the possibility that the Swiss Courts may decide not to accept jurisdiction of over [sic] our
clients' criminal and civil claims."  *Id.* at 3; *see also* Exh. G at ¶¶ 4-5.

Indeed, it appears that what Petitioners *wanted* was to have Switzerland decline to
exercise jurisdiction over their newly filed criminal and civil case.  This is apparent from the fact

that they lodged their criminal and civil complaint in the Canton of Bern, where virtually nothing underlying this dispute happened, and *not* the Canton of Geneva, where Rybolovlev was residing during many of the events underlying this case and where the principal Rybolovlev representative with whom Bouvier interacted resided and worked.

Petitioners' gambit failed. The complaint was, to the best of the knowledge of Intervenors, effectively transferred to the Canton of Geneva, where it apparently remains pending as of the date of this Memorandum. *See generally* Letter from Deputy Attorney General of Switzerland Ruedi Montanari, dated July 17, 2017, at 2 (noting that the Geneva prosecutor would have jurisdiction over the case) (attached as Exh. H to Levy Decl.).

**D.**     **Problematic Conduct Taints Petitioners' Case in Monaco**

Other than rushing to submit the documents obtained in discovery before the full motions panel ruled on Bouvier's emergency motion for a stay, Accent Delight has not sought to make any use of the documents in Monaco since the Court of Appeals' decision in August 2017. *See Accent Delight*, 869 F.3d at 127. This is directly contrary to their breathless claims of an urgent need for the discovery when they initially pressed their Section 1782 application before this Court. *See, e.g.,* Docket Entry No. 49 at 3 (claiming that investigating magistrate intended to conclude his investigation by the end of 2016).

There is a very clear reason why Petitioners have lost their appetite for pressing their criminal complaint in Monaco and have had to identify yet another jurisdiction in which to litigate. In the Summer of 2017, what appears, based on public reporting, to be significant misconduct by Monégasque government officials in connection with this case came to light.

These revelations arose out of a criminal complaint initiated by Tania Rappo, Bouvier and MEI's co-defendant in the Singapore and a subject of Petitioners' complaints in the Monaco and Swiss criminal proceedings. Rappo's criminal complaint, in sum, concerned the allegation

9

that a lawyer who works for Rybolovlev and who represents Petitioners in the Swiss criminal and civil proceedings, Tetiana Bersheda ("Bersheda"), had illegally recorded Rappo on Bersheda's mobile phone and invaded her privacy, a crime under the law of Monaco.

As part of the investigation of that allegation, the investigating magistrate obtained access to Bersheda's mobile phone and recovered a large volume of deleted text messages.  Among other things and as extensively reported by the press, the deleted text messages revealed that:

(1)     Philippe Narmino, the Monégasque Minister of Justice, had accepted various benefits and gifts from Rybolovlev in advance of the arrest of Bouvier.  Within hours of the publication of the text messages by French newspaper *Le Monde*, Narmino resigned and, upon doing so, announced that he had decided to take "early retirement."

(2)     Bersheda was deeply involved in luring Bouvier to be arrested in Monaco.  In this regard, Section 271 of the Swiss Penal Code, in general, makes it a crime to lure a person from Switzerland to be arrested outside of Switzerland.

(3)     Bersheda was also extensively involved in strategizing with the Monégasque police regarding their investigation of Bouvier in a manner implicating questions of Monégasque criminal law prohibiting influence trafficking.

Eventually, Rybolovlev himself was placed under investigation as part of the invasion of privacy investigation initiated by Rappo's criminal complaint against Bersheda.[2]

**E.     The Recently Filed Conciliation Action in Geneva**

Because of the threat of new litigation in the U.K., on November 17, 2017, Bouvier and various entities associated with him brought a *requête de conciliation*, an application for conciliation, seeking the Swiss equivalent of a declaratory judgment action, against Rybolovlev and various persons and entities associated with him.  Sotheby's, various entities associated with Sotheby's, including its U.K. subsidiary, and the Employee have joined the action as co-claimants.  The action was filed in the Court of First Instance of the Canton of Geneva,

---

[2] Except where otherwise noted, the facts in this section II.D are derived from publicly available reporting by *Bloomberg*, *The Daily Mail*, *The Times*, *Le Monde*, *Artnet News*, and *Bilan*.  The articles from which the facts in this section are derived, together with translations of original French language material, are contained in Exhibit I to the Levy Declaration.

Switzerland.  A copy and an informal English translation (both redacted to eliminate any home addresses) are attached as Exhibit J to the Levy Declaration.

In general, the relief sought by all of the claimants is a declaration that they have no liability or debt of any sort to a host of defendants associated with Rybolovlev, including Petitioners.  The Swiss conciliation action is drafted broadly to encompass any claims arising out of this dispute that might be brought by any potential claimant associated with Rybolovlev.

Bouvier and MEI's purpose in initiating this litigation is several-fold, including: (1) to protect the integrity of the directive of the Singapore Court of Appeal that this dispute be resolved under Swiss law; and (2) to ensure that this litigation be resolved finally, conclusively, in one forum whose law provides the rule of decision, and not in piecemeal fashion, with the concomitant risk of inconsistent judgments.

## III.   Argument

### A.   This Court Has Discretion to Deny Petitioners' Application

Contrary to Petitioners' suggestion, the Second Circuit's decision does not entitle them to the relief they seek.  Petitioners assert that "[t]he Protective Order anticipated that Petitioners might seek to use the Discovery Material in other legal proceedings and the Second Circuit held that they could do so."  Petitioners' Memorandum of Law, dated Nov. 6, 2017, at 3 ("Pet. Brief").  They then suggest that only evidence of bad faith can result in a denial of their application.  *Id.* at 4 ("The Second Circuit held that the Petitioners' ability to use the documents in later proceedings should be limited *only* if Bouvier presented evidence that 'Petitioners initiated or sought discovery for use in the Monégasque, Singaporean, or French proceedings in bad faith.'") (emphasis added).  These are misstatements of the Second Circuit's holding.

For sure, the Second Circuit did decide "what, if any, limits Section 1782 places on an applicant's ability to use the discovery obtained under the statute *after* it lawfully has been

obtained for use in a particular forum." *Accent Delight*, 869 F.3d at 133 (emphasis in original).

The Court of Appeals also held that "Section 1782 does not prevent an applicant who lawfully

has obtained discovery under the statute with respect to one foreign proceeding from using the

discovery elsewhere *unless the district court orders otherwise.*" *Id.* at 135 (emphasis added).

But the Second Circuit did *not* address how the Court should exercise its discretion in this

case and certainly did not hold that re-use of discovery obtained under Section 1782 is subject to

a "bad faith" test.  On the contrary, the Second Circuit repeatedly confirmed that district courts

retain substantial discretion over whether materials obtained under Section 1782 may be used in

proceedings for which they were not originally obtained and did not limit the reasons which a

district court might exercise that discretion.  For example, the Second Circuit explained:

> Of course, in domestic civil litigation, courts may issue protective orders that
> restrain parties from using the discovery from other purposes, including as
> evidence in other litigations.  So too may district courts in Section 1782 cases, as
> indeed they often do and as the district court did in this case.

*Accent Delight*, 869 F.3d at 135; *see also id.* (noting that "chicanery" in connection with Section

1782 applications may result in prohibition on re-use of discovery).

Nor was the Court of Appeals writing on a blank slate in considering how re-use of

documents obtained under Section 1782 should be regulated.  In exercising their discretion about

subsequent use of discovery in foreign proceedings, district courts typically reapply the statutory

and *Intel* factors with respect to the new proceedings.  *See In re Appl. of Accent Delight Int'l*,

2016 WL 5818597, at * 1 (summarizing statutory and discretionary factors to be considered

under Section 1782).

Indeed, this is much like the approach that the Court already indicated it was inclined to

adopt.  *See* Levy Decl., Exh. D at 4:6-17; *see, e.g.*, *In re Posco*, 794 F.3d 1372, 1377 (Fed. Cir.

2015) (requiring district court to apply the *Intel* factors before modifying a protective order to

allow protected information to be used in foreign litigation); *In re Kegel*, 67 F.Supp. 3d 1054,

1059-61 (D.N.D. 2014) (exercising discretion to deny request to use documents obtained pursuant to Section 1782 for use in one Canadian proceeding in a different Canadian proceeding); *INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*, No. 11-1007-SLR-CJB, 2013 WL 1867345, at *3-5 (D. Del. Mar. 28, 2013) (applying *Intel* factors to modification of protective order to allow foreign use); *In re Appl.of Grabski Inwestycje Finansowe Sp. z.o.o.*, No. M19-117, 2004 WL 1234046, at *2 (S.D.N.Y. June 2, 2004) (quashing Section 1782 subpoenas because identified proceeding was "not the proceeding the imminent filing of which was the basis for the issuance of the orders allowing service of the subpoenas.").

Petitioners have not even attempted to show that use of the documents in the threatened U.K. proceedings satisfies the requirements of Section 1782 and *Intel* and, instead, rely entirely on their misreading of the Court of Appeals decision that they are already permitted to do so, absent evidence of bad faith. As explained below, there is evidence of bad faith in Petitioners' effort to bring yet another litigation against Bouvier in yet another jurisdiction. And, beyond that, Petitioners could not satisfy the Section 1782 factors.

> ### B. Petitioners' Attempt to Initiate Yet Another Frivolous and Vexatious Proceeding is an Abuse of Section 1782

In the appeal of the original grant of discovery and of the terms of the Protective Order, the Second Circuit advised district courts to exercise their discretion to "weed out abusive Section 1782 applications" and to act as "gatekeepers." *Accent Delight*, 869 F.3d at 134-35.

Abusive Section 1782 applications include seeking discovery in aid of frivolous, vexatious, or otherwise bad faith litigation abroad and warrant denying discovery. *See Mees v. Buiter*, 793 F.3d 291, 302 n.18 (2d Cir. 2015) (court is free to deny § 1782 application made in bad faith); *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 594 (7th Cir. 2011) (discovery should be denied if foreign litigation was frivolous); *United Kingdom v. United States*, 238 F.3d 1312, 1319 (11th Cir. 2001) (court is free to deny §1782 application, if it "determines that a

party's discovery under section 1782 is made in bad faith, for the purpose of harassment, or

unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application in

toto, just as it can if discovery was sought in bad faith in domestic litigation"); *In re Cathode Ray*

*Tube Antitrust Litig.*, 2013 WL 183944, at *4 (N.D. Cal. Jan. 17, 2013) (district court may

consider whether petitioner is forum shopping in ruling on § 1782 petition.).

Despite the bare assertion of a lack of evidence of bad faith, Pet. Brief at 1, 4-5,

significant evidence of exactly that is present.  A review of the chronology of events in this case,

largely ignored by Petitioners, confirms that they propose yet another  litigation against Bouvier

is for no purpose other than harassment:

- In the Singapore case, Petitioners contended strongly that Singapore law should apply to the dispute with Intervenors.  That position was, after extensive litigation, rejected by the Singapore Court of Appeal.  *See* Levy Decl., Exh. E at ¶¶ 75, 79, 81, 82, 108.

  But it must be remembered that Petitioners did not first go to Singapore to seek a remedy to their claimed damages.  Instead, their first action in this case was to lure Bouvier from Switzerland to Monaco and, as facts recently reported in the press strongly suggest, to leverage their relationships with the Monaco authorities to engineer his arrest there.  *See* Levy Decl., Exh. A at 3-7; Exh. I at *passim*.

- Only after Bouvier was released on bail in Monaco did Petitioners then commence proceedings in Singapore.  *See* Levy Decl., Exh. A at 4.  Their first significant action there was to obtain a *Mareva* injunction, a worldwide injunction on Bouvier and MEI's assets.

  The Singapore Court of Appeal ultimately determined that the *Mareva* injunction was improperly obtained, was "an abuse of the court's process" and was "deployed as an instrument of oppression to inflict commercial prejudice on Mr Bouvier."  *See Accent Delight Int'l Ltd. v. Bouvier,* [2015] SGCA 45 (Aug. 21, 2015), at ¶ 108 (Docket Entry No. 3-12).  The Singapore Court of Appeal's description of Petitioners' litigation misconduct there takes up fewer than a dozen pages of its opinion overturning the *Mareva* injunction.  *Id.* at ¶¶ 108-31.

- Shortly after obtaining the Mareva injunction in Singapore, Petitioners commenced proceedings in Hong Kong, obtaining a *Mareva* injunction there. Levy Decl., Exh. A at 6 n.2.

- A few months after that, Petitioners joined the proceedings in Paris, claiming that they were victims.  Their main claim in these proceedings is that Bouvier's entity

sold Rybolovlev's entity two Picasso works that were allegedly stolen from Picasso's step-daughter.  *See id.* at 7-8.

The Paris proceedings are meritless, as Bouvier has demonstrated how Bouvier paid the purchase price to an entity and into a bank account specified by counsel for Picasso's step-daughter and, prior to the sale to Accent Delight, Bouvier verified that the Paris Works were not reported to have been stolen by obtaining a certificate from the Art Loss Register, a database of lost and stolen art.  *Id.*

- When petitioners finally initiated proceedings in Switzerland as directed by the court in Singapore, they filed in a forum with virtually no connection to the dispute *See* Levy Decl., Exhs. F-H.  And they filed a criminal complaint, with civil claims appended to it, to which Bouvier has no access and whose resolution he cannot expedite through the adversarial process, rather than a civil complaint.

- Now that Singapore has ruled against them, Switzerland has effectively transferred their case to the correct prosecutor's office, and their case in Monaco has been tainted, *see* Levy Decl., Exh. I, Petitioners propose new proceedings against Bouvier in yet another jurisdiction, the United Kingdom.

  Petitioners could have decided to sue only Sotheby's U.K. subsidiary and the Employee in the United Kingdom (and not Bouvier).  Instead, they propose to drag Bouvier into yet another set of proceedings and apply yet another country's law to a relationship that has already been determined to be subject to Swiss law.

Petitioners' proposed U.K. action is nothing less than abusive and vexatious as to Bouvier, as the history of Petitioners' conduct demonstrates.  *See, e.g., Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (LBS), 2011 WL 6156743, at *5 (S.D.N.Y. Dec. 12, 2011), *aff'd in part*, 474 F. App'x 810 (2d Cir. 2012) (enjoining vexatious foreign litigation where "[t]his Court, after due consideration, found that the forum selection clauses . . . did not preclude suit in New York; that New York law governs the dispute . . .; that Plaintiffs have adequately pled that most of the fraud occurred in New York; and that there are significant difficulties with the Singapore forum . . . ."); *see also Eastman Kodak  Co. v. Asia Optical Co.*, 118 F. Supp. 3d 581, 589 (S.D.N.Y. 2015) (litigant's attempts "to pursue a lawsuit in a foreign jurisdiction with no connection to the underlying facts" were vexatious).

Importantly, Petitioners disclosed none of these developments in their most recent application.  On this basis alone, their request could, and should, be denied.  *See In re WinNet R*

15

1342305

*CJSC*, No. 16-MC-484 (DLC), 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017),

*reconsideration denied*, 2017 WL 2728436 (S.D.N.Y. June 23, 2017) (finding bad faith and

quashing Section 1782 subpoena where petitioner did not adequately inform court of adverse

rulings that significantly undermined its application"); *In re Ex Parte Gov't of the Lao People's*

*Democratic Republic*, 2017 WL 2838051, at *5 (D. Idaho June 30, 2017) (finding bad faith and

quashing Section 1782 subpoena where petitioner failed to disclose a related proceeding).

Finally, evidence of bad faith is present in Petitioners' weak to the point of frivolous

suggestion that "[a]ny recovery in the UK against Bouvier would not duplicate recovery in any

other jurisdiction," Pet. Brief at 5.  Petitioners admit that the Swiss proceedings "include all

claims made by [Accent Delight and Xitrans] in Suit No. HC/S 236/2015," which is the

Singapore litigation.  *See* Levy Decl., Exh. F at 1; Exh. E at ¶ 34.  Petitioners describe the

proposed English proceedings as including the same allegations of fraudulent overcharging they

have brought in every jurisdiction in which they have attempted to litigate.  And the fundamental

contention in their threatened U.K. action is that Bouvier was an agent of Accent Delight.  *See*

Declaration of David Michael Edwards, dated Nov. 6, 2018, at ¶¶ 7-9 (describing nature of

allegations to be made in terms of agency and fiduciary duty and asserting nature of damages

allegedly flowing therefrom).  The Monaco proceedings are based on the same basic alleged

duties and the same claim of fraudulent overcharging.  *See* Docket Entry No. 3-9 at ¶¶ 1-22.  The

proposed U.K. proceedings against Bouvier and MEI seek to recover for the very same damages

alleged to have been done to Petitioners in the Singapore, Monaco, and the Swiss criminal

proceedings initiated by Petitioners.  Petitioners' bare suggestion to the contrary is false.

C.    **Petitioners' Proposed Use of the Discovery is
      Inconsistent With the Intention and Letter of Section 1782**

Petitioners have made no attempt to show that their proposed use of discovery in the U.K.

comports with Section 1782 statutory or discretionary requirements.  Petitioners cannot satisfy at

least the first and second *Intel* factors, which weigh strongly against their motion.

1.    **Section 1782 Does Not Permit Fishing Expeditions**

Courts in this district have universally held that Section 1782 does not allow petitioners

to engage in "fishing expeditions" to locate claims.  *See, e.g.*, *In re Sargeant*, No. 17MC374,

2017 WL 4512366, at *6 (S.D.N.Y. Oct. 10, 2017) (denying § 1782 discovery where petitioner

sought "to use § 1782 to investigate whether litigation is possible before launching it"); *In re*

*Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions*, 2015 WL 4040420, at *5 (S.D.N.Y.

June 29, 2015) (denying Section 1782 discovery "because it appears to be an attempt . . . to

engage in a fishing expedition to identify other foreign venues in which to bring suit"); *Grabski*

*Inwestycje Finansowe Sp. z.o.o.*, 2004 WL 1234046, at *2  ("The Court is not aware of any

authority for the proposition that 28 U.S.C. § 1782 discovery may be obtained on the basis that,

after the right to serve subpoenas is obtained, the party obtaining the right can then decide what

sort of proceeding to initiate.").  These cases would impose a meaningless requirement if

petitioners could circumvent Section 1782's prohibition on fishing expeditions by filing

additional foreign actions.[3]  Because Petitioners seek now to engage in precisely the behavior

prohibited by the "for use" requirement, their motion should be denied.

---

[3] Nor are these cases inconsistent with *Mees v. Buiter*, in which the Second Circuit held that Section 1782's "for use" requirement is satisfied "by showing that the materials . . . are to be used at some stage of a foreign proceeding that was within reasonable contemplation at the time of the" Section 1782 petition.  783 F.3d at 301.  According to Petitioners, the U.K. proceedings were not "within reasonable contemplation" when they received discovery.  As Petitioners admit, they only contemplated proceedings after mining the discovery they received.  Pet. Brief at 2.  If it is to have any meaning, the prohibition on fishing expeditions must apply to this scenario.

17

> ### 2.   Petitioners Cannot Use the Discovery in the Proposed U.K. Proceedings Because Those Proceedings Will Never Go Forward

In an effort to end Petitioners' efforts to vexatiously multiply these proceedings, Intervenors, Sotheby's, and the Employee have instituted proceedings in the proper forum for this dispute, Geneva, Switzerland.  As a result, Petitioners' proposed proceedings in the United Kingdom will not proceed.

This is so because both the United Kingdom and Switzerland are parties to the Lugano Convention.  That treaty is applicable among various European countries and governs, among other things, the manner in which a court of one country should exercise jurisdiction where there is first-filed litigation involving the same causes of actions and parties pending before another country's court.  *See generally* Convention on jurisdiction and the enforcement of judgments in civil and commercial matters, executed at Lugano on Sept. 16, 1988, and amended in 2007 (attached as Exh. K to the Levy Decl.).

Pertinent to the threatened U.K. case, Article 27 of the Lugano Convention provides:

> Where proceedings involving the same cause of action and between the same parties are brought in the courts of different States bound by this Convention, any court other than the court first seised shall of its own motion stay its proceedings until such time as the jurisdiction of the court first seised is established.  Where the jurisdiction of the court first seised is established, any court other than the court first seised shall decline jurisdiction in favour of that court.

*Id.*, art. 27.  Here, given the Swiss conciliation action filed on November 17, 2017, the Geneva court was "seised" of the proceedings as of then.  Therefore, the United Kingdom court will mandatorily stay its proceedings until jurisdiction of the Geneva court is established.  There can be no discovery in the U.K. while a stay is in place.  Once the Geneva court's jurisdiction is established, the United Kingdom court will dismiss the action, ending any litigation there.[4]

---

[4] And even if the mandatory requirements of Article 27 of the Lugano Convention do not apply, a U.K. court can grant a discretionary stay of litigation and decline jurisdiction under Article 28 of the Lugano Convention.  *See* Levy Decl., Exh. K, art. 28.

### 3.      Section 1782 Does Not Allow Discovery From Parties to the Foreign Proceedings

The first and third *Intel* factors weigh so strongly against Petitioners' application that this Court should exercise its discretion to deny it.  The first *Intel* factor instructs courts to deny applications where the respondent from whom discovery is sought is a "participant in the foreign proceeding" and subject to discovery in the foreign tribunal.  *Intel*, 542 U.S. at 264.  The third *Intel* factor cautions courts not to allow litigants to use Section 1782 to "circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Id.*  Both of these factors militate against allowing Petitioners to use discovery they could obtain from Sotheby's, should any United Kingdom proceeding actually be brought.

Courts routinely deny discovery sought from participants to the foreign proceedings.  *See, e.g.*, *In re Kreke Immobilien KG*, 2013 WL 5966916, at *4-7 (S.D.N.Y. Nov. 8, 2013) (finding that first and third *Intel* factors weighed against allowing discovery against a wholly-owned subsidiary of a party to the foreign proceeding because "the notion that [the parent company] could somehow be a nonparticipant in the foreign action is untenable"); *Nikon Corp. v. ASML US Inc.*, 2017 WL 4024645, at *2 (D. Ariz. Sept. 12, 2017) (denying discovery against party to the foreign proceedings and finding that first *Intel* factor weighs against any discovery where "[Petitioner's] discovery requests also target documents under the control of Respondent's parent, . . . which itself is a party to th[e foreign] proceedings").[5]

---

[5] In fact, courts in this District regularly deny discovery against *nonparties* to the foreign proceedings where the discovery sought is *accessible by* a party to the foreign proceeding.  *See, e.g.*, *In re Appl. of OOO Promnefstroy*, No. M 19-99 (RJS), 2009 WL 3335608, at *6-7 (S.D.N.Y. Oct. 15, 2009) (denying discovery against third party and asking "why . . . parties to the Dutch Proceedings[] are not the appropriate conduits for securing the[ requested] documents"); *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006) (quashing Section 1782 subpoena against nonparty because evidence was available in foreign tribunal).

Here, if there are to be U.K proceedings, Petitioners can seek discovery from Sotheby's subsidiary at the appropriate time.  Thus, modification of the Protective Order to allow use in the U.K. is improper under the first and third *Intel* factors.

### D.    In the Alternative, The Court Should Defer Ruling on This Motion Until Jurisdiction is Established in Either Switzerland or the United Kingdom

In the event that the Court is not inclined to deny Petitioners application to use the discovery in additional foreign proceedings now, such use should be stayed until what is sure to be a jurisdictional dispute is resolved.  At this point in the proceedings, this Court is unable to determine whether U.K. proceedings will now be commenced in view of the new Swiss proceedings, and, even if commenced, which proceedings, if any, will proceed past jurisdictional issues.  The discovery that Petitioners seek to use now is irrelevant to these questions.

The Court took this sensible approach to Petitioners' original request for Section 1782 discovery and should do so again.  *See* Transcript of Proceedings, dated May 31, 2016, at 2-3, 35-36 (attached as Exh. L to Levy Decl.); Order, dated May 31, 2016 (Docket Entry No. 39) (attached as Exh. M to Levy Decl.); *see In re Appl. of XPO Logistics, Inc.*, 2016 WL 3528195, at *3 (S.D.N.Y. June 22, 2016) (staying Section 1782 discovery until foreign proceedings "advance sufficiently to consider foreign discoverability (along with many other factors)") (internal quotations omitted).

### E.    Paragraphs 13 through 18 of the Edwards Declaration and Exhibits E through Q to It Should Remain Sealed

Intervenors do not object to unsealing of paragraphs 1 through 12 and paragraphs 19 and 20 of the Edwards Declaration.  They do object to the unsealing of paragraphs 13 through 18 of the Edwards Declaration (including the headings before and within those paragraphs) and Exhibits E through Q.  But, consistent with *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006), these specific paragraphs and exhibits, which consist of the evidence that

Petitioners claim support their claims in the U.K., should remain under seal.  Indeed, a Section 1782 analysis is typically done before any discovery is obtained.  The Court can, and should, decide Petitioners' application without any consideration of the details contained in these paragraphs of the Edwards Declaration or Exhibits E through Q.

### 1.   The Materials Intervenors Seek to Keep Sealed Are Not Judicial Documents

"Before [the] common law right [of public access to judicial documents] can attach . . . a court must first conclude that the documents at issue are indeed 'judicial documents.' . . . In order to be designated a judicial document, 'the item filed must be relevant to the performance of the judicial function and useful in the judicial process.'"  *Lugosch*, 435 F.3d at 119  (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)); *see, e.g., E.E.O.C. v. Kelley Drye & Warren LLP*, 2012 WL 691545, at *2 (S.D.N.Y. Mar. 2, 2012) ( "judicial documents are only those upon which the Court relied in deciding" motion).

Materials exchanged during discovery are not typically judicial documents.  *See S.E.C. v. TheStreet.Com*, 273 F.3d 222, 233 (2d Cir. 2001) (concluding that deposition discovery material was "[d]ocuments that play no role in the performance of Article III functions" and "did not 'directly affect an adjudication' nor does it significantly 'determin[e] litigants' substantive rights'") (citing *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)).

Even when discovery material is filed as part of a discovery dispute, it does not automatically become a judicial document.  *Lugosch*, 435 F.3d at 119 ("mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject"); *see also Winfield v. City of New York*, 2017 WL 2880556, at *4 (S.D.N.Y. July 5, 2017) ("documents filed with the court in connection with discovery-related disputes are not judicial documents"); *United States v. Smith*, 985 F. Supp. 2d 506, 520 (S.D.N.Y. 2013) (recognizing "the pitfalls in allowing unfettered public access to discovery materials").

1342305

For the purposes of Petitioners' present application, Intervenors understand that Petitioners seek to bring the proceedings and assert the claims described in paragraph 5 through 10 of the Edwards Declaration and do not oppose the unsealing of these paragraphs. And Intervenors understand that Petitioners assert that the discovery obtained contains the evidence summarized in paragraphs 11 and 12 of the Edwards Declaration. Without conceding anything for any purpose about the material in paragraphs 5 through 12 of the Edwards Declaration, Intervenors do not oppose the unsealing of those paragraphs.[6]

However, paragraphs 13 through 18 of the Edwards Declaration (including the headings before and within those paragraphs) and Exhibits E through Q are not judicial documents because they are not relevant to the issues before this Court. In order to rule on Petitioners' application, the Court need not consider the examples of discovery that Petitioners have selected and that they contend support the claims that they propose to bring in the United Kingdom. Nor does the Court need to consider whether the inferences in paragraphs 13 through 18 of the Edwards Declaration and in the headings before and within those paragraphs that Petitioners seek to draw from the Exhibits are accurate or warranted.[7]

Because this material (paragraphs 13 through 18 and Exhibits E through Q) need not be considered by the Court in ruling on Petitioners' application, they are not judicial documents.

---

[6] Paragraphs 1 through 4 and paragraphs 19 and 20 do not contain any factual material that could be deemed objectionable.

[7] If the content of Exhibits H through Q and the portion of the Edwards Declaration about them actually mattered to ruling on Petitioners' application, Petitioners would have included translations of the French language material that comprises the vast majority of those Exhibits.

22

*See Saleem v. Corporate Transp. Grp., Ltd.*, No. 12 Civ. 8450 (JMF). 2013 WL 6061340, at *8 (S.D.N.Y. Nov. 15, 2013 (sealing exhibits that court did not rely on in rendering decision).[8]

### 2.     Unsealing the Exhibits Would Eliminate Any Limit on Use that Is in the Protective Order

If this Court unseals the documents, it will effectively grant Petitioners the relief they seek before the Court has ruled on their application.  Beyond that, it will eliminate any restriction on use by anyone contained in the Protective Order because the documents may become freely usable.  The Edwards Declaration is clear that Rybolovlev will be a claimant in the proposed U.K. proceedings.  Edwards Decl. ¶ 5.  But Rybolovlev is a stranger to the Protective Order and not a party to this action.  If the documents are unsealed and publicly accessible, there may be no limitation on their use that the Court can re-impose.  The same is true for the trusts that own Petitioners and Rybolovlev's daughter, who is a beneficiary of these trusts.  *See* Levy Decl., Exh. E at ¶¶ 9, 31, 32.  Each of these might choose to bring litigation based on the unsealed materials.

### 3.     Interests of Confidentiality and the Rights of Third Parties Must Be Considered

Paragraphs 13 through 18 and Exhibits H through Q of the Edwards Declaration implicate Intervenors' and Sotheby's privacy concerns, as well as the rights of third parties, such as the Employee, that weigh against unsealing them.  The Court should consider these concerns when weighing whether to maintain these documents under seal.  *Amodeo*, 71 F.3d at 1050-51.

Here, the exhibits reveal information about the confidential business practices of Sotheby's overseas subsidiaries and employees -- including "precise terms" of contracts that "have no effect on the adjudication," but that Sotheby's overseas subsidiaries have kept private and confidential.  *See Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*, 2012 WL 1022258, at

---

[8] As Petitioners' Memorandum of Law refers only to material in the Edwards Declaration that Intervenors agree may be unsealed, Intervenors request that the Court direct Petitioners to file their Memorandum in unredacted form.

23

*3 (S.D.N.Y. Mar. 22, 2012) (permitting redaction of contract where existence of contract, but not its terms, was relevant to adjudication); *see also T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*, No. 13-CV-5356 (JMF), 2015 WL 394075, at *6 (S.D.N.Y. Jan. 29, 2015) (permitting a "third-party agreement" and "internal . . . emails" to remain under seal). The Court should be wary of unsealing "records [that] concern financial transactions involving . . . other persons and entities who have not been notified of their right to object." *See Strauss v. Credit Lyonnais, S.A.*, 2011 WL 4736359, at *5 (E.D.N.Y. Oct. 6, 2011).

### 4. The Interests of Foreign Courts Should Be Considered

Significantly, these documents will not likely be public if they are used in foreign proceedings. Each of the many jurisdictions in which the parties are litigating would consider these documents confidential and, even if made a part of a document filed in court, they would not necessarily become public. Thus, "[c]ontinued protection of the [documents] in court filings would also promote interests of international comity." *Id.*, at *5. In this regard, where the Court's role in administering Section 1782 is to assist a foreign court and not to rule on the applicant's claims, the public interest in disclosure is much more limited.

### 5. In the Alternative, the Court Should Redact Confidential and Proprietary Business Information From the Exhibits

If the Court is inclined to unseal paragraphs 13 through 18 of the Edwards Declaration and its Exhibits, Intervenors respectfully request an opportunity to propose more narrowly tailored redactions to protect their confidential and proprietary business information.

"The interest in protecting 'business information that might harm a litigant's competitive standing' has . . . been recognized by the Supreme Court as potentially sufficient to defeat the common law presumption [of access to judicial documents]." *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 2008 WL 199537, at *8 (S.D.N.Y. Jan. 22, 2008). When weighing whether to seal business information, courts consider many factors, including: the

24

extent of the sealing sought; the potential damage from disclosure; the significance of the public interest at stake; the extent to which a litigant seeks to prove its case by relying on documents to be sealed; whether the particular matter is integral or tangential to a court decision.  *Id.*

All of these factors favor giving Intervenors a further opportunity to propose specific document-by-document redactions.  Intervenors would, for example, redact from Exhibits E, F, and G the prices paid for particular works, as well as bank account information.  Disclosure of prices would undermine Intervenors' art dealing business and are not relevant to a significant public interest or to the Court's analysis of the Section 1782 factors.

Beyond that, Intervenors would, as another example, propose redactions to the emails between Bouvier and the Employee, Exhibits H through Q, to protect information regarding the private sales that are the subject of the e-mails.  Private art sales are part of a highly competitive industry in which confidentiality about individual transactions, terms, and negotiations is critical to the business of MEI and Bouvier and Sotheby's.  Once again, the specifics of these e-mail interchanges are not pertinent to the Court's adjudication, but disclosing them could compromise Intervenors and Sotheby's present and future business interests.  *See, e.g., Louis Vuitton Malletier SA v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015) (permitting redactions of "confidential business information," including valuations).

## IV.   <u>Conclusion</u>

For the foregoing reasons, the Court should deny Petitioners' request to amend the protective order to allow use of the documents in proposed U.K. proceedings.  The Court should also: (a) direct Petitioners to file their Memorandum of Law without redactions; (b) direct Petitioners to file the Edwards Declaration with paragraphs 13 through 18 (including the headings before and within those paragraphs) redacted; and (c) maintain Exhibits E through Q under seal.

<div align="center">25</div>

Dated:  New York, New York
        November 20, 2017

<div style="margin-left:40%">

Respectfully submitted,

MCKOOL SMITH, P.C.

/s/

By: _____
    Daniel W. Levy
    dlevy@mckoolsmith.com
    One Bryant Park
    47th Floor
    New York, New York 10036
    Telephone: (212) 402-9400
    Telecopier: (212) 402-9444

    Rebecca T. Matsumura, *pro hac vice*
    300 West 6th Street
    17th Floor
    Austin, Texas 78701
    Telephone: (512) 692-8740
    Telecopier: (512) 692-8744

    Attorneys for Yves Bouvier
    and MEI Invest. Ltd.

</div>

1342305

## CERTIFICATE OF SERVICE

DANIEL W. LEVY, pursuant to Title 28, United States Code, Section 1746, declares under the penalty of perjury:

1.      I am an attorney licensed to practice law in the State of New York and admitted to practice before this Court.  I am principal in the law firm of McKool Smith P.C. and counsel of record for Intervenors Yves Bouvier and MEI Invest Ltd.

2.      On November 20, 2017, I caused a true and correct copy of the foregoing MEMORANDUM OF LAW and the accompanying DECLARATION OF DANIEL W. LEVY, dated November 20, 2017, together with the exhibits thereto, to be served via ECF upon the following attorneys, who are filing users in connection with this case:

> Daniel J. Kornstein, Esq.
> O. Andrew F. Wilson, Esq.
> Douglas E. Lieb, Esq.
> Emery Celli Brinckerhoff & Abady LLP
> 600 Fifth Avenue, 10th Floor
> New York, New York  10020
>
> Attorneys for Petitioners Accent Delight
> International Ltd. and Xitrans Finance Ltd.
>
> Steven J. Comen, Esq.
> Henry C. Dinger, Esq.
> Goodwin Procter LLP
> Exchange Place
> 53 State Street
> Boston, Massachusetts  02109
>
> Attorneys for Respondents Warren Adelson,
> Alexander Parish, and Robert Simon

Marcus A. Asner, Esq.
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York  10019-9710

Attorneys for Respondent Sotheby's

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 20, 2017, at New York, New York.

/s/
_____
Daniel W. Levy

1342305